UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

In re:                                                                                    Case No. 8:22-bk-00103-CED

Senior Care Living VII, LLC,                                              Chapter 11

    Debtor.
_____/

***EXPEDITED* MOTION OF UMB BANK, N.A. FOR ENTRY OF AN ORDER (I) AUTHORIZING RECEIVER TO REMAIN IN POSSESSION OF THE DEBTOR'S ASSETS PURSUANT TO SECTION 543(d) OF THE BANKRUPTCY CODE AND (II) EXCUSING THE RECEIVER FROM COMPLYING WITH SECTIONS 543(a)-(c)**
**(Expedited Hearing Requested Week of January 17, 2022)**

UMB Bank, N.A., in its capacity as successor bond trustee (the "Bond Trustee") and successor master trustee (the "Master Trustee", and together with the Bond Trustee, the "Trustee") for the Bonds (as defined herein), requests, pursuant to section 543(d) of title 11 of the United States Code, 11 U.S.C. §§ 101–1532 (the "Bankruptcy Code"), the entry of an order (i) authorizing J. Robert Medlin, in his capacity as a court appointed receiver of the Debtor's assets (the "Receiver"), to remain in possession, custody, and control of the Debtor's assets, and (ii) excusing the Receiver from compliance with section 543(a)-(c) of the Bankruptcy Code. In support of this Motion, the Trustee relies upon and incorporates by reference the *Affidavit of J. Robert Medlin Solely in his Capacity as Receiver of Senior Care Living VII, LLC* (the "Medlin Affidavit") and the *Affidavit of David Fields of RBC Capital Markets, LLC as Investment Banker and Broker to Senior Care Living VII, LLC* (the "Fields Declaration") filed with this motion. In support of this motion, the Trustee respectfully states as follows:

**PRELIMINARY STATEMENT**

1.    After nearly two years of negotiations with the Debtor regarding multiple defaults under the Bond Documents (as defined herein), the Trustee, on October 11, 2021, without any

1

objection from the Borrower and Mark Bouldin (the Debtor's principal), obtained an order (the "Receivership Order") from the District Court of Denton County, Texas, 431st Judicial District (the "Receivership Court") appointing the Receiver as receiver for all of the Debtor's assets (the "Receivership Action").  A copy of the Receivership Order is attached hereto as **Exhibit A**.  Over the past ninety (90) plus days since his appointment, the Receiver, with the assistance of RBC Capital Markets, LLC ("RBC") and Meridian Capital ("Meridian"), and with the Trustee's support, has implemented and pursued a sale process for the "Facility" and other "Collateral Assets" as expressly contemplated by, and in compliance with, the detailed "Sale Process" set forth in the Receivership Order.  *See Receivership Order*, ¶ 8.[1]

2.     Specifically, immediately upon entry of the Receivership Order, the Receiver and his professionals worked closely with Validus Senior Living ("Validus"), the manager of the Facility, to assemble marketing materials, create a marketing distribution list, populate a virtual dataroom, and prepare a confidential information memorandum ("CIM") to support the sale effort. After putting the marketing materials together, the Receiver commenced the sales efforts on October 29, 2021 with the distribution of an initial marketing email to *over 800 groups*, including owners, operators and investors of communities similar to the Facility.  Of those initial recipients, over 50 groups executed a non-disclosure agreement, which allowed them access to the virtual dataroom and CIM, and 8 submitted initial letters of interest related to the sale.  Given the strong interest in the Facility and the multiple LOIs received, the Receiver, through its investment banker, went out to the 8 parties and requested highest and best final LOIs with the intention of designating one such party to become the Stalking Horse Bidder.  On January 10, 2022, the Receiver received final offers from seven of the eight parties and was on track to select a Stalking Horse Bidder by

---

[1] Unless otherwise defined herein, all capitalized terms have the meaning ascribed to such terms as in the Receivership Order.

January 14, 2022 and schedule a final auction for the Facility and related assets by the end of March.

3. Despite these efforts over the past three months, and the fact that the Receiver is the middle of the Sale Process, which is fully supported by the Trustee, and the fact that neither the Debtor nor Mr. Bouldin objected to the entry of the Receivership Order, which sets forth the Sale Process, the Debtor, with no advanced notice to the Trustee or the Receiver, commenced the above-captioned bankruptcy case (the "Bankruptcy Case") for the express purpose of delaying the sale. Indeed, the Debtor states that it commenced the Bankruptcy Case "to preserve the value of its assets for all creditors, including the [bondholders]" because if the assets are "sold in the current distressed environment, [it] does not believe that the bondholders will be paid in full." *Debtor's Chapter 11 Case Management Summary* (Doc. No. 5) (the "Debtor's Summary"), pp. 2-3. The Debtor's position, however, is belied by the facts, which clearly demonstrate that it is in the best interest of creditors, including the Trustee, that the Receiver be permitted to continue in possession, custody, and control of the Debtor's assets for the purpose of completing the sale.

4. The Debtor estimates that the value of the Facility and the Collateral Assets, "[a]ssuming a non-distressed environment," is "approximately $38 million." *Debtor's Motion for Authority to Use Cash Collateral* (Doc. No. 6) (the "Cash Collateral Motion"), ¶ 8. The Trustee's claim against the Debtor, however, is, as of the Petition Date, $54,060,936.15. The Debtor also owes almost $2 million related to unpaid property taxes, as well as unpaid obligations with respect to a disputed mechanic's lien.[2] Thus, based upon the Debtor's highest estimated value of its own assets, the estate is nevertheless severely "underwater" and the Debtor has no equity in the estate. Any sale of the Debtor's assets, therefore, is primarily for the benefit of the Trustee—and the

---

[2] The Debtor is current on its obligations to trade creditors. Medlin Affidavit, ¶ 19.

3

Trustee has been, and continues to be, fully supportive of the Receiver, the Sale Process, and the oversight of the Receivership Court. Indeed, the Trustee believes that the sale efforts undertaken by the Receiver is the best option for maximizing the value of the assets.

5. Contrary to the Debtor's assertions, the Bankruptcy Case will not create value. Instead, as reported by the Receiver and RBC, the Bankruptcy Case has already had a chilling effect on the Sale Process by creating confusion and misapprehension among the current bidders. Such uncertainty jeopardizes the Receiver's sale efforts and may depress the value of the sale, which, in turn, directly harms the Trustee and other creditors.

6. The Debtor's attempt to justify its actions as being for the benefit of creditors is not supported by the history of, what is essentially, a two-party dispute between the Trustee and the Debtor (and the Debtor's principal's efforts to get out from underneath his guaranty). Additionally, the principal's actions in signing the Bankruptcy Petition is directly in violation of the Receivership Order, which expressly prohibits the Debtor's members and directors (among others) from "commencing, prosecuting, continuing or enforcing any suit or proceeding in law, equity, bankruptcy, or otherwise against or affecting [the Debtor] or any part of the Collateral Assets"—which the Debtor's principal ignored and violated in commencing this Bankruptcy Case.[3]

7. In order to preserve the integrity of the valid state court order, to ensure that the Receiver can continue to carry out his responsibilities under the Receivership Order, and to otherwise preserve the value of the assets and not disrupt the Sale Process that has been pending

---

[3] The Debtor's petition (Doc. No. 1) was signed by Mr. Bouldin, in his capacity as President of the Debtor's sole manager, and thus falls within the scope of actions specifically enjoined by the Receivership Order. As a result of Mr. Bouldin's violation of the Receivership Order, the Trustee filed the *Plaintiff's Motion for Contempt and Sanctions* (the "Sanctions Motion") against Mr. Bouldin in the Receivership Action, a copy of which is attached hereto as **Exhibit B**. As stated therein, and for the avoidance of doubt, the Trustee does not intend the Sanctions Motion to address anything related to the Debtor in violation of the automatic stay.

for over the past 90 days, the Trustee requests that the Court enter an order authorizing the Receiver to retain possession and control of the Debtor's assets under the terms of his appointment.

## JURISDICTION AND VENUE

8.  The Court has jurisdiction over this Motion pursuant to 28 U.S.C. §§ 157 and 1334(b). This is a core proceeding pursuant to 28 U.S.C. § 157(b).

9.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory and legal predicates for the relief requested herein are sections 105(a), 305(a), and 543(d) of the Bankruptcy Code.

## BACKGROUND

**A.  The Bond Obligations**

10. In 2016, the Woodloch Health Facilities Development Corporation (the "Issuer") issued its Senior Housing Revenue Bonds (Inspired Living at Lewisville Project) Series 2016 (the "Bonds") in the aggregate principal amount of $45,385,000 pursuant to that certain Trust Indenture and Security Agreement between the Issuer and Branch Banking and Trust Company ("BB&T"), as predecessor to the Trustee, dated as of November 1, 2016 (the "Bond Indenture"). The proceeds of the Bonds were loaned by the Issuer to the Debtor pursuant to that certain Loan Agreement dated November 1, 2016 (the "Loan Agreement") for the purpose of, among other things, financing the Debtor's acquisition and construction of a senior living facility known as Inspired Living at Lewisville, located in Lewisville, Texas (the "Project" or the "Facility"). Pursuant to that certain Master Trust Indenture, Deed of Trust and Security Agreement between SCL and BB&T, as predecessor to the Trustee, dated as of November 1, 2016 (the "Master Indenture"), SCL executed, and delivered to the Issuer, four promissory notes in the amounts of the Bonds (collectively, the "Obligations").

11. As security for its obligations owing on the Bonds, including with respect to the Obligations, the Master Indenture grants the Trustee a first priority security interest in substantially all of the Debtor's assets. The Bonds are further secured by, *inter alia*, (i) that certain Multiple Indebtedness Deed of Trust, and Assignment of Leases and Rents, Security Agreement and Fixture Filing (the "Deed of Trust"), and (ii) that certain Guaranty Agreement executed by the Debtor's principal, Mark Bouldin, dated as of November 1, 2016 (the "Bouldin Guaranty"). The Bond Indenture, the Loan Agreement, the Master Indenture, the Deed of Trust, the Bouldin Guaranty, and all other documents evidencing and/or securing the Bonds are collectively referred to herein as the "Bond Documents".

12. As of the Petition Date, the total amount outstanding on the Bonds was $54,060,936.15, comprised of $45,385,000 in outstanding principal and $8,675,936.15 in outstanding interest.

**B.      The Debtor's Other Outstanding Debt Obligations**

13. The Debtor is current under its trade obligations, but, as conceded by the Debtor, it has outstanding obligations related to unpaid real estate taxes which currently primes the Trustee's liens against the Project. *See Cash Collateral Motion*, ¶ 6. Such liability relates to property taxes for 2018, 2019, and 2020 which the Debtor failed to pay.[4] Additionally, the Debtor currently owes Denton County not less than $413,528.53 for 2020 taxes, and the penalties and interest on the unpaid taxes will continue to accrue at a rate of 1% per month until such amount is paid. As such,

---

[4] In connection with the tax obligations for 2018 and 2019, however, the Debtor is not directly indebted to the "county tax collector in Texas." *Id.* Rather, under the terms of a Tax Lien Contract executed by the Debtor, such indebtedness, *i.e.* $1,575,793.68, was paid by Tarpon Hunters, LLC ("Tarpon Hunters") on the Debtor's behalf. The Debtor has failed to satisfy its repayment obligations to Tarpon Hunters, which claims that it has the same authority that the taxing authorities have to foreclose upon and sell the Project and the Property, and interest is continuing to accrue at a rate of 6% per annum.

the Debtor has outstanding obligations related to unpaid property taxes in an approximate amount of $1.2 million and which have resulted in liens being asserted on the Property and the Project.

14.  In addition to its unpaid tax obligations, a mechanic's lien has been asserted against the Property by Baxter Construction Company, LLC ("Baxter") relating to unpaid labor and materials.

C.  **The Debtor's Defaults Under the Bond Documents**

15.  On October 4, 2019, the Trustee served a Default and Acceleration Notice (the "Default Notice") on the Debtor stating that an Event of Default had occurred and was continuing under the Bond Documents due to the Debtor's (i) failure to make its payment obligations to the Trustee under the Bond Documents, (ii) failure to pay property taxes when due, and (iii) failure to pay certain other obligations that resulted in the imposition of asserted liens against the Property. The Default Notice further stated that the Trustee was exercising its rights under the Bond Documents to accelerate the Debtor's payment obligations and declared the entire outstanding principal amount due on the Bonds, *i.e.* $45,385,000, to be immediately due and payable, and that "all such Obligations [were] accelerated, effective immediately." Default notices were also served on Bouldin in connection with the Bouldin Guaranty.

16.  Over the following two years, the Trustee engaged in extensive negotiations with the Debtor in an attempt to resolve the defaults described in the Default Note, as well as under the Bouldin Guaranty. During that time, the Trustee supported the Debtor's efforts to improve its operations and provide the Debtor with the opportunity to resolve the outstanding defaults

D.  **Commencement of the Receivership Action**

17.  Ultimately, given the lack of cashflow from operations, and the failure to pay any debt service owed under the Bond Documents, it was determined that the highest and best recovery for the holders of the Bonds was a sale of the Facility and related assets. Although various

discussions occurred with the Borrower and Mr. Bouldin regarding a proposed sale process, such negotiations ultimately broke down given the failure to reach a resolution of Mr. Bouldin's obligations under the Bouldin Guaranty. Accordingly, on June 25, 2021, the Trustee exercised its rights under the Bond Documents and commenced the Receivership Action to implement the sale process that had been previously discussed with the Borrower and Mr. Bouldin. Even after the filing of the Receivership, the Trustee continued to engage in negotiations with the Debtor, as well as Bouldin individually, regarding the intended sale of the Debtor's assets in the Receivership Action and a resolution of the defaults under the Bond Documents, including the Bouldin Guaranty. In order to support the negotiation efforts, the Trustee continued the scheduled hearing on its request for the appointment of a receiver on two separate occasions. However, given the lack of resolution under the Guaranty, the negotiations ended and the Trustee pursued the appointment of the Receiver.

18. In October, 2021, almost three and a half months after the commencement of the Receivership Action, the Trustee requested entry of the Receivership Order, which was entered on October 11, 2021. Notably, neither the Debtor nor Bouldin raised any objection to the Receivership Order.

19. In relevant part, the Receivership Order creates a Receivership Estate and provides certain protections to the Receiver to ensure that no parties will interfere with the Sale Process. *See*, *e.g.*, *Receivership Order*, ¶¶ 5, 19.

20. The Receivership Order also empowers the Receiver to conduct a sale of substantially all of the assets associated with the Facility, *i.e.* the Sale Process.

21.     As noted above, after entry of the Receivership Order, RBC and Meridian worked diligently to assemble marketing materials, a marketing distribution list, virtual data room and a CIM to support the sale effort of the Facility. Medlin Affidavit, ¶ 6; Fields Affidavit, ¶ 4.

22.     On October 29, 2021, RBC and Meridian commenced an external marketing effort for the Facility. Medlin Affidavit, ¶ 7; Fields Affidavit, ¶ 4. The initial marketing email was distributed to over 800 groups covering owners, operators and investors of similar communities. As of December 30, 2021, fifty (50) groups have executed a non-disclosure agreement, which is required to have access to the virtual data room and the CIM. Medlin Affidavit, ¶ 8; Fields Affidavit, ¶ 5.

23.     The first round of offers in the Sale Process resulted in eight (8) letters of intent from potential Bidders. Medlin Affidavit, ¶ 9; Fields Affidavit, ¶ 5.

24.     On January 10, 2022, the Receiver called for and received final bids from seven of the eight parties.  Medlin Affidavit, ¶ 10; Fields Affidavit, ¶ 6. As of the Petition Date, RBC and its affiliates were in the process of conducting an evaluation and intended to recommend a Stalking Horse Bidder by January 14, 2022. Medlin Affidavit, ¶ 11; Fields Affidavit, ¶ 6.

## **RELIEF REQUESTED**

25.     Permitting the Receiver to continue its control and management of the Receivership Estate and continue the Sale Process is in the best interests of the Debtor, its estate, its creditors, and all parties in interest in this Bankruptcy Case. Accordingly, the Trustee respectfully requests that the Court enter an order excusing the Receiver from complying with sections 543(a)-(c) of the Bankruptcy Code and granting such other relief as necessary.

## BASIS FOR RELIEF

26. Section 543(d)(1) of the Bankruptcy Code provides that this Court may "excuse compliance [with the turnover requirements of Sections 543(a) and (b)] . . . if the interests of creditors . . . would be better served by permitting a custodian to continue in possession, custody, or control [of the debtors' assets]." 11 U.S.C. § 543(d)(1); *see also In re Orchards Vill. Invs., LLC*, 405 B.R 341, 352 (Bankr. D. Or. 2009) (waiving the provisions of section 543(a) & (b) where a senior living facility was placed into a receivership because of "the Debtor's failure to make payments on the Loan, failure to pay property taxes, and failure to pay the [Debtor's] architects . . . resulting in a mechanics lien being placed on the [Debtor's] property and a foreclosure action on that lien being initiated."); *In re Corporate & Leisure Event Prods.*, 351 B.R. 724, 732 (Bankr. D. Ariz. 2006) ("Even though the ordinary rule is that receivers must turn over estate property to a debtor in possession or trustee . . . the bankruptcy courts have discretion to waive that requirement if the interests of creditors would be better served by continuing the receiver in possession."), *abrogated on other grounds by In re Sino Clean Energy, Inc.*, F.3d 1139 (9th Cir. 2018); *In re KCC-Fund V, Ltd.*, 96 B.R. 237, 238 (Bankr. W.D. Mo. 1989). Section 548(d) "is merely a recognition of a long-recognized doctrine of abstention now expressly codified by Congress in section 305 of the Bankruptcy Code which permits the court to decline to entertain any controversy which otherwise would be within its judicial competence if to do so would be in the best interest of all parties concerned, although not necessarily the interest of the debtor." *In re WPAS*, 6 B.R. 40, 43 (Bankr. M.D. Fla. 1980); *see also In re Sundance Corp.*, 83 B.R. 746, 747 (Bankr. D. Mont. 1988 (observing that section 548(d) ". . . is an abstention policy which permits the custodianship to continue if the best interest of creditors and stockholders is served . . . .").

27. "If turnover is opposed, courts consider a number of factors in determining whether to order turnover, including '(1) whether there will be sufficient income to fund a successful reorganization; (2) whether the debtor will use the property for the benefit of its creditors; and (3) whether there has been mismanagement by the debtor.'" *In re Orchards Vill. Invs., LLC*, 405 B.R. 341, 353 (Bankr. D. Or. 2009) (citing 5 COLLIER ON BANKRUPTCY ¶ 543.05 (15th ed. rev. 2009)).

28. Notably, "[t]he interests of the debtor . . . are not part of the criteria considered when applying section 543(d)(1)." *In re Dill*, 163 B.R. at 225. Moreover, even if the factors are ultimately resolved in favor of the Debtor, the Court may excuse the Receiver's compliance if turnover would be injurious to creditors. *In re Poplar Springs Apartments of Atlanta, Ltd.*, 103 B.R. 146, 150 (Bankr. S.D. Ohio 1989). In fact, where it has better served creditors, bankruptcy courts in other districts have excused custodians from the turnover requirements of section 543 of the Bankruptcy Code. *See, e.g., In re LCL Income Props., L.P. VI*, 177 B.R. 872 (Bankr. S.D. Ohio 1995) (excusing turnover, even without a showing of mismanagement, where the receivership did not appear detrimental to the debtor's ability to reorganize, and recognizing that, if the reorganization failed, the reinstatement of the receiver would cause unnecessary trouble and expense).

29. Here, it is unquestionable that creditors' interests are better served by excusing the Receiver from turning over the Receivership Estate to the Debtor so as to allow the Receiver to complete the Sale Process. As noted above, the Debtor estimates that the value of its own assets, "[a]ssuming a non-distressed environment," is "approximately $38 million." *Cash Collateral Motion*, ¶ 8. Thus, even in the Debtor's best case scenario, the estate is still entirely "underwater" and the Debtor has no equity interests in the estate.  As the largest creditor and holder of a valid first priority security interest in substantially all of the Debtor's assets, the Court must consider

what is in the best interests of the Trustee, as well as other creditors, and allow no consideration to the Debtor's interests. It is critical, therefore, that the Trustee is fully supportive of the Receiver, the Sale Process, and the oversight of the Receivership Court, and believes that the sale efforts undertaken by the Receiver is the best option for maximizing the value of the assets. Indeed, there is no question that the Trustee believes that the Receiver's continued control over the Debtor's assets is in its, and all creditors', best interests.

30. Additionally, any interruption to the Sale Process beyond what has already been caused by the Debtor's commencement of the Bankruptcy Case, threatens to undo over three-months of work by the Receiver and his professionals at a time when the Receiver is in the middle of the Sale Process that was not otherwise objected to by the Debtor or Mr. Bouldin. The expense and burden associated with compelling the Receiver to turn over the assets and otherwise jeopardizing the Sale Process, which will only maximize value to creditors and place the Project in the hands of a viable third party owner/operator for the benefit of the resident population, would cause greater harm to the Debtors' creditors in the pretext of some other alternative plan which, as discussed below, is not feasible.

31. Moreover, the application of the factors identified above provides further support for a finding that sufficient cause exists to excuse the Receiver from any turnover requirement and to permit him to remain in possession of the Debtors' assets.

**A.    The Debtor Does Not Have Sufficient Income to Fund a Successful Reorganization**

32. As the Debtor has filed a bare bones petition, there is no indication that it has any funds available for reorganization. The only source of funding that the Debtor has identified is cash collateral securing the obligations due under the Bond Documents. The Trustee, however, has not, and will not, consent to the use of its cash collateral. As will be more fully addressed in the

Trustee's objection to the Cash Collateral Motion, the Debtor cannot provide "adequate protection" in exchange for its non-consensual use of cash collateral as required by section 363(c)(2) of the Bankruptcy Code.

33. Notably, the Facility, which is the Debtor's only income producing asset, will not generate sufficient income to fund a successful reorganization. Moreover, notwithstanding the approximately $54 million due under the Bond Documents (in addition to the over $2 million related to outstanding property taxes), the Debtor's estimated value for the Project "assuming a non-distressed environment" is "approximately $38 million." *Cash Collateral Motion*, ¶ 8. Thus, even using the Debtor's highest estimate for the value of its assets, the estate is entirely "underwater." The Debtor simply does not have the means to conduct a successful reorganization.

34. Moreover, there is no need for the Debtor to reorganize under Chapter 11. Since his appointment, the Receiver has overseen the Debtor's day-to-day operations of the Project. Due to the Receiver's familiarity with the Debtors' financial history, its business operations, the status of the ongoing daily operations, he is best suited to continue in his efforts to ensure the longevity of the Project by conducting a successful Sale Process. While the Trustee shares the Debtor's concern that the residents served by the Debtor should be prioritized, the Trustee believes that the Receiver's Sale Process is in the best interests of those very residents. The Sale Process has already produced eight potential bidders who are experienced in the Debtor's business and have demonstrated the financial wherewithal to support the Project's community. If this matter remains in bankruptcy with a Debtor will very little liquidity, and has no ability to reorganize, the resident population is put at unnecessary risk.

B.     **The Debtor's Use of the Turned-Over Property Will Not Benefit Creditors**

35.     The Receiver was appointed for the express purpose of safeguarding the Debtor's assets and pursuing a sale to bring more stability and liquidity to the Project. The Receivership Order states the Receiver was appointed to take possession, custody, and control of the Debtor's to protect such assets. The order goes on to say that the Receiver shall have the usual and customary powers of a receiver to take control of and preserve the Project, in addition to the duties and powers enumerated in that Order. The reason the Trustee sought the appointment of a receiver was to oversee the Debtor's business, so that it would remain operational during the pendency of a Sale Process. Implicit within the Receivership Order is a determination by the Receivership Court that the Debtor's creditors are better protected and served by the Receiver having possession, custody, and control of the Debtor's assets as compared to the Debtor. Consequently, the turnover of assets to the Debtor will not benefit creditors. In fact, by filing the Bankruptcy Case, the Debtor has harmed creditors by jeopardizing the Sale Process. *See* Medlin Affidavit, ¶ 12; Fields Affidavit, ¶ 9.

36.     The purpose of the receivership estate is unchanged by the Debtor's filing of a bankruptcy. There is nothing to indicate that the Debtor is ready or has the ability to successfully take control of these key functions of the Project.

C.     **The Debtor's Mismanagement Leading to the Receivership**

37.     Evidence of pre-petition mismanagement by a debtor is by a compelling justification for the continuation of a receivership when the debtor files a bankruptcy petition. *See In re WPAS, Inc.*, 6 B.R. 40 (Bank. M.D. Fla. 1980); *see also Dill*, 163 B.R. at 226; *In re Plantation Inn Partners*, 142 B.R. 561, 564 (Bankr. S.D. Ga. 1992) (receiver temporarily excused from turnover requirements where there is evidence of prior mismanagement by debtor); *In re KCC–*

14

*Fund V, Ltd.*, 96 B.R. 237, 240 (Bankr. W.D. Mo. 1989) (receiver excused from turnover requirements where properties were not maintained and sadly neglected); *In re CCN Realty Corp.*, 19 B.R. 526, 529 (Bankr. S.D.N.Y. 1982) (where bank is justifiably concerned that the turnover by the receiver to the debtor of rent proceeds is a prelude to proceeds being frittered away, the receiver is properly excused from the turnover requirements of section 543); *Matter of WPAS Inc.*, 6 B.R. 40, 44 (Bankr. M.D. Fla. 1980) (receiver excused from turnover requirements where debtor clearly mismanaged property).

38. Here, the Debtor is not managing the Facility, and thus this factor is inapplicable. The Facility is managed by Validus, not the Debtor, because the Debtor is incapable of managing the Facility. As evidenced by the Receivership Order, the Debtor also cannot be entrusted to have control over its assets.

**D.**    **Additional Considerations**

39. While the Trustee is the party seeking the relief requested herein, there is no reason to believe that excusing the Receiver from compliance with section 543 would adversely affect other creditors of the bankruptcy estate. In fact, the best way to preserve the Project is to put it into the hands of an owner that can financially support its ongoing operations. The Receiver is prepared and willing to continue to act in accordance with the Receivership Order and continue the Sale Process.

40. Moreover, as of the Petition Date, the Debtor has no outstanding trade obligations. *See* Medlin Affidavit, ¶ 19. Thus, other than the Trustee, the Debtor's debt obligations are limited to the almost $1.2 million owed in connection with unpaid taxes, subordinated payment obligations owed to Validus, and the mechanic's lien asserted by Baxter. Accordingly, no creditors will be impacted, and most likely will benefit from the continuation of the Receivership.

## SATISFACTION OF BANKRUPTCY RULE 6003

41. Under Bankruptcy Rule 6003(b), any motion seeking to use property of the estate pursuant to section 363 of the Bankruptcy Code or to satisfy prepetition claims within twenty-one days of the Petition Date requires a showing that such relief "is necessary to avoid immediate and irreparable harm." Fed. R. Bankr. Proc. 6003(b). The Trustee believes that any disruption caused by compelling the Receiver to comply with the turnover requirements of section 543 of the Bankruptcy Code would have an adverse impact on the Debtor's ability to continue operating as a going concern.

42. Thus, if the relief requested herein is not granted, the failure to excuse the Receiver from compliance with the turnover provisions of the Bankruptcy Code would cause the Debtor estates to suffer immediate and irreparable harm.

## WAVIER OF BANKRUPTCY RULE 6004

43. Under Bankruptcy Rule 6004(h), "[a]n order authorizing the use, sale, or lease of property other than cash collateral is stayed until the expiration of fourteen (14) days after entry of the order, unless the court orders otherwise." Fed. R. Bankr. P. 6004(h). As set forth throughout this Motion, any delay or disruption in the provision of services by the Receiver would substantially diminish or impair the Sale Process and the progress of the Project's prepetition reorganizational efforts. For this reason and those set forth above, the Trustee submits that ample cause exists to justify a waiver of the fourteen-day stay imposed by Bankruptcy Rule 6004(h).

## BASIS FOR EXPEDITED RELIEF

44. In light of the detrimental effect the Bankruptcy Case is having on the Sale Process, and in order to protect the value of the Debtor's assets and to ensure the completion of the Sale Process by the Receiver, the Trustee requests a hearing on this motion on an expedited basis.

## CONCLUSION

45.     In sum, it is in the best interests of all creditors in this case for this Court to excuse the Receiver from complying with the turnover provisions of 11 U.S.C. § 543(b) and to authorize the Receiver to retain possession, custody, and control of the Receivership Estate pursuant to 11 U.S.C. § 543(d). Indeed, as set forth above, the continuation of the Sale Process not otherwise objected to by the Debtor and Mr. Bouldin will maximize the value of assets for creditors and otherwise be beneficial to the resident population by placing the Project in the hands of a more stable owner/operator. Thus, it is critical that the Receiver remain in possession of the Receivership Estate to ensure the Debtor's business continues to operate efficiently to maximize the likelihood of successful Sale Process. Additionally, the Trustee is not aware of any creditor or interested party that would be unfairly impacted if the relief requested herein is granted.

## NOTICE

46.     Notice of this Motion has been provided to: (i) the Debtor; (ii) the Debtor's twenty (20) largest unsecured creditors; (iii) counsel to the Receiver; and (iv) the Office of the United States Trustee for the Middle District of Florida. In light of the nature of the relief requested herein, the Trustee submits that no other or further notice is necessary.

*[Remainder of page intentionally left blank.]*

WHEREFORE, the Trustee requests the Court enter an order granting the relief requested herein, and such other and further relief as is just and proper.

Date: January 14, 2022            **SHUTTS & BOWEN LLP**

                                     */s/ Ryan C. Reinert*
                                     Ryan C. Reinert
                                     Florida Bar No. 81989
                                     Bridget M. Dennis
                                     Florida Bar No. 1024897
                                     4301 W. Boy Scout Blvd., Suite 300
                                     Tampa, Florida 33607
                                     Email: rreinert@shutts.com
                                                        bdennis@shutts.com

-and-

**MINTZ, LEVIN, COHN, FERRIS GLOVSKY AND POPEO, P.C.**

Daniel S. Bleck (*pro hac vice* pending)
Timothy J. McKeon (*pro hac vice* pending)
One Financial Center
Boston, Massachusetts 02111
Telephone: (617) 542-6000
Email: DSBleck@mintz.com
              TJMcKeon@mintz.com

*Attorneys for the Trustee*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 14, 2022, a true and correct copy of the foregoing was electronically filed with the Clerk of the Bankruptcy Court via the CM/ECF system, which electronically served a copy on all counsel of record, with a copy via U.S. Mail on January 15, 2022 to Senior Care Living VII, LLC, 3665 East Bay Drive, Ste. 204-429, Largo, FL 33771.

                                     */s/ Ryan C. Reinert*
                                     Attorney