FILED: 10/14/2021 11:22 AM
David Trantham
Denton County District Clerk
By: Velia Duong, Deputy

CAUSE NO. 21-5445-431

| | | |
|---|---|---|
| UMB BANK, N.A., AS TRUSTEE | § | IN THE DISTRICT COURT OF |
| | § | |
| Plaintiff, | § | |
| | § | |
| VS. | § | DENTON COUNTY, TEXAS |
| | § | |
| SENIOR CARE LIVING VII, LLC | § | |
| | § | |
| Defendant. | § | 431st JUDICIAL DISTRICT |

## ORDER APPOINTING A RECEIVER

Plaintiff UMB Bank, N.A. (the "Trustee"), as successor master trustee and successor bond trustee for the Bonds filed an Original Petition and Request for the Appointment of a Receiver (the "Request").[1] A hearing was held on the Request on October 7, 2021 (the "Hearing"). After hearing argument from counsel at the Hearing, and considering the facts and assertions set forth in the Request, and considering the evidence presented at the Hearing, this Court rules as follows, and it is hereby ORDERED that:

### Appointment of the Receiver

1. Appointment of Receiver. The Trustee has established sufficient cause, pursuant to Section 64.001 of Chapter 64 of the Civil Practice and Remedies Code, for the immediate appointment of a receiver over all of the assets of Senior Care Living VII, LLC ("SCL"). Specifically, this Court finds: (i) all of SCL's assets (as defined more fully below, the "Collateral Assets") are subject to the Trustee's claim; (ii) the rules of equity make the appointment of a receiver appropriate under the circumstances; (iii) conditions of the Bond Documents have not been performed by SCL, specifically the Obligations related to the Bonds have not been paid as

---

[1] Capitalized terms not otherwise defined herein have the meanings given to them in the Request.

**ORDER APPOINTING A RECEIVER**                                                                                                  Page 1

agreed, and SCL has failed to pay taxes owed on the Land and the Facility; and (iv) the Collateral Assets are probably insufficient to discharge the Obligations owed to the Trustee.

2. <u>Applicants Bond</u>. The Trustee shall execute and file with the clerk of the Court, a bond in the amount of $10,000.00.

3. <u>Receiver's Bond</u>. Upon posting of a bond in the amount of $1,000,000.00, to be approved by the clerk of the Court, J. Robert Medlin (the "<u>Receiver</u>") is hereby appointed receiver for all of the Collateral Assets on the terms set forth herein. Receiver is in all ways qualified to act as Receiver herein and is not disqualified in any way. The Court finds that the Receiver is a citizen of Texas and a qualified voter of Texas as of the date of this Order.

4. <u>Standard of Care</u>. The Receiver shall at all times exercise reasonable care in employing its business judgment to oversee the Receivership Estate (as defined below). The Receiver's actions shall be governed by the business judgment rule. The Receiver is appointed as an officer of the Court and shall have immunity from personal liability as is afforded such officers under Texas law, including but not limited to immunity from personal liability for acts or omissions undertaken as Receiver within the scope of his authority as set forth herein or as otherwise defined by law or by statute.

## Creation of the Receivership Estate

5. The Receiver has the authority to take immediate custody, possession, and control of all property of SCL, including but not limited to: (i) the assisted living facility known as "Inspired Living at Lewisville," consisting of approximately 123 assisted living beds, 51 memory support beds, and all common and other areas, located in the city of Lewisville, Texas (the "<u>Facility</u>"); (ii) the real property associated with the Facility and located at 1080 W Round Grove Road, Lewisville, Texas (the "<u>Facility Land</u>"), and all other real property owned by SCL,

including but not limited to approximately 4.04 acres of undeveloped land defined in the Master Indenture as the "Excess Land" (the "Excess Land"; and together with the Facility Land, collectively, the "Land"); (iii) all machinery, equipment, furniture, spare parts, inventory and other personal property possessed by SCL (the "Personal Property"); (iv) all revenue, accounts, accounts receivable, rents, and Gross Revenues (as defined in as defined in the Master Indenture (as defined below)) of SCL, including revenues, collections, accounts, income and profits derived from the Land, the Facility or otherwise, and all intangibles, claims and awards of SCL; (v) all other assets of SCL of any kind, and (vi) all of the proceeds of the foregoing. The assets referred to in (i) through (vi) plus any other assets of SCL or assets that come within the control of the Receiver through the operation of the business are referred to herein as the "Collateral Assets". The estate created hereby is referred to as the "Receivership Estate". The business related to the Collateral Assets and the Receivership Estate is referred to as the "Business". Any funds held by the Trustee in connection with the Bonds are not the property of SCL or the Receivership Estate.

## Authority of the Receiver

6. The Receiver is appointed under Chapter 64 of the Civil Practice and Remedies Code and shall have, vested in him, all of the usual powers authorized under such statute, as qualified by or supplemented by this Order.

7. The Receiver's authority includes, without limitation, the right:

   a. To take all actions associated with the operation of the Business and the Collateral Assets, all as described more fully herein; provided, however, the Receiver may employ Validus Senior Living REIT Investment Company, LLC, a Florida limited liability doing business as Validus Senior Living (the "Existing Manager"), the existing manager of SCL's Facility on the same business terms as it was employed prior to the commencement of this receivership proceeding to assist with management of the Business and to assist with the roles and responsibilities of the Receiver as described herein;

    b. To pay from the amounts collected from the Business the ordinary and necessary monthly expenses of operating the Business that are incurred from, and after, the date of the Receiver's appointment, subject to the terms of the budget attached hereto as Exhibit "A" (the "Budget");[2]

    c. To pay the Receiver's fees and expenses on the terms set forth on Exhibit "A";

    d. Solely with the approval of the Trustee, to pay expenses related to the Facility or the Business arising prior to the date of entry of this Order;

    e. To take possession of all bank accounts or parts thereof containing funds associated with the Business, and to be able to utilize the Federal Tax Identification Number of SCL or the Business for banking and other reporting purposes;

    f. To demand and collect from any persons liable therefore, all accounts, income, insurance proceeds, or other amounts now due and unpaid and all accounts, income, insurance proceeds, or other amounts hereafter to become due, and enforce the terms of any lease or other contract for all or any portion of the Facility;

    g. To take such steps as are reasonable and necessary to prevent physical deterioration, waste or ongoing damage to the Facility;

    h. To enter into contracts for those services necessary to aid the Receiver in the administration of the Business or the sale of the Facility and the other Collateral Assets;

    i. To sell the Facility and the other assets of the Receivership Estate free and clear of all liens, claims and interests, with such liens attaching to the proceeds of the sale in the same order of priority as they existed on the Facility and other Collateral Assets prior to such sale, and to take all actions associated with the Sale Process (as defined below) and, if not included in the Sale Process, the sale of the Excess Land;

    j. Employ, with this Court's prior approval, after notice and a hearing (other than with respect to RBCCM and Meridian), such business financial advisors, property managers, real estate brokers, appraisers, professionals or other service providers, with any such employment to come only after consultation with the Trustee and written approval of this Court, with all reasonable

---

[2]     The Budget may be amended by agreement between the Receiver and the Trustee, in which event a copy of the amended Budget will be filed with the Court.

**ORDER APPOINTING A RECEIVER**                                                                        Page 4

      expenses incurred in connection therewith deemed to be expenses of the Receivership Estate;

k. To pursue, resist and defend, after consultation with the Trustee, all suits, actions, claims and demands now pending, or that may be hereafter brought by or asserted, against the Business;

l. To renew, cancel, negotiate, terminate or otherwise amend any executory contracts relating to the Business, or to enter into new contracts in order to control, manage and operate the Business;

m. To generally do, execute and perform any other act, deed, matter or thing whatsoever that the Receiver deems, in his sole judgment, ought to be done, executed or performed with respect to the Business or the Sale Process, so long such action does not conflict with any other provision of this Order.

8. <u>Sale Process</u>. The Receiver is authorized to take the following actions in connection with the sale of the Facility and the other assets Collateral Assets (collectively, the "<u>Sale Process</u>"):[3]

a. Engage RBC Capital Markets, LLC ("<u>RBCCM</u>"), and specifically David Fields of RBCCM, to serve as investment banker and broker with respect to the Sale Process;

b. Engage Meridian Capital ("<u>Meridian</u>") as co-broker in connection with the sale of the Facility, if the Receiver in his business judgment, believes co-brokers to be advantageous (including the terms upon which they are to be employed) to the Sale Process and maximizing the value received for the Collateral Assets in connection with the Sale Process;

c. With the assistance of RBCCM, establish a data room, which will include a form asset purchase agreement ("<u>Form APA</u>"), to permit potential bidders for the Facility and other Collateral Assets to conduct due diligence, including providing such potential bidders access to the Facility upon reasonable notice and within the discretion of the Receiver;

d. Establish a date that is no more than fourteen (14) weeks after the date the Receiver is appointed ("<u>Bid Deadline</u>") as the last date for parties to submit a Qualified Bid (as defined below) for the purchase of the Facility and other Collateral Assets;

---

[3]     The milestones set forth in the Sale Process may be amended by the Receiver, with the consent of the Trustee. Notice of such amendments shall be provided to the Court.

**ORDER APPOINTING A RECEIVER**                                        Page 5

e. With the assistance of RBCCM, and the consent of the Trustee, at any time prior to a winning bid being designated as such at the Auction, select an entity to serve as a stalking-horse bidder ("Stalking Horse Bidder") for the purchase of the Facility and the other Collateral Assets, pursuant to the terms of an executed asset purchase agreement (subject to the consent of the Trustee) (the "Stalking Horse APA") which may include a break-up fee in favor of the Stalking Horse Bidder not to exceed 3% of the proposed purchase price set forth in the Stalking Horse APA (the "Break-Up Fee") and require an initial bid increments at the Auction not to exceed $100,000 (the "Initial Bid Increment");

f. Establish requirements that potential bidders must include in their bids in order to participate in the Auction (a bid meeting such requirements is termed a "Qualified Bid"), including (i) that such bids are submitted by the Bid Deadline; (ii) that such bid be on substantially the same terms as set forth in the Form APA by including a word version of the bid in the same form as the Form APA; (iii) that such bid include a redline comparison between the bid and the Form APA; (iv) that the bid be accompanied by a deposit of not less than ten percent (10%) of the purchase price set forth in the bid (unless a lesser amount is agreed to by the Receiver, with the consent of the Trustee); (v) in the event a Stalking Horse Bid is selected more than seven (7) days prior to the Bid Deadline, that the bid include a redline comparison between the bid and the Staling Horse APA (in which case a redline between the bid and the Form APA shall not be required); and (vi) if a Stalking Horse Bid is selected at any time before the Bid Deadline, that the purchase price set forth in such bid be in at least the amount of the purchase prices set forth in the Stalking Horse APA, plus the Break Up Fee, plus the Initial Bid Increment.

g. In the event more than one Qualified Bid is received, with the assistance of RBCCM, conduct an auction of the Facility and other Collateral Assets (the "Auction") not later than one-week after the Bid Deadline, to be held in a manner, place and time recommended by RBCCM;

h. Execute an asset purchase agreement with the winning bidder at the Auction on terms set forth in the winning bid (the "Final APA");

i. Establish, at the recommendation of RBCCM, following consultation with the Trustee, specific bid procedures that will govern the bidding process and the Auction, which shall be provided to all potential bidders; and

j. Upon conclusion of the Auction, but prior to a closing on the Final APA and the transaction for transfer and sale of the Facility and the other Collateral Assets, file a report with this Court indicating the results of the Auction, the identity of the successful bidder, the identity of a back-up bidder, if any, and the final and highest bid price.

The Receiver shall be required to request an order of this Court following a hearing before this Court (the "<u>Sale Hearing</u>") to consummate the sale the Facility and the other Collateral Assets, as set forth in the Final APA. The order approving the sale to the winner of the Auction shall specify: (i) that such sale constitutes the Trustee's powers of sale as set forth in the Bond Documents and is the equivalent of a foreclosure or deed in lieu of foreclosure; (ii) that such sale is free and clear of all claims, liens and interests; (iii) that any liens on the Facility and the other Collateral Assets that are sold shall attach to the sale proceeds in the same order of priority as they existed on the Facility and the other Collateral Assets prior to the sale; and (iv) that, except for (A) unpaid expenses of the Receiver, including any amounts owed to the Receiver, (B) amounts reserved by the Receiver as security for any parties asserting a lien senior to that of the Trustee until such time as a court of competent jurisdiction determines the priority between such liens, (C) amounts necessary to pay taxes owed on any Collateral Asset solely to the extent such amounts are senior to the liens of the Trustee, (D) amounts owed to RBCCM and Meridian (if Meridian is employed as co-broker), if not otherwise paid, (E) the amount of the Break-Up Fee owed to the Stalking Horse Bidder, if any, (E) an amount agreed to by the Trustee and the Receiver as sufficient to pay for wind-down of the receivership, and (F) other amounts agreed to by the Trustee, all proceeds shall be paid directly to the Trustee at closing.

9. The Receiver, through RBCCM, may sell the Excess Land pursuant to a sale process separate and apart from the Sale Process, or may include the Excess Land in such Sale Process. In the event the Excess Land is sold separately from the Sale Process, the Receiver shall request an order of this Court following a hearing before the Court to consummate the sale of the Excess Land. The proceeds of any such sale, following payment of taxes owed on the Excess Land and any fee owed to RBCCM, shall be paid to the Trustee at closing.

**ORDER APPOINTING A RECEIVER**                                                              Page 7

10. The Trustee shall have the right to "credit bid" all or any portion of the secured obligations under the Bond Documents (including by accepting some or all of the collateral thereunder in satisfaction of some or all of the secured obligations pursuant to a deed in lieu of foreclosure or otherwise) and in such manner purchase (either directly or through one or more acquisition vehicles) all or any portion of such collateral at any sale, foreclosure or acceptance of collateral in lieu of debt, free and clear of all liens, claims and encumbrances to the extent permitted by applicable law. In addition, the Trustee may assign its "credit bid" to a third-party, including but not limited to for use at a foreclosure sale of the Collateral Assets, for consideration determined acceptable to the Trustee in its sole discretion.

### Turnover of Assets

11. SCL, its officers, agents, members, representatives, parents, affiliates, subsidiaries, employees, and attorneys shall turn over to the Receiver all tangible and intangible assets of the Receivership Estate, held or controlled as of the entry of this Order, or received after the entry of this Order, including all contracts, agreements, books and records, and other documents with respect to the Collateral Assets and the operations of the Business, and all sums relating to, pertaining to, or deriving from the Business or the Collateral Assets held by them from before the date this Order is executed until the Receiver's duties under this Order cease including, but not limited to: (a) all cash in hand, (b) all cash equivalents and negotiable instruments (including, but not limited to, all checks, notes, drafts, or other related documents or instruments), and (c) all sums held in accounts in any financial institutions including, without limitation, (i) security deposits, (ii) deposits held in escrow for any purpose, such as for payment of real estate taxes and insurance premiums, (iii) proceeds of insurance maintained for, or pertaining to, Collateral Assets; (iv) reserves or other funds designated or intended for capital

improvements, repairs, replacements, or renovations to, or in connection with, the Facility, (v) proceeds from property tax appeals, and (vi) all other sums of any kind relating to the use, enjoyment, possession, improvement, maintenance, repair, or occupancy of all or any portion of the Collateral Assets.

## Operation of the Facility

12. <u>Licensing</u>. With respect to the possession, operation and maintenance of the Facility, effective as of the date of this Order, the Receiver shall have the following authority and duties:

> to the extent allowed by law, to operate the Facility under SCL's existing licenses and permits, including, without limitation, the licenses issued by the State of Texas Health and Human Services or any other applicable state agencies and any accreditations or certificates of occupancy issues by any federal, state, municipal, or local governmental authority. The Receiver shall oversee and be responsible for ensuring compliance with applicable federal and state laws and regulations relating to operation of the Facility and shall be authorized to enter into any agreements necessary for the use and operation of the Facility, and to seek approval of changes to resident rates or payment schedules.

13. <u>Reporting</u>. On the first Tuesday after the end of the two (2) week calendar week period following the date of entry of this Order, and every other Tuesday thereafter, the Receiver shall deliver to the Trustee financial statements, including cash flow statements and an analysis of expenses incurred and paid as compared to the Budget. Such reports may be provided by the Existing Manager.

14. <u>Collecting Funds Related to the Facility and the Other Collateral Assets</u>. The Receiver may demand and collect from any persons liable therefore, all accounts, income, insurance proceeds, or other amounts now due and unpaid and all accounts, income, insurance proceeds, or other amounts hereafter to become due, and enforce the terms of any lease or other contract for all or any portion of the Facility, including but not limited to all amounts owed by residents of the Facility to SCL or the Receiver.

15. <u>Receiver Reports</u>. So long as any part of the Collateral Assets remain in Receiver's possession, the Receiver is directed to prepare and file with the Court, within thirty (30) days after the last day of the first month of entry of this Order and no less frequently than every month thereafter, and within sixty (60) days after termination of the receivership, a descriptive report of the status of the Sale Process, to the extent the Sale Process has been completed, any Collateral Assets that remain to be liquidated, and copies of any reports provided to the Trustee pursuant to this Order. The Receiver is further directed to serve copies of each such report on the attorneys of record for the Trustee, and any other party who submits a written request to the Court and the Receiver to be served with copies of such reports.

16. <u>Insurance</u>. SCL shall not terminate any existing insurance policy that provides coverage over the Collateral Assets. SCL shall add the Receiver and the Trustee as additional insured parties under any existing insurance policy that provides coverage over the Collateral Assets within seven (7) calendar days of the entry of this Order. The Receiver shall obtain insurance, if needed, in addition to existing pre-paid coverage for the Collateral Assets of the Receivership Estate in such amounts, with such companies, and to insure against such risks, as the Receiver deems necessary or desirable, and the Receiver may finance any of the premiums associated with such insurance without Court approval. If the Receiver deems it necessary to replace insurance coverage, or does so at the request of the Trustee, the Receiver will endeavor to replace the insurance with comparable coverage to that required under the Bond Documents. This insurance will be considered primary and non-contributory with respect to existing liability and property damage insurance coverage maintained by the Receiver. All cost of said insurance and applicable deductibles shall be provided for in the Budget.

17. <u>Taxes</u>. The Receiver shall have no obligation to prepare or file state or federal tax returns on behalf of SCL and shall not be responsible for paying any unpaid federal or state or federal taxes on behalf of SCL. The responsibility for such filings and payments lies exclusively with SCL, its agents, employees, and representatives. The Receiver shall permit reasonable access to all books and records relating to the Collateral Assets as necessary to facilitate such filings and payments by SCL. The Receiver shall escrow 1/12 of the total amount of forward looking ad valorem tax obligations due on the Collateral Assets.

18. <u>Termination of Receiver</u>. The Receiver shall serve until further order of the Court excusing the Receiver from its duties. The Receiver may resign his position only upon thirty (30) days written notice to all parties of record and upon approval of the Court.

19. <u>No Interference with the Receivership Estate</u>. Without first obtaining leave of this Court, SCL, all of SCL's members, shareholder, equity owners, creditors and other persons associated with SCL, and all others acting on behalf of SCL, or any such member, shareholder, equity owner, creditor, director, or other persons, including sheriffs, marshals, and other officers, deputies, servants, agents, employees and attorneys are enjoined from:

   a. Commencing, prosecuting, continuing or enforcing any suit or proceeding in law, equity, bankruptcy, or otherwise against or affecting SCL or any part of the Collateral Assets in any forum other than this Court, except that such actions may be filed to toll any statues of limitations;

   b. Using self-help or executing or issuing or causing the execution or issuance of any court attachment, subpoena, replevin, execution, or other process for the purpose of impounding or taking possession of or exercising control over or interfering with or creating or enforcing adjustment or lien upon any portion of the Collateral Assets, wherever situated;

   c. Attempting to modify, cancel, terminate, call, extinguish, revoke or accelerate the due date of any lease, loan, mortgage, indebtedness, security agreement, or other agreement otherwise affecting the Collateral Assets;

    d.  Doing any act to interfere with the taking control, possession, or management, by the Receiver, of any portion of the Collateral Assets or to interfere in any manner with the exclusive jurisdiction of this Court over the Collateral Assets;

    e.  Engaging in any act to create, perfect, or enforce any lien against the Collateral Assets, unless specifically authorized by order of this Court;

    f.  Engaging in any act to collect, assess, or recover a claim against SCL that arose before the appointment of the Receiver; and

    g.  Exercising a set off of any debt owing to SCL that arose before the appointment of the Receiver against any claim against SCL.

20.    <u>Contracts</u>. The Receiver is authorized, without further leave of Court, to reject or terminate any agreement or contract entered into by any of SCL with respect to services performed at or related to the Collateral Assets, prior to the appointment of the Receiver that may be deemed by the Receiver, in the Receiver's sole discretion, not to be in the best interest of the Receivership Estate, and any claims arising from such rejection or termination shall be pre-receivership claims and neither the Receiver nor the Trustee nor the Receivership Estate shall be liable for such claims.

## Miscellaneous

21.    <u>Retention of Jurisdiction</u>. This Court explicitly retains jurisdiction, despite any attempted dismissal, to hear and rule on any issues relating to the Receiver's oversight of the Receivership Estate.

22.    <u>Modification of Order</u>. The relief granted herein may be modified or waived only by order of this Court upon proper motion, after notice and a hearing. If any or all provisions of this Order are hereafter modified, vacated or stayed, such modification, vacation or stay shall not affect the validity or enforceability of the liens, priority or other protections authorized or created hereby. Notwithstanding any such modification, vacation or stay, the Receiver shall be entitled to all of the rights, remedies, privileges and benefits granted herein.

23.  <u>**Binding Effect**</u>. To the extent permitted by law, the provisions of this Order shall be binding upon SCL and all of its subsidiaries, shareholders, managers, members, directors, officers, employees, agents, independent contractors, other natural or legal entities acting in concert with them and their respective successors and assigns, including any trustee hereinafter appointed as a representative of the Receivership Estate in any subsequent proceedings under the Bankruptcy Code, and all creditors of SCL and other parties in interest.

Signed this _____ day of October 2021, at _____ o'clock ____.m.
10/11/2021 11:22:30 am

_____
Judge Presiding

**Inspired Living - Lewisville: Cash Budget**

Case One: Actual through August 2021 and Stable Thereafter Projection

| | Actual Cash Flow (1/21 to 8/21) | | | | | | | | Case One Projection - Stabilized Using August 2021 Cash Flow | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Jan-21 | Feb-21 | Mar-21 | Apr-21 | May-21 | Jun-21 | Jul-21 | Aug-21 | Sep-21 | Oct-21 | Nov-21 | Dec-21 | Jan-22 | Feb-22 | Mar-22 |
| **OCCUPANCY:** | | | | | | | | | | | | | | | |
| *Total Residents* | 107.7 | 101.6 | 103.0 | 107.2 | 106.7 | 107.7 | 116.7 | 123.5 | 123.5 | 123.5 | 123.5 | 123.5 | 123.5 | 123.5 | 123.5 |
| *Average Units Occupied* | 96.8 | 89.9 | 92.0 | 97.2 | 98.6 | 100.5 | 108.2 | 113.5 | 113.5 | 113.5 | 113.5 | 113.5 | 113.5 | 113.5 | 113.5 |
| **Unit Occupancy %** | **65.0%** | **60.3%** | **61.7%** | **65.2%** | **66.2%** | **67.5%** | **72.6%** | **76.2%** | **76.2%** | **76.2%** | **76.2%** | **76.2%** | **76.2%** | **76.2%** | **76.2%** |
| **Revenue** | | | | | | | | | | | | | | | |
| Memory Care Revenue | $156,128 | $126,066 | $135,050 | $171,719 | $180,767 | $219,107 | $230,312 | $216,920 | $216,920 | $216,920 | $216,920 | $216,920 | $216,920 | $216,920 | $216,920 |
| Assisted Living Revenue | 315,604 | 307,815 | 318,907 | 313,741 | 313,569 | 275,637 | 312,408 | 347,150 | 347,150 | 347,150 | 347,150 | 347,150 | 347,150 | 347,150 | 347,150 |
| Community Fee Revenue | 6,333 | 6,000 | 20,000 | 11,000 | 9,000 | 18,500 | 16,000 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 | 14,500 |
| Ancillary Revenue | 12,362 | 13,986 | 23,535 | 18,760 | 8,847 | 11,859 | 15,364 | 18,245 | 18,245 | 18,245 | 18,245 | 18,245 | 18,245 | 18,245 | 18,245 |
| **TOTAL REVENUE** | **$490,427** | **$453,867** | **$497,492** | **$515,220** | **$512,183** | **$525,103** | **$574,084** | **$596,815** | **$596,815** | **$596,815** | **$596,815** | **$596,815** | **$596,815** | **$596,815** | **$596,815** |
| **Labor Expenses** | | | | | | | | | | | | | | | |
| Healthcare | $108,105 | $103,286 | $108,569 | $100,434 | $116,489 | $124,344 | $129,097 | $118,444 | $118,444 | $118,444 | $118,444 | $118,444 | $118,444 | $118,444 | $118,444 |
| Programming | 9,814 | 9,735 | 7,687 | 7,640 | 7,428 | 8,986 | 7,934 | 7,732 | 7,732 | 7,732 | 7,732 | 7,732 | 7,732 | 7,732 | 7,732 |
| Housekeeping/Plant Ops/Transportation | 20,906 | 18,514 | 13,588 | 13,665 | 15,407 | 15,448 | 15,187 | 11,770 | 11,770 | 11,770 | 11,770 | 11,770 | 11,770 | 11,770 | 11,770 |
| Sales | 9,692 | 6,462 | 7,183 | 7,888 | 7,529 | 5,974 | 4,890 | 4,738 | 4,738 | 4,738 | 4,738 | 4,738 | 4,738 | 4,738 | 4,738 |
| Administration | 20,426 | 15,535 | 26,075 | 22,479 | 20,684 | 23,559 | 23,921 | 25,444 | 25,444 | 25,444 | 25,444 | 25,444 | 25,444 | 25,444 | 25,444 |
| Overtime & Contract Labor | 16,582 | 13,550 | 14,870 | 17,781 | 15,569 | 5,963 | 6,938 | 9,816 | 9,816 | 9,816 | 9,816 | 9,816 | 9,816 | 9,816 | 9,816 |
| Commissions & Bonuses | 550 | 1,913 | 18,713 | 11,588 | 8,513 | 16,513 | 15,275 | 7,473 | 7,473 | 7,473 | 7,473 | 7,473 | 7,473 | 7,473 | 7,473 |
| Payroll Tax & Benefits | 46,065 | 30,912 | 27,348 | 31,778 | 25,766 | 35,447 | 33,916 | 34,854 | 34,854 | 34,854 | 34,854 | 34,854 | 34,854 | 34,854 | 34,854 |
| **TOTAL LABOR COST** | **232,140** | **199,907** | **224,033** | **213,253** | **217,385** | **236,234** | **237,158** | **220,271** | **220,271** | **220,271** | **220,271** | **220,271** | **220,271** | **220,271** | **220,271** |
| **Non Labor Expenses** | | | | | | | | | | | | | | | |
| Healthcare | 1,025 | -1,151 | 3,353 | 2,533 | 2,826 | 2,321 | 1,816 | 2,067 | 2,067 | 2,067 | 2,067 | 2,067 | 2,067 | 2,067 | 2,067 |
| Programming | 176 | 836 | 2,121 | 2,242 | 2,399 | 1,616 | 2,382 | 819 | 819 | 819 | 819 | 819 | 819 | 819 | 819 |
| Housekeeping/Plant Ops/Transportation | 20,160 | 23,411 | 12,586 | 14,279 | 13,217 | 15,956 | 19,522 | 14,078 | 14,078 | 14,078 | 14,078 | 14,078 | 14,078 | 14,078 | 14,078 |
| Administration | 19,719 | 12,694 | 17,748 | 36,574 | 17,099 | 16,835 | 20,284 | 22,055 | 22,055 | 22,055 | 22,055 | 22,055 | 22,055 | 22,055 | 22,055 |
| Sales/Marketing/Allocations | 6,308 | 2,378 | 5,627 | 4,730 | 3,530 | 3,498 | 3,500 | 4,303 | 4,303 | 4,303 | 4,303 | 4,303 | 4,303 | 4,303 | 4,303 |
| Referral Fees | 13,162 | 2,253 | 17,186 | 12,736 | 8,500 | 32,860 | 15,133 | 10,358 | 10,358 | 10,358 | 10,358 | 10,358 | 10,358 | 10,358 | 10,358 |
| Dining | 85,304 | 77,024 | 80,651 | 79,886 | 80,053 | 80,833 | 80,655 | 89,961 | 89,961 | 89,961 | 89,961 | 89,961 | 89,961 | 89,961 | 89,961 |
| **TOTAL NON LABOR COST** | **145,854** | **117,445** | **139,272** | **152,980** | **127,624** | **153,919** | **143,292** | **143,641** | **143,641** | **143,641** | **143,641** | **143,641** | **143,641** | **143,641** | **143,641** |
| **TOTAL CONTROLLABLE COST** | **377,994** | **317,352** | **363,305** | **366,233** | **345,009** | **390,153** | **380,450** | **363,912** | **363,912** | **363,912** | **363,912** | **363,912** | **363,912** | **363,912** | **363,912** |
| **Non Controllable Expenses** | | | | | | | | | | | | | | | |
| Utilities | 15,909 | 17,365 | -5,007 | 7,539 | 41,238 | 17,402 | 18,482 | 32,954 | 32,954 | 32,954 | 32,954 | 32,954 | 32,954 | 32,954 | 32,954 |
| Home Office Allocations | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 | 5,533 |
| Real Estate Taxes | 36,067 | 1,078 | 36,067 | 36,067 | -16,417 | 18,572 | 18,625 | 18,572 | 18,572 | 18,572 | 18,572 | 18,572 | 18,572 | 18,572 | 18,572 |
| Management Fees | 29,426 | 27,202 | 29,848 | 31,083 | 30,721 | 31,341 | 34,421 | 35,806 | 35,806 | 35,806 | 35,806 | 35,806 | 35,806 | 35,806 | 35,806 |
| Insurance | 27,064 | 27,064 | 27,064 | 23,218 | 26,173 | 26,173 | 26,173 | 26,173 | 26,173 | 26,173 | 26,173 | 26,173 | 26,173 | 26,173 | 26,173 |
| **TOTAL NON-CONTROLLABLE COSTS** | **113,999** | **78,242** | **93,505** | **103,440** | **87,248** | **99,021** | **103,234** | **119,038** | **119,038** | **119,038** | **119,038** | **119,038** | **119,038** | **119,038** | **119,038** |
| **TOTAL EXPENSES** | **$491,993** | **$395,594** | **$456,810** | **$469,673** | **$432,257** | **$489,174** | **$483,684** | **$482,950** | **$482,950** | **$482,950** | **$482,950** | **$482,950** | **$482,950** | **$482,950** | **$482,950** |
| **Cash Based NOI (Net Operating Income)** | **-$1,566** | **$58,273** | **$40,682** | **$45,547** | **$79,926** | **$35,929** | **$90,400** | **$113,865** | **$113,865** | **$113,865** | **$113,865** | **$113,865** | **$113,865** | **$113,865** | **$113,865** |
| **Non Operating Expenses:** | | | | | | | | | | | | | | | |
| Labor - Non-Operating | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Dining - Non-Operating | 3,700 | 0 | 186 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Supplies - Non Operating | 1,228 | 1,006 | 257 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Bad Debt - Non-Operating | 1,000 | 1,000 | 3,000 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| Non-Operating Covid-19 Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 | 5,000 |
| Receiver Expenses | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 | 30,000 |
| **TOTAL Non-Operating Expenses** | **$5,928** | **$2,006** | **$3,443** | **$0** | **$0** | **$0** | **$0** | **$0** | **$5,000** | **$35,000** | **$35,000** | **$35,000** | **$35,000** | **$35,000** | **$35,000** |
| **Cash Based NOI AFTER NON OPERATING EXPENSES** | **-$7,494** | **$56,267** | **$37,239** | **$45,547** | **$79,926** | **$35,929** | **$90,400** | **$113,865** | **$108,865** | **$78,865** | **$78,865** | **$78,865** | **$78,865** | **$78,865** | **$78,865** |

## Automated Certificate of eService

This automated certificate of service was created by the efiling system. The filer served this document via email generated by the efiling system on the date and to the persons listed below. The rules governing certificates of service have not changed. Filers must still provide a certificate of service that complies with all applicable rules.

Janet Hopper on behalf of Aimee Furness
Bar No. 24026882
janet.hopper@haynesboone.com
Envelope ID: 57996217
Status as of 10/12/2021 9:29 AM CST

Case Contacts

| Name | BarNumber | Email | TimestampSubmitted | Status |
|---|---|---|---|---|
| Aimee Furness | | aimee.furness@haynesboone.com | 10/7/2021 5:04:45 PM | SENT |
| Taylor R.Robertson | | taylor.robertson@haynesboone.com | 10/7/2021 5:04:45 PM | SENT |
| Tiffany Thrasher | | tiffany.thrasher@haynesboone.com | 10/7/2021 5:04:45 PM | SENT |
| Janet Hopper | | janet.hopper@haynesboone.com | 10/7/2021 5:04:45 PM | SENT |