UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

IN RE:

SENIOR CARE LIVING VII, LLC,                    CASE NO. 8:22-bk-00103-CED
                                                Chapter 11

      Debtor.

_____/

**DEBTOR'S MOTION FOR ORDER AUTHORIZING THE SALE OF
SUBSTANTIALLY ALL ASSETS AND THE ASSUMPTION AND ASSIGNMENT OF
DESIGNATED CONTRACTS PURSUANT TO BIDDING PROCEDURES
AND 11 U.S.C. §§ 363 and 365, FREE AND CLEAR OF ALL LIENS, CLAIMS AND
ENCUMBRANCES, SUBJECT TO HIGHER AND BETTER OFFERS AT AUCTION**

---

**A hearing on this Motion will be held on <u>November 21, 2022, at 1:30 p.m.</u>, in
Courtroom 9A, Sam M. Gibbons United States Courthouse, 801 N. Florida
Avenue, Tampa, Florida, before the Honorable Caryl E. Delano, Bankruptcy
Judge.**

---

SENIOR CARE LIVING VII, LLC, as debtor and debtor in possession (the "Debtor"),  by

and through its undersigned attorneys, respectfully requests the entry of an order by this Court

authorizing the sale of substantially all of its assets free and clear of any and all claims (including

"claims" as defined in Section 101(5) of the Bankruptcy Code), mortgages, pledges, liens, security

interests, interests, charges, encumbrances, setoffs, recoupments, cure claims, liabilities, debts,

indebtedness, costs, damages, judgments or obligations of any character whatsoever and whenever

arising, either before or after the date of the filing of this Chapter 11 case (collectively, the

"Encumbrances") and the assumption and assignment of the Designated Contracts[1], pursuant to 11

---

[1] Unless otherwise defined herein, all capitalized terms have the meaning given to such terms in this
Court's Bidding Procedures Order.

U.S.C. §§ 363 and 365 and this Court's Bidding Procedures Order (Doc. No. 187).[2]  In support of

this Motion, the Debtor states as follows:

### Jurisdiction and Venue

1.        This Court has jurisdiction to consider this Motion pursuant to 28 U.S.C. §§ 157

and 1334.  The subject matter of this Motion is a core proceeding pursuant to 28 U.S.C. § 157(b).

Venue is proper in this district pursuant to 28 U.S.C. § 1408.  The statutory predicates for the relief

sought in this Motion include 11 U.S.C. §§ 105, 363, 365, 1107 and 1108 and Rules 2002, 6004,

and 6006 of the Federal Rules of Bankruptcy Procedure.

### General Background

2.        On January 10, 2022 (the "Petition Date"), the Debtor filed a voluntary petition for

relief under Chapter 11 of Title 11 of the United States Code (the "Bankruptcy Code").

3.        Since the Petition Date, the Debtor has continued to operate its business and

manage its properties as a debtor-in-possession pursuant to Sections 1107(a) and 1108 of the

Bankruptcy Code.

4.        The Debtor owns and operates an adult living facility in Texas and adjacent vacant

land.  For a more detailed discussion of the Debtor's business and the reasons for the Chapter 11

filing, please see the Debtor's Chapter 11 Case Management Summary (Doc. No. 5).

5.        No previous application for the relief sought in this Motion has been made by the

Debtor to this Court or any other court.

6.        No official committee has been appointed in this case.

7.        UMB Bank, N.A. (the "Bond Trustee") serves as successor bond trustee and

successor master trustee for the Senior Housing Revenue Bonds (Inspired Living at Lewisville

---

2    Pursuant to the Bidding Procedures Order, the offer of the MPH Partners, LLC ("MPH"), the Excess Land Stalking Horse
     Bidder, as set forth in the Commercial Contract of Sale attached as Exhibit 1 to the Bidding Procedures, is subject to higher
     and better bids.

Project) Series 2016 (the "Bonds"), which were issued in 2016 in the aggregate principal amount of $45,385,000 for the benefit of the Debtor. As security for the Debtor's obligations owing on the Bonds, the Bond Trustee holds a valid, first priority security interest in substantially all of the Debtor's Assets, including the Facility and the Excess Land.  The Bond Trustee timely filed a proof of claim (Claim No. 4) for the total amount outstanding on the Bonds, *i.e.* $54,060,936.15, which is comprised of $45,385,000 in outstanding principal and $8,675,936.15 in outstanding interest.  The Debtor's Assets are further encumbered by real estate tax obligations in favor of Tarpon Hunters, LLC, Lewisville ISD, and The County of Denton, Texas.

8.      On or about May 27, 2022, the Debtor and MPH executed a Commercial Contract of Sale which provides for the sale by the Debtor, and the purchase by MPH, of certain undeveloped real property of approximately 4.01+/- acres located along West Round Grove Road in Lewisville, Texas, *i.e.* the Excess Land for $1,683,445.00 in cash.  An executed copy of the Commercial Contract of Sale is attached to Bidding Procedures that are attached to and approved by this Court's Bidding Procedures Order.[3]

### Sale Efforts; Bidding Procedures; Summary of Purchase Agreement

*Sale Efforts*

9.      The Debtor has determined, in the exercise of its business judgment and in consultation with the Bond Trustee, that it would be in the best interests of its creditors and its estate to maximize value through a sale of substantially all of its assets pursuant to Section 363 of the Bankruptcy Code.  As presently contemplated, the sale will be pursuant to Section 363 of the

---

3       In order to reduce photocopying and mailing costs, a copy of the Commercial Contract of Sale is not being attached and served on all parties as it has already been served with the Bidding Procedures Order.

Bankruptcy Code, and the closing of the sale will occur on or before March 1, 2023, with the distribution of available sale proceeds to its creditors as provided by order of this Court.

10.    The Excess Land has been listed and marketed for sale by the Debtor's court-approved real estate broker, Matthew Huckin of Valhalla Real Estate. *See* Doc. 57.

11.    In consultation with the Bond Trustee, the Debtor engaged RBC Capital Markets, LLC, and Meridian Capital Group, LLC (collectively, "RBC"), as investment banker/broker to assist the Debtor with the sale of its Assets, including the Facility and the Excess Land. *See* Doc. 190.

12.    The Debtor determined, in the exercise of its business judgment and in consultation with the Bond Trustee, that it would be in the best interests of creditors and its estate to maximize value through the sale of substantially all of its Assets pursuant to Bidding Procedures.

*Bidding Procedures*

13.    In connection with the proposed sale by the Debtor of substantially all of its Assets, on August 31, 2022, the Court entered its Bidding Procedures Order (Doc. 187).  The Bidding Procedures are attached as Exhibit A to the Bidding Procedures Order and govern the sale of the Debtor's Assets.

14.    The Bidding Procedures Order granted the relief requested by the Debtor after a hearing conducted on August 31, 2022, including, but not limited to, approval of (a) procedures for the submission of competing bids for the sale and purchase of the Debtor's Assets, (b) minimum overbid amounts, (c) break-up fees to MPH as the Excess Land Stalking Horse Bidder and to any Stalking Horse Bidder designated by the Debtor, (d)  procedures governing the assumption and assignment of Designated Contracts, and (e) various deadlines, including the deadlines to file competing bids and file objections to the sale.  The Bidding Procedures Order also set forth the date for an auction of the Debtor's Assets (November 16, 2022) and the hearing on

the sale on November 21, 2022 (the "Sale Hearing").  In addition, as set forth above, MPH has been designated as the Excess Land Stalking Horse Bidder.  All parties are directed to review the Bidding Procedures attached to the Bidding Procedures Order for the process governing submission of competing bids and the bid deadline.

15.    On September 1, 2022, following the entry of the Bidding Procedures Order, the Debtor mailed or served the Bidding Procedures Order, by United States first class mail or CM/ECF transmission, to (i) all parties and creditors on the Court's mailing matrices for this case (including all parties listed on the Local Rule 1007-2 Parties in Interest List for this case), and (ii) all parties which, to the knowledge of the Debtor, have, or have asserted, liens on the Assets (Doc. 192).

*Summary of Purchase Agreements*

16.    As set forth above, on or about May 27, 2022, the Debtor and MPH executed a Commercial Contract of Sale which provides for the sale by the Debtor, and the purchase by MPH, the Excess Land for $1,683,445.00 in cash.  MPH is not an affiliate of the Debtor.  MPH has been designated as the Excess Land Stalking Horse Bidder pursuant to the Bidding Procedures.

17.    The form of Asset Purchase Agreement relating to a bid for the Debtor's Assets is attached hereto as **Exhibit A**.  This form agreement is available to interested purchasers in the data room maintained by RBC.

18.    The principal business terms of the form Asset Purchase Agreement are set forth in the attached Exhibit A and are typical for a sale of this type.

19.    The Debtor's Assets shall be sold, transferred and conveyed by the Debtor to the Winning Bidder(s) free and clear of all Encumbrances, pursuant to Section 363 of the Bankruptcy Code and an order of this Court granting this Motion (the "Sale Order").  The Encumbrances of any creditors or claimants of any kind whatsoever will attach to the sale proceeds to the same

extent, validity and priority as existed on the Debtor's Assets as of the Petition Date. The closing of the sale(s) will occur pursuant to the Bidding Procedures, and the available sale proceeds will be distributed to the Debtor's creditors as order by the Court or as provided in a plan of reorganization.

### Relief Requested

20.     By this Motion, the Debtor requests that this Court, pursuant to Sections 363(b), (f), (m) and 365 of the Bankruptcy Code and Rule 6004 of the Federal Rules of Bankruptcy Procedure, approve, among other things, (i) the sale(s) of the Debtor's Assets free and clear of all Encumbrances, and (ii) the assumption and assignment of the Designated Contracts.

21.     Section 363(b)(1) states that the "trustee, after notice and a hearing, may use, sell, or lease, other than in the ordinary course of business, property of the estate." 11 U.S.C. §363(b)(1). A debtor must demonstrate a sound business justification for a sale or use of assets outside the ordinary course of business. *See, e.g.*, *Licensing by Paolo, Inc. v. Sinatra (In re Gucci)*, 126 F.3d 380, 387 (2d Cir. 1997); *Comm. of Equity Sec. Holders v. Lionel Corp. (In re Lionel Corp.)*, 722 F.2d 1063, 1070 (2d Cir. 1983); *In re Global Crossing Ltd.,* 295 B.R. 726, 743 (Bankr. S.D.N.Y. 2003); *In re Ionosphere Clubs, Inc.*, 100 B.R. 670, 675 (Bankr. S.D.N.Y. 1989); *In re Phoenix Steel Corp.*, 82 B.R. 334, 335-36 (Bankr. D. Del. 1987) (stating that judicial approval of a section 363 sale requires a showing that the proposed sale is fair and equitable, a good business reason exists for completing the sale and the transaction is in good faith); *cf. In re Delphi Corp.*, No. 05-44481(RDD), 2009 WL 2482146, at *6 (Bankr. S.D.N.Y. July 20, 2009) (Drain, J.) ("Debtors have demonstrated compelling circumstances and a good, sufficient and sound business purpose and justification for the sale under section 363(b) and (f) of the Bankruptcy Code."). Courts usually defer to the business judgment of a debtor in deciding whether or not to authorize a debtor to sell property outside the ordinary course of business. *See e.g., In re Continental Airlines, Inc.,* 780 F.2d

1223 (5th Cir. 1986); *In re Lionel Corp.,* 722 F.2d 1063, 1071 (2nd Cir. 1983); *In re Mason's Nursing Center, Inc.,* 73 E.R. 360, 362 (Bankr. S.D. Fla. 1987).

22.     In considering whether a debtor is justified in selling assets outside the ordinary course of business, courts consider four factors: (1) a sound business reason or emergency justifies a pre-confirmation sale; (2) adequate and reasonable notice of the sale was provided through interested parties; (3) the sale has been proposed in good faith; and (4) the purchase price is fair and reasonable.

23.     For all of the reasons set forth in this Motion, the Debtor, through the exercise of its business judgment, has determined that the sale of the Debtor's Assets is in the best interests of the Debtor, its creditors and its estate.  The Debtor, in consultation with the Bond Trustee and its professionals, has engaged in extensive efforts to market the Debtor's Assets and has determined that the proposed Bidding Procedures will produce the highest and best offer(s) for the Debtor's Assets, and that the proposed sale is in the best interest of the estate.  Moreover, as set forth in the Bidding Procedures Order, the sale is subject to higher and better offers which will insure that the price is fair and reasonable.

24.     Any purchase agreement has been or will be negotiated in good faith and at arm's length between any purchaser and the Debtor.  The Debtor believes that any Winning Bidder (or Backup Bidder) will be a good faith purchaser entitled to the protections of Sections 363(m) of the Bankruptcy Code.

25.     Section 363(m) of the Bankruptcy Code provides:

> The reversal or modification on appeal of an authorization under subsection (b) or (c) of this section of a sale or lease of property does not affect the validity of a sale or lease under such authorization to an entity that purchased or leased such property in good faith, whether or not such entity knew of the pendency of the appeal,

> unless such authorization and such sale or lease were stayed pending
> appeal.

11 U.S.C. § 363(m).

26.     Although the Bankruptcy Code does not define "good faith," the Second Circuit

Court of Appeals, in *In re Gucci*, 126 F.3d 380 (2d Cir. 1997), has held that the:

> [g]ood faith of a purchaser is shown by the integrity of his conduct during
> the course of the sale proceedings; where there is a lack of such integrity, a
> good faith finding may not be made. A purchaser's good faith is lost by
> "fraud, collusion between the purchaser and other bidders or the trustee, or
> an attempt to take grossly unfair advantage of other bidders."

*Id.* at 390 (quoting *In re Rock Indus. Mach. Corp.*, 572 F.2d 1195, 1198 (7th Cir. 1978) (interpreting

Bankruptcy Rule 805, the precursor to section 363(m) of the Bankruptcy Code)); see also *Bace v.

Babbitt*, No. 07 Civ. 2420 (WHP), 2008 WL 800579, at *3 (S.D.N.Y. Mar. 25, 2008) (same)

(quoting *Gucci*, 126 F.3d at 390); *In re Sasson Jeans, Inc.*, 90 B.R. 608, 610 (S.D.N.Y. 1988) (same)

(quoting *Tompkins v. Frey (In re Bel Air Assocs., Ltd.)*, 706 F.2d 301, 305 (10th Cir. 1983)).

27.     The Debtor submits that any third party purchaser is a "good faith purchaser" within

the meaning of Section 363(m) of the Bankruptcy Code.  The consideration to be received by the

Debtor pursuant to any purchase agreement is substantial, fair and reasonable.  Accordingly, the

Debtor seeks a finding that the Winning Bidder(s) (as defined in the Bid Procedures Order) is a

"good faith purchaser" under Section 363(m) of the Bankruptcy Code and is entitled to the full

protection thereof.

28.     The Debtor requests approval to sell the Assets free and clear of any and all

Encumbrances, except for any Assumed Liabilities, in accordance with Section 363(f) of the

Bankruptcy Code.  Pursuant to Section 363(f) of the Bankruptcy Code, a debtor in possession may

sell property of the estate "free and clear of any interest in such property of an entity other than

the estate" if any one of the following conditions is satisfied:

      (a)      applicable nonbankruptcy law permits sale of such property free and clear of such interest;

      (b)      such entity consents;

      (c)      such interest is a lien and the price at which such property is to be sold is greater than the aggregate value of all liens on such property;

      (d)      such interest is in *bona fide* dispute; or

      (e)      such entity could be compelled, in a legal or equitable proceeding, to accept a money satisfaction of such interest.

11 U.S.C. § 363(f); *see also Contrarian Funds, LLC v. Westpoint Stevens, Inc. (In re Westpoint Stevens, Inc.)*, 333 B.R. 30, 50 (S.D.N.Y. 2005) ("Where ... a sale is to be free and clear of existing liens and interests other than those of the estate, one or more of the criteria specified in section 363(f) of the statute must also be met."), *rev'd in part on other grounds* 600 F.3d 231 (2d Cir. 2010). This provision is supplemented by section 105(a) of the Bankruptcy Code, which provides that "[t]he court may issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of [the Bankruptcy Code]." 11 U.S.C. § 105(a); *see also Volvo White Truck Corp. v. Chambersburg Beverage, Inc. (In re White Motor Credit Corp.)*, 75 B.R. 944, 948 (Bankr. N.D. Ohio 1987) ("Authority to conduct such sales is within the court's equitable powers when necessary to carry out the provisions of Title 11.").

29.      The Debtor submits that the proposed sale to the Purchaser will satisfy Section 363(f) of the Bankruptcy Code, and therefore, the sale of the Assets should be approved free and clear of all Encumbrances.

30.      The Debtor further submits that the assumption and assignment of the Designated Contracts should be approved pursuant to Section 365 of the Bankruptcy Code.

31.     Section 365 provides that a debtor, subject to bankruptcy court approval, may assume or reject executory contracts. 11 U.S.C. § 365(a). A bankruptcy court should examine the contract to be assumed and surrounding circumstances, and determine, using its best "business judgment", whether assumption would be beneficial or burdensome to the estate. *Chira v. Saal (In re Chira),* 367 B.R. 888, 898 (S.D. Fla. 2007). Assumption is warranted when the debtor can demonstrate in its "business judgment" that assumption would benefit the estate. *Id.*

32.     Once an executory contract is assumed, Section 365(f) allows the debtor to assign such contract to a third party if there is adequate assurance of future performance by the proposed assignee. "Adequate assurance of future performance" depends on the facts and circumstances of the proposed assumption, but the required assurance falls far short of an absolute guarantee of performance. *In re DH4, Inc.,* 2007 Bankr. LEXIS 3814 (Bankr. S.D. Fla. November 2, 2007). Upon assignment, the debtor is relieved of any further liability under the contract, pursuant to section 365(k).

33.     The assumption and assignment of the Designated Contracts is essential to the proposed sale to the Purchaser. Therefore, the assumption and assignment of the Designated Contracts is a sound exercise of the Debtor's business judgment and will benefit the Debtor's bankruptcy estate. Pursuant to the procedures set forth in the Court's Bidding Procedures Order, counterparties to the Designated Contracts will have an opportunity to object to the adequacy of the assurance or assumption and/or assignment of its Designated Contract as set forth in the Assumption Notice. Accordingly, the Court should authorize the Debtor to assume and assign the Designated Contracts as part of the Sale.

**Transfer Tax Exemption**

34.     To the extent that the sale of the Assets is in contemplation and furtherance of the confirmation of a plan of reorganization, pursuant to Section 1146(a) of the Bankruptcy Code, the Debtor hereby requests that the making or delivery of an instrument or instruments of transfer, any or all of which include the vesting, transfer and/or the sale of any real or personal property or any direct or indirect interest therein, including, without limitation, all documents relating to or referred to in the Purchase Agreement, not be taxed under any law imposing any recording, registration, transfer or stamp tax or fee, or any similar tax or fee, including any applicable transfer taxes or fees, sales taxes, or mortgage recording taxes or fees.  The Debtor further requests that all Federal, state and local governmental agencies or departments be directed to accept and abide by the terms of the transfer tax exemption as set forth herein in connection with any transfer of the Assets, including accepting any and all documents and instruments necessary and appropriate to consummate the transactions contemplated by any purchase agreement, including any special warranty deed, bill of sale, or assignment agreement.

**Notice**

35.     A copy of this Motion with attached **Exhibit A** is being served on MPH, the Office of the United States Trustee, and all parties receiving CM/ECF Transmission in this case.  A copy of this Motion without attached **Exhibit A** is being served on all parties set forth on the Local Rule 1007(d) Parties in Interest List for this case as set forth on the service list attached to this Motion (which includes the twenty (20) largest unsecured creditors of the Debtor) and all other creditors of the Debtor as set forth on the Court's master mailing matrix for this case attached to this Motion (which includes all parties which, to the knowledge of the Debtor, have, or have asserted, liens on the Assets).  Accordingly, the Debtor requests that the Court enter an order finding that such notice

of this Motion is adequate and sufficient and complies with the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure and the Local Rules of this Court.

36.    At the Sale Hearing, the Debtor will request that the Court enter an order waiving the 14-day stays set forth in Rules 6004(h) and 6006(d) of the Federal Rules of Bankruptcy Procedure and providing that the orders granting this Motion be immediately enforceable and that the closing(s) may occur immediately.  In addition, the Debtor will request that the Court find that the Debtor has complied with Rules 6006(e) and (f) of the Federal Rules of Bankruptcy Procedure. Any objection to the proposed sale(s) must be filed with the Court by no later than **November 18, 2022.**

WHEREFORE, the Debtor respectfully requests entry of an order granting the relief requested herein, and such other and further relief as is just and proper.

/s/ Michael C. Markham
Michael C. Markham (FBN 0768560)
Johnson Pope Bokor Ruppel & Burns, LLP
401 E. Jackson Street, Suite 3100
Tampa, Florida 33602
(727) 480-5118
Email: mikem@jpfirm.com
Attorneys for Debtor

## **CERTIFICATE OF SERVICE**

I HEREBY CERTIFY that a true and correct copy of the foregoing **Debtor's Motion for Order Authorizing the Sale of Substantially All of Its Assets and the Assumption and Assignment of Designated Contracts Pursuant to 11 U.S.C. §§ 363 and 365, Free and Clear of All Liens, Claims and Encumbrances, Subject to Higher and Better Offers at Auction**, has been furnished on this 27th day of October, 2022, by either the Court's electronic CM/ECF transmission or by United States first class mail to: (i) the Office of the United States Trustee, (ii)

MPH at vino@mphpartners.com, (iii) all parties on the Local Rule 1007-2 Parties in Interest List for this case as set forth on the service list attached hereto (which includes the twenty (20) largest unsecured creditors of the Debtor), and (iv) all other creditors of the Debtor as indicated on the Court's master mailing matrix for this case attached hereto (which includes all parties which, to the knowledge of the Debtor, have, or have asserted, liens on the Assets).

/s/ Michael C. Markham
Michael C. Markham

## Exhibit A

**Form Asset Purchase Agreement**

(See Attached Document)

ASSET PURCHASE AGREEMENT

by and among

[·]

as Purchaser

and

Senior Care Living VII, LLC,

as Seller

[·], 2022

# TABLE OF CONTENTS

PAGE

ARTICLE I      Definitions ...............................................................1

    1.1      Defined Terms...................................................................1
    1.2      References to Dollars.........................................................8
    1.3      General Rules of Construction ..........................................8

ARTICLE II      General Provisions of Purchase and Sale ....................8

    2.1      Purchase and Sale of Acquired Assets.............................8
    2.2      Excluded Assets.................................................................10
    2.3      Assumption of Liabilities..................................................10
    2.4      Retained Liabilities ...........................................................10
    2.5      Closing Proceedings ..........................................................11
    2.6      Instruments of Transfer and Conveyance; Delivery of Records/Contracts ......11
    2.7      Allocation of Purchase Price.............................................12
    2.8      Assignment of Rights of Purchaser; Nominee .................12
    2.9      Adjustments to Purchase Price ..........................................12

ARTICLE III      Representations and warranties of Seller.....................13

    3.1      Organization ......................................................................13
    3.2      Execution and Delivery.....................................................13
    3.3      Litigation Proceedings; Judgments...................................13
    3.4      Financial Statements..........................................................13
    3.5      Compliance with Legal Requirements...............................14
    3.6      Broker ................................................................................14
    3.7      Environmental Matters.......................................................14
    3.8      The Property.......................................................................14
    3.9      Insurance ...........................................................................14
    3.10     Expiration of Representations and Warranties..................15

ARTICLE IV      Representations and warranties of Purchaser ..............15

    4.1      Organization ......................................................................15
    4.2      Authorization.....................................................................15
    4.3      No Conflicts ......................................................................15
    4.4      Licensure ...........................................................................15
    4.5      Compliance with Legal Requirements...............................15
    4.6      Litigation...........................................................................16
    4.7      Financing............................................................................16
    4.8      "AS IS" Transaction .........................................................16
    4.9      ACKNOWLEDGMENT......................................................17
    4.10     Obligation to Provide Updates .........................................17

ARTICLE V      Risks, Conduct and Covenants of the Parties ..............17

    5.1      Risk of Loss; Condemnation .............................................17
    5.2      Casualty Losses/Condemnation ........................................17

i

| | | |
|---|---|---|
| 5.3 | Access to Books and Records | 18 |
| 5.4 | Cooperation; Approvals | 18 |
| 5.5 | Further Assurances | 18 |
| 5.6 | Deposit | 18 |
| 5.7 | Employees and Employee Benefits | 19 |
| 5.8 | WARN | 19 |
| 5.9 | COBRA Continuation Coverage | 19 |
| 5.10 | Assumed and Assigned Contracts | 20 |
| 5.11 | Affirmative Covenants of Seller Regarding Conduct of Business Prior to the Closing | 20 |
| 5.12 | Negative Covenants of Seller Regarding Conduct of Business Prior to the Closing | 21 |
| 5.13 | Consummation of Agreement | 22 |
| 5.14 | Confidentiality | 22 |
| 5.15 | Fees and Expenses | 23 |
| 5.16 | Resident Medical Records | 23 |
| 5.17 | Access and Inspection | 23 |
| 5.18 | Eligible Rollovers from 403(b) Plan | 24 |
| 5.19 | Accounts Receivable | 24 |
| 5.20 | Diligent Application for All Approvals | 25 |
| 5.21 | Bankruptcy Court Matters | 25 |
| ARTICLE VI | Purchaser's Conditions Precedent to Closing | 27 |
| 6.1 | Bankruptcy Matters | 27 |
| 6.2 | Observance and Performance | 27 |
| 6.3 | No Legal Actions | 27 |
| 6.4 | Permits | 27 |
| 6.5 | Title | 27 |
| ARTICLE VII | Seller's Conditions Precedent to Closing | 27 |
| 7.1 | Bankruptcy Matters | 27 |
| 7.2 | Observance and Performance | 27 |
| 7.3 | No Legal Actions | 28 |
| 7.4 | Permits | 28 |
| ARTICLE VIII | Rights of Termination and Remedies for Default | 28 |
| 8.1 | Termination | 28 |
| 8.2 | Remedies | 28 |
| ARTICLE IX | closing | 29 |
| 9.1 | Closing Date | 29 |
| 9.2 | Deliveries of Seller at Closing | 29 |
| 9.3 | Deliveries of Purchaser at Closing | 30 |
| ARTICLE X | Miscellaneous | 31 |
| 10.1 | No Broker | 31 |
| 10.2 | Entire Agreement | 31 |

10.3     Binding Effect; Assignment .......................................................................................31
10.4     Notices ......................................................................................................................31
10.5     Captions .....................................................................................................................32
10.6     Joint Effort ................................................................................................................32
10.7     Counterparts ..............................................................................................................32
10.8     Partial Invalidity .......................................................................................................32
10.9     No Offer .....................................................................................................................32
10.10    Amendments...............................................................................................................32
10.11    Schedules and Exhibits .............................................................................................32
10.12    Waivers ......................................................................................................................32
10.13    Attorneys' Fees..........................................................................................................33
10.14    Course of Dealing ......................................................................................................33
10.15    Jurisdiction ................................................................................................................33
10.16    WAIVER OF JURY TRIAL .....................................................................................33
10.17    Governing Law ..........................................................................................................34
10.18    Third Parties ..............................................................................................................34

## ASSET PURCHASE AGREEMENT

This Asset Purchase Agreement (as currently existing and from time to time in effect, this "Agreement") is made and entered into as of [·], 2022 (the "Execution Date"), by and among [·] ("Purchaser") and Senior Care Living VII, LLC (the "Seller").  The Seller and Purchaser are sometimes collectively referred to herein as the "Parties" and individually referred to herein as a "Party."

## RECITALS:

**WHEREAS**, on January 10, 2022, the Seller filed a voluntary petition for relief under chapter 11 of title 11 of the United States Code (the "Bankruptcy Code") with the United States Bankruptcy Court for the Middle District of Florida (the "Bankruptcy Court") where such case is currently pending under Case Number 8:22-bk-00103-CED (the "Chapter 11 Case");

**WHEREAS**, Seller is the owner of certain real estate and the improvements thereon used in connection with the assisted living facility known as Inspired Living at Lewisville, located at 1080 W Round Grove Road, Lewisville, Texas 75067;

**WHEREAS**, Seller, in its business judgment, has determined that a sale of the Acquired Assets and Assumed Liabilities is in the best interests of its bankruptcy estate and all of its creditors and parties-in-interest, and Seller has obtained the approval of the Bankruptcy Court of a process for the proposed sale;

**WHEREAS**, Purchaser has agreed to purchase the Acquired Assets as of the Closing, and Purchaser is willing to assume from Sellers the Assumed Liabilities as of the Closing, in each case upon terms and subject to the conditions set forth hereinafter, and desires to act as the stalking horse in the sale process; and

**WHEREAS**, the transactions contemplated by this Agreement will be subject to higher and better bids, as well as the approval of the Bankruptcy Court and certain other conditions, as expressly set forth herein, including but not limited to the entry of the Sale Order approving and authorizing the Sale pursuant to sections 363, 365 and other applicable provisions of the Bankruptcy Code.

**NOW, THEREFORE**, for and in consideration of the premises and the mutual covenants, conditions, representations and undertakings hereinafter contained, and other valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Parties hereto do hereby agree as follows:

ARTICLE I

DEFINITIONS

1.1     Defined Terms.  As used in this Agreement, the following terms shall have the meanings specified or referred to below:

"Acquired Assets" shall have the meaning ascribed thereto in Section 2.1.

"<u>Affiliate</u>" of any Person shall mean any entity which, directly or indirectly, controls or is controlled by that Person, or is under common control with that Person. For the purposes of this definition, "control" (including, with correlative meaning, the terms "controlled by" and "under common control with"), as used with respect to any Person, shall mean the possession, directly or indirectly, of the power to direct or cause the direction of the management and policies of such Person, whether through the ownership of voting securities or by contract or otherwise.

"<u>Agreement</u>" shall have the meaning ascribed thereto in the preamble.

"<u>Alternative Transaction</u>" shall means if Seller selects a bid by someone other than Purchaser as the "highest or best offer" in accordance with the Bidding Procedures Order and said selection is not overruled by the Bankruptcy Court and the sale to such bidder closes.

"<u>Applicable Law</u>" shall mean means all applicable laws, statutes, regulations, rules, ordinances, codes, licenses, permits and orders, from time to time in existence, of all courts of competent jurisdiction and Regulatory Authorities, and all applicable judicial and administrative and regulatory decrees, judgments and orders, including common law rulings and determinations of any kind, including without limitation, those relating to (i) damage to, or the protection of real or personal property, (ii) human health and safety (except those requirements which, by definition, are solely the responsibility of employers), (iii) Environmental Laws, (iv) accessibility for the disabled or handicapped, including, but not limited to, any applicable provisions of The Architectural Barriers Act of 1968, The Rehabilitation Act of 1973, The Fair Housing Act of 1988, The Americans With Disabilities Act, the accessibility code(s), if any, of the State in which the Facility is located, (v) the laws described herein, (vi) any laws applicable to the Facility under any third party payor program contract, and all regulations and guidelines lawfully promulgated under any of the foregoing, as the same may be amended from time to time; and (vii) all Healthcare Regulatory Laws.

"<u>Approvals</u>" shall means any approval, authorization, consent, notice, qualification or registration, or any extension, modification, amendment or waiver of any of the foregoing, of or from, or any notice, statement, filing or other communication to be filed with or delivered to, any Regulatory Authority necessary to consummate the transactions contemplated under this Agreement all as set forth on <u>Exhibit A</u>.

"<u>Assumed Benefit Liabilities</u>" shall mean any and all vested and accrued vacation pay, holiday pay and sick leave expense (but only to the extent such sums are determined in accordance with <u>Schedule X</u> and actually credited to Purchaser on the settlement statement executed by the parties at the Closing) and employment related taxes and benefit expenses related thereto for all Hired Employees which remain unpaid with respect to or for any period ending on or prior to the Closing Date, determined in accordance with the method described on <u>Schedule X</u> hereto.

"<u>Assumed Contracts</u>" shall have the meaning ascribed thereto in Section 5.10.

"<u>Assumed Liabilities</u>" shall have the meaning ascribed thereto in Section 2.3.

"<u>Back-Up Bidder</u>" shall have the meaning ascribed thereto in Section 5.21.

"<u>Bankruptcy Code</u>" shall have the meaning ascribed thereto in the preamble.

"Bankruptcy Court" shall have the meaning ascribed thereto in the preamble.

"Bidding Procedures Order" shall mean that certain order entered by the Bankruptcy Court on August [____], 2022, approving the bidding procedures in connection with the sale of substantially all of the Seller's assets, approving the form and manner of notice thereof, scheduling an auction and a sale hearing, approving procedures for the assumption and assignment of contracts, and granting related relief, a copy of which is attached hereto as Exhibit B.

"Bonds" shall mean, collectively, the following series of bonds:  (i) $35,925,000 Senior Housing Revenue Bonds (Inspired Living at Lewisville Project) Series 2016A-1; (ii) $2,555,000 Taxable Senior Housing Revenue Bonds (Inspired Living at Lewisville Project) Series 2016A-2; (iii) $1,915,000 Taxable Senior Housing Revenue Bonds (Inspired Living at Lewisville Project) Series 2016A-3; and (iv) $4,990,000 Subordinate Senior Housing Revenue Bonds (Inspired Living at Lewisville Project) Series 2016B.

"Break-Up Fee" shall mean the amount of $[____].

"Brokers" shall mean, together, RBC Capital Markets, LLC and Meridian Capital.

"Business" shall mean all business and services conducted by the Seller, including the operation of the Facility for the Current Use.

"Business Day" shall mean any day other than Saturday, Sunday or any other day which is a legal holiday in the State of Texas.

"Casualty Loss" shall have the meaning ascribed thereto in Section 5.2.

"Casualty Notice" shall have the meaning ascribed thereto in Section 5.2.

"CHAMPUS" shall mean the Civilian Health and Medical Program of the Uniformed Services, established by 10 USC §§1071 et seq.

"Chapter 11 Case" shall have the meaning ascribed thereto in the preamble.

"Closing" shall have the meaning ascribed thereto in Section 9.1.

"Closing Date" shall have the meaning ascribed thereto in Section 9.1.

"Code" means the Internal Revenue Code of 1986, and the regulations thereunder, published IRS rulings, and court decisions in respect thereof, all as the same shall be in effect at the time.

"Contract Party" shall have the meaning ascribed thereto in Section 5.10.

"Current Use" shall mean the use, as of the date hereof, of the Facility as an assisted living facility, together with all normal and customary uses accessory thereto.

"Cure Amounts" means the amounts necessary pursuant to 11 U.S.C. § 365 to cure defaults under Assumed Contracts.

3

"Deeds" shall have the meaning ascribed thereto in Section 2.6.

"Deposit" shall have the meaning ascribed thereto in Section 2.5.

"Employees" shall have the meaning ascribed thereto in Section 5.7.

"Environmental Laws" shall mean any federal, state, or local Applicable Law relating to the prevention of pollution, protection of health or the environment or natural resources, restoration of environmental quality, or releases of or exposure to Hazardous Materials or the handling, generation, treatment, transportation, storage, use, arrangement for disposal or disposal, manufacture, distribution, formulation, packaging or labeling of Hazardous Materials, including the following federal statutes and the regulations promulgated thereunder:  the Comprehensive Environmental Response, Compensation and Liability Act of 1980; the Emergency Planning and Community Right-To-Know Act; the Resources Conservation and Recovery Act; the Clean Air Act; the Clean Water Act; the Safe Drinking Water Act; the Oil Pollution Act; the Toxic Substances Control Act; the Hazardous Materials Transportation Act; the Federal Insecticide, Fungicide, and Rodenticide Act; and the regulations promulgated pursuant thereto and analogous State and local Applicable Laws.

"ERISA" shall mean the Employee Retirement Income Security Act of 1974, as amended, including the regulations promulgated pursuant thereto.

"Escrow Agent" shall have the meaning ascribed thereto in Section 2.5.

"Escrow Agreement" shall have the meaning ascribed thereto in Section 2.5.

"Excess Land" shall mean the approximately 4 acres of undeveloped real property immediately adjacent to the Facility shown on the plan attached hereto as Exhibit C.

"Excluded Assets" shall have the meaning ascribed thereto in Section 2.2.

"Facility" shall mean the business operations of the approximately 149-unit assisted living facility known as Inspired Living at Lewisville, consisting of approximately 106 assisted living units (accommodating approximately 123 beds), and approximately 43 memory care units (accommodating approximately 51 beds) and related common areas such as dining, recreation and administrative spaces, located at 1080 W Round Grove Road, Lewisville, Texas 75067.

"Financial Statements" shall have the meaning ascribed thereto in Section 3.4.

"GAAP" means generally accepted accounting principles in the United States set forth in the opinions and pronouncements of the Accounting Principles Board and the American Institute of Certified Public Accountants and statements and pronouncements of the Financial Accounting Standards Board or in such other statements by such other entity as may be approved by a significant segment of the accounting profession, which are applicable to the circumstances as of the date of determination.

"Healthcare Regulatory Laws" means:  (i) all state and federal healthcare fraud and abuse laws and regulations, including:  (A) the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b, 42 C.F.R.

§ 1001.952, (B) the Civil Monetary Penalties Law, 42 U.S.C. § 1320a-7a, (C) the federal physician self-referral prohibition, 42 U.S.C. § 1395nn, 42 C.F.R. § 411.351 et seq., and (D) the False Claims Act, 31 U.S.C. § 3729 et seq.; (ii) Department of Health and Human Services, Office of Inspector General Exclusion regulations at 42 C.F.R. part 1001; (iii) applicable state licensing regulations and rules; (iv) federal or state laws related to billing or claims for reimbursement submitted to any third party payor; (v) the Health Insurance Portability and Accountability Act of 1996, as amended by the Health Information Technology for Economic and Clinical Health Act, the regulations promulgated pursuant thereto and comparable state privacy and security laws and regulations; and (vi) the regulations promulgated pursuant thereto and comparable state laws and regulations relating to any and all registration of practitioners to practice nursing and other related professional services.

"Indebtedness" shall mean, as applied to any Person, (i) all items (except items of capital stock or capital or paid-in surplus or retained earnings) which in accordance with GAAP would be included in determining total liabilities as shown on the liability side of the balance sheet of such Person as of the date of which Indebtedness is to be determined, including any capital lease; (ii) all indebtedness secured by any mortgage, pledge, lien or conditional sale or other title retention agreement to which any property or asset owned or held by such Person is subject, whether or not the indebtedness secured thereby shall have been assumed, or such Person is liable therefor; (iii) all indebtedness of others which such Person has directly or indirectly guaranteed, endorsed (otherwise than for collection or deposit in the ordinary course of business), discounted or sold with recourse or agreed (contingently or otherwise) to purchase or repurchase or otherwise acquire, or in respect of which such Person has agreed to supply or advance funds (whether by way of loan, stock purchase, capital contributions or otherwise) or otherwise to become directly or indirectly liable; and (iv) all amounts for which such Person may be liable, contingently or otherwise, under reimbursement, indemnification or contribution agreements and the like, whether with respect to letters of credit issued for the account of such Person or others or otherwise.

"IRS" means the Internal Revenue Service and any similar or successor agency of the federal government administering the Code.

"Knowledge of Seller" shall mean actual knowledge of Seller without any duty of inquiry being imposed.

"Legal Requirements" shall mean all statutes, laws, rules, regulations, orders, judgments, arbitration awards, decrees and Permits of any Regulatory Authority, including, but not limited to, those relating to employment of labor (for example, ERISA, equal opportunity, occupational safety and health, worker adjustment and retraining, wages, hours, and the payment of Social Security and similar Taxes and immigration (including the Immigration Reform Control Act of 1986)), the Medicare and Medicaid programs (for example, fraud and abuse, false claims, and conditions of participation), all building, zoning, fire and safety codes, and laws imposing Taxes or other forms of payment to Regulatory Authorities.

"Lien" means, with respect to the Acquired Assets and/or the Property, any mortgage, deed of trust, pledge, hypothecation, assignment, security interest, lien, charge, restriction, adverse claim by a third party, any assignment or other conveyance of any right to receive income and any assignment of receivables with recourse against assignor), any filing of any financing statement as

debtor under the Uniform Commercial Code or comparable law of any jurisdiction and any agreement to give or make any of the foregoing.

"<u>Medicaid</u>" shall mean the medical assistance program established by Title XIX of the Social Security Act (42 USC §§1396 <u>et</u> <u>seq</u>.) and any statutes succeeding thereto.

"<u>Medicare</u>" shall mean the health insurance program for the aged and disabled established by Title XVIII of the Social Security Act (42 USC §§1395 <u>et</u> <u>seq</u>.) and any statutes succeeding thereto.

"<u>Necessary Consent</u>" shall have the meaning ascribed thereto in Section 5.10.

"<u>Resident Deposits</u>" shall mean any and all deposits made by residents or prospective residents of the Facility that are required to be held in escrow pending actual occupancy of a unit.

"<u>Permits</u>" shall mean all licenses, consents, approvals, certificates of inspection, registrations, qualifications, variances, permissive uses, permits and other authorizations (including, without limitation, discharge permits, sewer permits, building permits, curb cut permits, historic district approvals, wetlands authorizations, subdivision approvals, subdivision plans and all Medicare and Medicaid participation agreements, certificates of use and occupancy and determinations and certificates of need), if any, issued by any Regulatory Authority and benefiting or affecting the Acquired Assets and/or which relate thereto or affect the operation thereof and/or the ownership, construction, development, maintenance, repair, occupancy, or possession thereof.

"<u>Permitted Encumbrances</u>" shall mean (i) the Liens, easements, restrictions, encumbrances, rights, licenses, agreements, encroachments, overlaps, special assessments, claims, leases, tenancies, adverse interests and defects shown on <u>Schedule 2</u> hereto, (ii) the rights of residents occupying the Facility, (iii) all applicable building, zoning laws, rules, ordinances and regulations and Environmental Laws, and (iv) water bills, municipal liens and assessments and real estate Taxes on the Facility and the Property not yet due and payable on the Closing Date.

"<u>Person</u>" shall mean a corporation (including a business trust), association, trust, partnership, joint venture, joint stock company, organization, proprietorship, natural person, government or governmental agency or political subdivision thereof or any other entity of whatever nature.

"<u>Property</u>" shall mean the land shown on the plan attached hereto as <u>Exhibit D</u>, and all buildings and improvements thereon, commonly known as and numbered 1080 W Round Grove Road, Lewisville, Texas 75067, on which is located the Facility, including, without limitation, all easements, rights of way and the Real Estate Permits and other appurtenances thereto[, as well as the Excess Land].

"<u>Purchase Price</u>" shall have the meaning ascribed thereto in Section 2.5.

"<u>Purchaser</u>" shall have the meaning ascribed thereto in the preamble.

"<u>Re-Hired Employees</u>" shall have the meaning ascribed thereto in Section 5.7.

"Regulatory Authority" shall mean all agencies, authorities, bodies, boards, commissions, institutions, instrumentalities, legislatures and offices of any nature whatsoever for any governing unit or political subdivision, whether foreign, federal, state, county, district, municipal, city or otherwise, and whether now or hereafter in existence.

"Rejected Contracts" shall have the meaning ascribed thereto in Section 5.10.

"Resident Contract" shall mean all agreements and leases between residents of the Facility and the Seller, and all security deposits, and other rights, titles, and interests, associated therewith.

"Retained Liabilities" shall have the meaning ascribed thereto in Section 2.4.

"Sale Order" shall mean an order by the Bankruptcy Court authorizing and approving, *inter alia*, the transactions contemplated by this Agreement, including the sale of the Acquired Assets to the Purchaser, on the terms and conditions set forth herein.

"Seller" shall have the meaning ascribed thereto in the preamble.

"Tax" and "Taxes" shall mean all federal, state and local, territorial and foreign taxes, levies, deficiencies or other assessments and other charges of whatever nature (including income, gross receipts, license, payroll, employment, excise, severance, stamp, occupation, premium, windfall profits, environmental, customs duties, capital stock, franchise, profits, withholding, backup withholding, social security, unemployment, disability, real property, personal property, sales, use, transfer, real property gains, real property transfer, registration, intangible property, value added, alternative or add-on minimum, and estimated taxes and workers' compensation premiums and other governmental charges, and other obligations of the same nature as or of a nature similar to any of the foregoing) imposed by any taxing authority, as well as any obligation to contribute to the payment of Taxes determined on a consolidated, combined or unitary basis with respect to the Seller or any affiliate, and including any transferee or successor liability in respect of any tax (whether imposed by law, contractual agreement or otherwise) and any liability in respect of any tax as a result of being a member of any affiliated, consolidated, combined unitary or similar group including any liability pursuant to Treasury Regulation Section 1.1502-6 (or any similar or corresponding provision under state or local law), including any interest, penalty (civil or criminal), or addition thereto, whether disputed or not, as well as any expenses incurred in connection with the determination, settlement or litigation of any liability.

"Tax Return" shall mean any federal, state, local, foreign and other taxing authority return, declaration, report, claim for refund, amended return, declarations of estimated Tax or information return or statement relating to Taxes, and any schedule or attachment thereto, filed or maintained, or required to be filed or maintained in connection with the calculation, determination, assessment or collection of any Tax, and including any amendment thereof, as well as, where permitted or required, combined or consolidated returns for any group of entities that include the Seller or any affiliate; and reports with respect to backup withholding and other payments to third parties.

"Third Party Payor Programs" shall mean all programs of Third Party Payors in which the Facility participates.

"Third Party Payors" shall mean Medicare, Medicaid, CHAMPUS, Blue Cross and/or Blue Shield, private or public insurers, health maintenance organizations, preferred provider organizations or programs, self-insured employers and any other Person which maintains and/or administers Third Party Payor Programs.

"Transaction Documents" shall mean this Agreement, the Deeds, the bill of sale, the documents, instruments and agreements listed on Schedule 3 and any other certificate, document, instrument, power, or agreement executed in connection herewith or therewith.

"Trustee" shall mean UMB Bank, N.A., in its capacity as successor bond trustee under that certain Trust Indenture and Security Agreement between Woodloch Health Facilities Development Corporation and Branch Banking and Trust Company, as predecessor to the Trustee, dated as of November 1, 2016 and the successor master trustee under that certain Master Trust Indenture, Deed of Trust and Security Agreement between the Seller and Branch Banking and Trust Company, as predecessor to the Trustee, dated as of November 1, 2016, each related to the Bonds

"WARN Act" shall mean the Worker Adjustment and Retraining Notification Act, 29 U.S.C. Sections 2101-2109 and related regulations, as amended.

1.2    References to Dollars.  References to dollars or "$" in this Agreement shall mean United States dollars.

1.3    General Rules of Construction.  For all purposes of this Agreement:  (i) the terms defined in this Agreement include the plural as well as the singular; (ii) all references in this Agreement to designated "Articles," "Sections," "Exhibits," and other subdivisions are to the designated Articles, Sections, Exhibits, and other subdivisions of the body of this Agreement; (iii) pronouns of either gender or neuter include, as appropriate, the other pronoun forms; (iv) the words "herein," "hereof" and "hereunder" and other words of similar import refer to this Agreement as a whole and not to any particular Article, Section or other subdivision; (v) "or" is not exclusive; (vi) "including" and "includes" shall be deemed to be followed by "but not limited to" and "but is not limited to," respectively; (vii) any definition of or reference to any Legal Requirement, agreement, instrument or other document herein shall be construed as referring to such Legal Requirement, agreement, instrument or other document as from time to time amended, supplemented or otherwise modified; (viii) any definition of or reference to any statute shall be construed as referring also to any rules and regulations  promulgated thereunder; and (ix) the term "applicable" as it relates to a Closing, a Closing Date and a Purchase Price and the like shall mean the Initial Closing or Subsequent Closing, Initial Closing Date or Subsequent Closing Date, and Initial Purchase Price or Subsequent Purchase Price, as applicable under the circumstances.

ARTICLE II

GENERAL PROVISIONS OF PURCHASE AND SALE

2.1    Purchase and Sale of Acquired Assets.  Upon the basis of and in reliance on the representations and warranties contained in, and subject to the terms and conditions of, this Agreement, Purchaser agrees to purchase and acquire from Seller, and Seller agrees to sell, transfer and assign to Purchaser on the Closing Date, pursuant to Sections 363 and 365 of the Bankruptcy

Code, the Acquired Assets free and clear of any Lien of any kind (except for the Permitted Encumbrances), upon receipt on the Closing Date of the Purchase Price. The term "Acquired Assets" shall mean all of Seller's right, title and interest in and to all assets, properties, rights, titles and interests of every kind and nature of Seller which are owned by the Seller and used in the Business (other than the Excluded Assets), including, without limitation, the following:

      (a)    The Facility;

      (b)    The Property;

      (c)    All inventories of Seller existing on the Closing Date and used or to be used by Seller in connection with the ownership, management or operation of the Facility or related thereto (including, without limitation, products ordered and held for shipment or in transit to or from Seller), as applicable, and all supplies used in connection with the Facility;

      (d)    All plant, machinery, leasehold improvements, fixtures, parts, furniture, furnishings, office and computer equipment and other equipment and fixed assets of the Seller on the Closing Date, and located in, on or about the Facility and/or used or to be used by Seller in connection with the ownership, operation or management of the Property and the Facility or related thereto, including those assets described on Schedule 2.1(d) hereto;

      (e)    The Assumed Contracts;

      (f)    The Resident Contracts and related Resident Deposits;

      (g)    To the extent assignable, any and all trademarks and trademark applications, service marks and service mark applications, trade and product names, copyrights and copyright applications, patents, patent applications, proprietary designs, all federal, state, local and foreign registrations thereof, if applicable, all common law rights thereto, and all claims or causes of action for infringement thereof; and including the associated goodwill, the right to sue for and recover such damages and such other relief as might be granted by a court of competent jurisdiction for past infringement thereof, with respect to the Business and or operations of the Facility;

      (h)    To the extent assignable, any and all warranties and guaranties made to or in favor of Seller associated with the Acquired Assets;

      (i)    All other tangible and intangible assets of the Seller used in connection with the ownership or operation of the Property and/or the Facility, on the Closing Date, including, without limitation, customer and supplier lists, resident lists, policy manuals, records (subject to Legal Requirements and Applicable Laws and excepting therefrom records relating to Excluded Assets and Seller's general ledger, Tax Returns, corporate and company charter documents, minute books and member agreements), Seller's forms and office supplies, all promotional literature relating to the Facility, all computer programs to the extent assignable and documentation, if any, used in conducting such business; all operating manuals, and the rights to use the telephone numbers and listings pertaining to same;

      (j)    All records pertaining to residents, referral sources, employees, licensing, reimbursement sources, and other legal compliance reasonably related to the Facility, subject to

Legal Requirements and the limitations, if any, of Applicable Laws on the transfer or disclosure thereof to Purchaser;

(k)     All licenses, Permits, registrations, certificates and determinations of need and authorizations from or with all Regulatory Authorities having jurisdiction over the Facility to the extent transferable; and

(l)     All other assets, tangible or intangible, now or hereafter held or used in connection with the Business.

2.2     <u>Excluded Assets</u>.  Notwithstanding anything contained herein to the contrary, the Acquired Assets shall not include (i) any cash or cash equivalents, (ii) accounts receivable existing as of the Closing Date; (iii) any funds held by the Trustee; (iv) Seller's rights under this Agreement, (v) causes of action of Seller (except as otherwise included in the Acquired Assets), including, but not limited to, causes of action that arise under Chapter 5 of the Bankruptcy Code, (vi) any prepaid expenses or deposits (other than resident security deposits), (vii) any other items set forth on <u>Schedule 2.2</u>, which shall include any contracts which the Purchaser desires to not have assigned to it, and [(viii) the Excess Land] (collectively, the "<u>Excluded Assets</u>").

2.3     <u>Assumption of Liabilities</u>.  Upon the terms and subject to the conditions contained in this Agreement, at the Closing, Purchaser shall assume or otherwise be responsible, which amounts shall be in addition to the Purchase Price, for (collectively, the "<u>Assumed Liabilities</u>"):

(a)     all liabilities and obligations under the Acquired Assets accruing or arising after the Closing;

(b)     all liabilities and obligations associated with the Assumed Contracts from and after Closing and all Cure Amounts associated therewith;

(c)     all liabilities and obligations associated with the Assumed Benefit Liabilities, including, without limitation, all pre-petition liabilities; and

(d)     all liabilities required to be paid by Purchaser pursuant to this Agreement (such as, without limitation, stamp and recording Taxes).

Seller shall have no liability for any such liabilities or obligations.

2.4     <u>Retained Liabilities</u>.  Except for the Assumed Liabilities, Purchaser shall not assume or be liable for any liability, obligation, debt, claim against or contract of Seller or any of its Affiliates which, in any case, pertain to the ownership, operation or conduct of the Business or the ownership of the Acquired Assets prior to the Closing Date, at any time existing or asserted, whether or not accrued, fixed, contingent or otherwise, whether known or unknown, and whether or not recorded on the books and records of Seller or any of its Affiliates (collectively, the "<u>Retained Liabilities</u>").

2.5     Closing Proceedings.

(a)     The Purchase Price under this Agreement is [$_____], ("Purchase Price") as adjusted in accordance with this Section.

(b)     Simultaneously with the execution of this Agreement, Purchaser has delivered payment in an amount equal to 10% of the Purchase Price (the "Deposit") to Johnson, Pope Bokor Ruppel & Burns, LLP, as escrow agent (the "Escrow Agent"), which will be held in escrow by the Escrow Agent pursuant to the terms of the Bidding Procedures Order, this Agreement, and an escrow agreement (the "Escrow Agreement") in the form attached hereto as Exhibit E.  The Deposit will be credited against the Purchase Price, or will otherwise be disbursed as provided in this Agreement, the Escrow Agreement, and the Sale Order.  Any interest on the Deposit shall follow the Deposit.

(c)     At the Closing, in addition to such other actions as may be provided for herein, Purchaser shall pay to the Seller, in cash, an amount equal to the Purchase Price by wire transfer of immediately available funds, net of the cash portion of the Deposit transferred to Seller and credited thereto.

(d)     At the Closing, Purchaser shall assume the Assumed Liabilities (which shall be in addition to, and not a credit against, the Purchase Price), and with regard to Assumed Contracts, shall pay to each Contract Party any Cure Amounts, in cash, by wire transfer of immediately available funds, necessary to acquire any Assumed Contract, at such time as may be designated by the Bankruptcy Court in the Sale Order.

(e)     At the Closing, Purchaser shall pay all escrow fees, recording costs or fees, transfer Taxes, and conveyance fees.

(f)     Except as otherwise set forth in this Agreement, all utility charges, rents or other payments under the Acquired Assets and all ad valorem, real property, personal property and similar Taxes with respect to the Acquired Assets shall be prorated as of the Closing Date.  Taxes, including applicable real estate Taxes, shall be prorated based on the most recent available tax duplicate.  All prorations shall be final.  The prorations and adjustments provided for in this Section shall be made so that Seller shall receive the income and be charged with the expense of the operation of the property as of the Closing Date.  Purchaser shall receive a credit for all prorations due from Seller as of Closing, and Purchaser shall pay all such expenses following the Closing Date.  Purchaser shall be charged for all prorations due from Purchaser as of Closing which have already been paid to third parties by Seller prior to the Closing Date.

2.6     Instruments of Transfer and Conveyance; Delivery of Records/Contracts.

(a)     The conveyance of the Property shall be effected by delivery of quitclaim deeds running to Purchaser, which deeds shall be in substantially the form attached hereto as Exhibit F and shall convey to Purchaser marketable fee simple title to the Property, free from all Liens of whatever kind except Permitted Encumbrances (the "Deeds").

(b)     The sale of all other Acquired Assets, as herein provided, shall be effected by delivery by Seller at the Closing of such bills of sale or other instruments of conveyance, as

Purchaser reasonably deems necessary to vest in Purchaser good, clear and marketable title to the Acquired Assets including a bill of sale and Assignment and Assumption Agreement in form and substance reasonably acceptable to the parties. Such instruments of transfer and conveyance shall be in form reasonably satisfactory to Purchaser.

(c)     At the Closing, Seller shall deliver copies of Seller's business records that are reasonably related to the ownership, use and/or operation of the Facility (except for records pertaining to Excluded Assets and records and other property of Seller excluded under Section 2.2), and Seller shall take all requisite steps to put Purchaser in actual possession and operating control of the Acquired Assets and the Business.

2.7     <u>Allocation of Purchase Price</u>.  The Purchase Price shall be allocated among the Acquired Assets in accordance with <u>Schedule 2.7</u>.  Purchaser and Seller also each agree to file IRS form 8594 consistently with the foregoing and in accordance with Section 1060 of the Code.

2.8     <u>Assignment of Rights of Purchaser; Nominee</u>.

(a)     Purchaser may assign this Agreement, in whole or in part, to an existing Affiliate or an Affiliate to be formed by Purchaser; <u>provided that</u> (i) Purchaser shall provide Seller with written notice of such assignment prior to the Closing Date, (ii) such assignee shall assume all of Purchaser's rights and obligations hereunder, and (iii) such assignment shall not relieve Purchaser of its obligations hereunder.

(b)     Purchaser, and any such Affiliate, shall have the right to designate nominees to hold title to all or any portion of the Acquired Assets provided that such nominees are themselves Affiliates of Purchaser and such nominees shall agree in writing to be bound by the obligations of Purchaser and Purchaser shall continue to be liable for such obligations.

2.9     <u>Adjustments to Purchase Price</u>.  The following items shall be adjusted at the Closing and the net amount thereof shall be added to, or deducted from, the applicable Purchase Price as the case may be:

(a)     Water and sewer use charges shall be adjusted on the basis of meter readings taken within seven (7) Business Days prior to the Closing, plus a pro rata adjustment for the number of days elapsed between such reading and the Closing Date.  Seller shall make necessary arrangements to have meter readings taken by municipal or other appropriate authorities.

(b)     Real estate Taxes, if applicable, for the Property and Facility shall be adjusted on a per diem basis, calculated by dividing the yearly tax payment by 365 (or 366 if applicable).  If the amount of Taxes assessed against the Property is not known at the Closing, then the Taxes shall be apportioned on the basis of the taxes (as abated, if applicable) assessed for the preceding year; provided that if the parties can estimate an amount which is likely to be more accurate than the preceding year's Taxes, then such estimated amount shall be used as the basis for the apportionment.

(c)     Ad valorem real and tangible personal property Taxes with respect to the applicable Acquired Assets for the calendar year in which the Closing occurs shall be prorated between Seller and Purchaser as of the Closing Date on the basis of no applicable discount.  If the

amount of such Taxes with respect to any of such Acquired Assets for the calendar year in which the Closing occurs has not been determined as of the Closing Date, then the Taxes with respect to such Acquired Assets for the preceding calendar year, on the basis of no applicable discount, shall be used to calculate such prorations, with known changes in valuation or millage being applied. The prorated Taxes shall be an adjustment to the amount of cash due from Purchaser at the Closing.

ARTICLE III

REPRESENTATIONS AND WARRANTIES OF SELLER

Seller hereby represents and warrants to Purchaser that the statements contained in this Article III are correct and complete as of the date hereof and as of the Closing Date:

3.1    Organization.  Subject to entry of the Sale Order, Necessary Consents, and the Approvals, the Seller has full power, authority and capacity to execute and deliver this Agreement and the Transaction Documents and to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.

3.2    Execution and Delivery.  Subject to entry of the Sale Order, Necessary Consents, and the Approvals, this Agreement has been duly and validly executed and delivered by Seller and constitutes, and upon the execution and delivery by the Seller of the Transaction Documents, the Transaction Documents shall constitute, legal, valid and binding obligations of Seller enforceable against Seller in accordance with their terms.

3.3    Litigation Proceedings; Judgments.  To the Knowledge of Seller, in addition to the Chapter 11 Case, Schedule 3.3 is an accurate list of all pending litigation or proceedings with respect to the Facility and the Acquired Assets.  To the Knowledge of Seller, except for the Chapter 11 Case and as set forth on Schedule 3.3, there are no claims, actions, suits, proceedings, or investigations, pending or threatened, against or related to Seller, the Facility or the Acquired Assets, at law or in equity.  Except for the Chapter 11 Case and as set forth on Schedule 3.3, there are no judgments presently outstanding and unsatisfied against the Facility, Seller or any of the Acquired Assets.  Seller has not received any written notice or written claim for tort or violation of any applicable order, or an investigation thereof with respect to its ownership or operation of the Facility or the Business.

3.4    Financial Statements.

(a)    Seller has furnished to Purchaser financial statements of Seller for its fiscal years ending [December 31, 2019], [December 31, 2020] and [December 31, 2021], certified by independent certified public accountants, true and complete copies of which are attached hereto as Schedule 3.4 (the "Financial Statements").  Seller has also furnished to Purchaser interim financial statements for the [_____-month period ending _____, 2022], copies of which are attached hereto as Schedule 3.4.  The financial statements included in Schedule 3.4 hereto are referred to herein as the "Financial Statements." The Financial Statements and the books and records of Seller which gave rise thereto, as well as all other books and records maintained by Seller, as applicable, with respect to the ownership, management and/or operation of the Acquired Assets, are complete and accurate in all material respects and not misleading, and the Financial Statements present fairly

13

the assets, liabilities, operations and financial condition of Seller and the results of its business operations and have been prepared in conformity with GAAP except for the omission of footnotes as included in the Financial Statements.

3.5    Compliance with Legal Requirements.  To the Knowledge of Seller, the Property and the Facility are not in violation of, nor are the operations of the Property and the Facility in violation of, applicable Legal Requirements in any material respects.  To the Knowledge of Seller, the Current Use is not improper or unlawful, and Seller is not liable for any arrears of wages or any taxes or penalties for failure to comply with any applicable Legal Requirements.  Except in regards to matters covered by Schedule 3.5, no notice has been issued by any Regulatory Authority stating that there exists any violation of any applicable Legal Requirements by Seller or the Facility, which violation has not been remedied and dismissed.  Purchaser acknowledges that it is responsible for the operation of the Facility in compliance with all applicable Legal Requirements after the Closing Date.

3.6    Broker.  Except for the engagement of the Brokers, whose fees shall be paid by Seller from the proceeds of the sale and, if required, upon entry of applicable Approvals by the Bankruptcy Court, neither Seller nor any of its Affiliates has incurred any liability for any fee or commission to any broker, finder, investment banker or other intermediary in connection with the transactions contemplated by this Agreement that would result in any liability, fee, expense or obligation being imposed on Purchaser.

3.7    Environmental Matters.  Except as set forth on Schedule 3.7:  (a) there are no material environmental liabilities on or affecting any of the Facility, (b) to the Knowledge of Seller, Seller has at all times operated the Facility and conducted the Business and, during the period that Seller owned the Facility and any third party operated any such Business, such third party operated the Business, in each case, in compliance with all applicable Environmental Laws and all Permits required thereunder or issued pursuant thereto; (c) to Knowledge of Seller, there are no Actions pending or threatened before any Regulatory Authority with respect to Seller's ownership or operation of the Property alleging violations of Environmental Laws, or claiming material remediation obligations under applicable Environmental Laws, and Seller has not received any written notice of any alleged or actual violation or non-compliance with any Environmental Law or of non-compliance with the terms or conditions of any environmental Permits, arising from, based upon, associated with or related to the Property or the ownership or operation thereof; and (d) Seller has provided Purchaser access to accurate and complete copies of all final written environmental reports, studies and notices in Seller's possession prepared by any third party on behalf of, or delivered by a Regulatory Authority to, Seller with respect to the Property, that identify or allege any Environmental Defect on or affecting the Property.

3.8    The Property.  Schedule 3.8 contains an accurate and complete legal description, street address and tax parcel identification number for the Property.  Seller holds good and indefeasible fee simple title to all of the Property, and shall convey the Property in accordance with the sale Order free and clear of all Liens (other than the Permitted Encumbrances).

3.9    Insurance.  Schedule 3.9 sets forth an accurate and complete list of all insurance policies or self-insurance funds maintained by Seller or its representatives or agents with respect to the Facility and Seller as of the Closing Date covering the ownership and operation of the

Business, indicating the types of insurance, policy numbers, terms, identity of insurers and amounts and coverages (including applicable deductibles).

3.10    <u>Expiration of Representations and Warranties</u>.  The representations and warranties of Seller contained herein shall expire upon and shall not survive the Closing for any purpose whatsoever.

ARTICLE IV

REPRESENTATIONS AND WARRANTIES OF PURCHASER

Purchaser hereby represents and warrants to Seller that the statements contained in this <u>Article IV</u> are correct and complete as of the date hereof and as of the Closing Date:

4.1    <u>Organization</u>.  Purchaser is (a) a [_____  corporation] duly organized, validly existing and in good standing under the laws of the jurisdiction of its [incorporation], and (b) duly qualified or registered to conduct business and in good standing under the laws of each jurisdiction where the nature of Purchaser's business requires such qualification or registration, except where the failure to be so qualified would not have a material adverse effect on Purchaser's business

4.2    <u>Authorization</u>.  Purchaser has all requisite corporate power and authority (a) to make, execute, deliver and perform this Agreement and the other Transaction Documents and (b) to perform its obligations hereunder and thereunder and to consummate the transactions contemplated hereby and thereby.  The execution, delivery and performance of this Agreement and the other Transaction Documents have been duly and validly authorized by all necessary corporate action on the part of Purchaser.  This Agreement constitutes, and when executed and delivered the other Transaction Documents will constitute, the valid and legally binding obligation of Purchaser, enforceable in accordance with their respective terms, except as such enforceability may be limited by applicable bankruptcy, insolvency and similar laws affecting creditors' rights generally and general principles of equity (whether considered in equity or at law).

4.3    <u>No Conflicts</u>.  Neither the execution nor the delivery of this Agreement by Purchaser and by any Affiliate to which this Agreement may be assigned, nor the consummation of the transactions contemplated by this Agreement, will violate or conflict in any material respect with any applicable Legal Requirement, or violate or conflict in any material respect with or constitute a default under (or give rise to any right of termination, cancellation or acceleration under) the terms, conditions or provisions of any or its organizational documents or any material note, contract, lease, mortgage, or other obligation of any kind to which Purchaser or such Affiliate is a party or by which Purchaser or such Affiliate is bound, or require the consent or approval of any third party.

4.4    <u>Licensure</u>.  As of the date hereof, Purchaser is unaware of any reason which would prevent its ability to qualify for and obtain any necessary Permits, including with respect to its ability to operate the Facility.

4.5    <u>Compliance with Legal Requirements</u>.  As of the date hereof, to the best of its knowledge, neither the Purchaser nor any of its affiliates is or has been the subject of any investigation by any Regulatory Authority, and has not received any complaints from employees,

independent contractors or vendors that would indicate that Purchaser or any of its affiliates has violated any Legal Requirements.  As of the date hereof, there are no material citations or deficiencies currently outstanding with respect to any assisted living facilities or memory care facilities owned or operated by the Purchaser or any of its affiliates.

4.6    <u>Litigation</u>.  There is no litigation or governmental or administrative proceeding or investigation pending or, to Purchaser's knowledge, threatened against Purchaser which would prevent, hinder or delay the consummation of the transactions contemplated by this Agreement.

4.7    <u>Financing</u>.  At the Closing, Purchaser will have adequate funds available to it in order to consummate the transactions contemplated by this Agreement and the Transaction Documents and to perform its obligations hereunder and thereunder.  As of the Execution Date, Purchaser has the ability to obtain funds in cash in amounts equal to the Purchase Price by means of credit facilities or otherwise and will at Closing have immediately available funds in cash, which are sufficient to pay the Purchase Price and to pay any other amounts payable pursuant to this Agreement and to consummate the transaction contemplated herein.

4.8    <u>"AS IS" Transaction</u>.  IT IS UNDERSTOOD AND AGREED THAT, UNLESS EXPRESSLY STATED HEREIN OR IN ANY OF THE OTHER TRANSACTION DOCUMENTS, SELLER IS NOT MAKING AND HAS NOT AT ANY TIME MADE ANY WARRANTIES OR REPRESENTATIONS OF ANY KIND OR CHARACTER, EXPRESS OR IMPLIED, WITH RESPECT TO THE ACQUIRED ASSETS, INCLUDING BUT NOT LIMITED TO, ANY WARRANTIES OR REPRESENTATIONS AS TO MERCHANTABILITY OR FITNESS FOR A PARTICULAR PURPOSE.

(a)    EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS ASSET PURCHASE AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS, PURCHASER ACKNOWLEDGES AND AGREES THAT, UPON THE CLOSING, SELLER SHALL SELL AND CONVEY TO PURCHASER, AND PURCHASER SHALL ACCEPT, THE ACQUIRED ASSETS "<u>AS IS, WHERE IS, WITH ALL FAULTS</u>." EXCEPT AS OTHERWISE EXPRESSLY PROVIDED IN THIS ASSET PURCHASE AGREEMENT OR THE OTHER TRANSACTION DOCUMENTS, PURCHASER HAS NOT RELIED AND WILL NOT RELY ON, AND SELLER IS NOT LIABLE FOR OR BOUND BY, ANY EXPRESS OR IMPLIED WARRANTIES, GUARANTEES, STATEMENTS, REPRESENTATIONS, OR INFORMATION PERTAINING TO THE ACQUIRED ASSETS OR RELATING THERETO MADE OR FURNISHED BY SELLER OR ITS REPRESENTATIVES, TO WHOMEVER MADE OR GIVEN, DIRECTLY OR INDIRECTLY, ORALLY OR IN WRITING, EXCEPT AS EXPRESSLY STATED HEREIN OR IN THE OTHER TRANSACTION DOCUMENTS.    PURCHASER ALSO ACKNOWLEDGES THAT THE TOTAL PURCHASE PRICE REFLECTS AND TAKES INTO ACCOUNT THAT THE ACQUIRED ASSETS ARE BEING SOLD "AS IS, WHERE IS, WITH ALL FAULTS."

(b)    PURCHASER ACKNOWLEDGES TO SELLER THAT PURCHASER HAS HAD THE OPPORTUNITY TO CONDUCT AND DID CONDUCT SUCH INSPECTIONS AND INVESTIGATIONS OF THE ACQUIRED ASSETS AS PURCHASER DEEMS NECESSARY OR DESIRABLE TO SATISFY ITSELF AS TO THE ACQUIRED ASSETS AND ITS ACQUISITION THEREOF.    PURCHASER HEREBY ASSUMES ALL RISKS THAT

ADVERSE MATTERS INCLUDING, BUT NOT LIMITED TO, LATENT OR PATENT DEFECTS, ADVERSE PHYSICAL OR OTHER ADVERSE MATTERS, MAY NOT HAVE BEEN REVEALED BY PURCHASER'S REVIEW AND INSPECTIONS AND INVESTIGATIONS.

(c)    WITHOUT LIMITING THE GENERALITY OF THE FOREGOING, PURCHASER WAIVES ANY CLAIM ARISING OUT OF OR IN CONNECTION WITH THE VALIDITY AND CONDITION OF THE ACQUIRED ASSETS AS OF THE CLOSING.

4.9    ACKNOWLEDGMENT.  WITHOUT LIMITING THE FOREGOING TOTAL EXCLUSION OF REPRESENTATIONS AND WARRANTIES, THE SALE IS MADE EXPRESSLY WITHOUT ANY REPRESENTATIONS OR WARRANTIES AS TO THE FOLLOWING:  (A) COMPLIANCE WITH ANY ZONING, ENVIRONMENTAL, OR OTHER STATE, LOCAL OR FEDERAL LAWS WHICH MAY AFFECT THE USE, DEVELOPMENT, OR OCCUPANCY OF THE PREMISES OR THE PERSONAL PROPERTY, INCLUDING, WITHOUT LIMITATION, THE EXISTENCE OR AVAILABILITY OF ANY PERMITS OR APPROVAL RELATING TO USE, DEVELOPMENT OR OCCUPANCY OF THE PREMISES OR THE PERSONAL PROPERTY, AND (B) THE EXISTENCE ON THE PREMISES OF ANY HAZARDOUS WASTE, ASBESTOS, LEAD-BASED PAINT, PLASTER, OR OTHER LEAD-BASED ACCESSIBLE MATERIAL, OR ANY OTHER MATERIALS WHICH MAY BE SUBJECT TO GOVERNMENTAL REGULATION OR RESTRICTION.

4.10    Obligation to Provide Updates.  At any time prior to the Closing Date (as defined herein), the Purchaser has the affirmative obligation to immediately provide the Seller with updates regarding the representations and warranties contained in this Article IV to the extent the Purchaser discovers that such representations and warranties are no longer true or accurate.

ARTICLE V

RISKS, CONDUCT AND COVENANTS OF THE PARTIES

5.1    Risk of Loss; Condemnation.  The risk of loss, destruction, condemnation, eminent domain taking or damage to any component of the Facility, the Property and all other Acquired Assets by any cause prior to the Closing are assumed by Seller, and Seller shall maintain in full force and effect through such date the scope and levels of insurance coverage currently in effect on such Property.  Seller shall immediately notify Purchaser if, prior to, or at the Closing, there shall have been any loss, destruction or damage to, or any taking or threatened or proposed taking of, all or a portion of the Property or any of the Acquired Assets.

5.2    Casualty Losses/Condemnation.

(a)    As used herein, the term "Casualty Loss" means any destruction by fire, storm or other casualty, or any taking or pending or threatened taking, in condemnation or under the right of eminent domain, of the Property or a portion thereof, in each case, prior to Closing. Seller shall promptly give Purchaser written notice ("Casualty Notice") of any Casualty Loss of which Seller becomes aware.  To the extent such Casualty Loss exceeds $1,000,000 in cost, Purchaser shall have the option, which must be exercised within ten (10) days after its receipt of

17

the Casualty Notice, to terminate this Agreement or to proceed with the Closing.  If Purchaser elects to terminate this Agreement, the Deposit shall be returned to Purchaser and all rights, duties, obligations and liabilities created hereunder shall cease.  If Purchaser elects to proceed with Closing (or if the Casualty Loss is less than $1,000,000), it shall acquire the Property in accordance with the terms hereof without a credit against the Purchase Price except for any deductible under any insurance agreement (subject to the last sentence hereof) and Seller shall transfer to Purchaser all of its rights to unpaid insurance proceeds, claims, awards and other payments arising out of such Casualty Loss and pay to Purchaser all sums paid to Seller as insurance proceeds, awards or other payments arising out of such Casualty Loss.  Seller shall not voluntarily comprise, settle or adjust any amounts payable by reason of any Casualty Loss without first obtaining the written consent of Purchaser, such consent not to be unreasonably withheld, conditioned, or delayed. Notwithstanding the foregoing, Seller shall not be required to credit Purchaser with the amount of the required deductible in the event that the damage is the result of negligence or misconduct of Purchaser or its employees or agents.

      5.3    <u>Access to Books and Records</u>.  From and after the Closing, the Purchaser shall afford, for a period ending on the later of (i) three (3) years from the Closing Date and (ii) the date of the entry of a final decree or an order converting or dismissing the Chapter 11 Case, the Seller and its representatives reasonable access, during normal business hours, to the books, records and other data relating to the operation of the Business prior to the Closing in its possession to the extent that such access may be reasonably required by the requesting Party in connection with (a) the preparation of Tax returns, (b) the determination or enforcement of rights and obligations under this Agreement, (c) compliance with the requirements of any Regulatory Authority, (d) in connection with any threatened or actual legal proceeding, (e) in connection with any audit of the Business for any pre-Closing period, or (f) in connection with administering the Chapter 11 Case, or any subsequent Chapter 7 case.  During such period neither Party shall dispose of or destroy any books, records or other data relating to the operation of the Business prior to the Closing unless such Party gives the other Party thirty (30) days' prior written notice thereof and the option to retain such books, records or other data.

      5.4    <u>Cooperation; Approvals</u>.  Subject to the terms and conditions herein provided, the Parties shall use commercially reasonable efforts to bring about the satisfaction as soon as practicable of all the conditions (whether set forth in this Agreement or otherwise) necessary to effect the consummation of the transactions contemplated by this Agreement.

      5.5    <u>Further Assurances</u>.  Subject to the terms and conditions of this Agreement, at any time or from time to time after the Closing, at Purchaser's reasonable request and at the Purchaser's sole cost and expense, the Seller will execute and deliver to Purchaser such other instruments of sale, transfer, conveyance and assignment, provide such materials and information and take such other actions as Purchaser may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign to Purchaser, and to confirm Purchaser's title to, all of the Acquired Assets.

      5.6    <u>Deposit</u>.  Except as set forth in <u>Section 2.5</u>, the Deposit is non-refundable to the Purchaser.

5.7   <u>Employees and Employee Benefits</u>.

(a)   Purchaser agrees, on an aggregate basis, to offer employment to substantially all employees of Seller who are in good standing on the date of this Agreement and on the Closing Date (the "<u>Employees</u>").   Subject to Legal Requirements, Purchaser will have reasonable access to the Facility and personnel records (including performance appraisals, disciplinary actions and any other records required to be maintained by a Regulatory Authority as a condition of such individual's employment) of Seller.   Prior to Closing, Purchaser will provide Seller with a list of those Employees to whom Purchaser has made an offer of employment which offer has been accepted (the "<u>Re-Hired Employees</u>").   Effective immediately before the Closing, Seller will terminate the employment of all of the Re-Hired Employees.

(b)   It is understood and agreed that (A) Purchaser's expressed intention to extend offers of employment as set forth in this Section shall not constitute any commitment, contract or understanding (expressed or implied) of any obligation on the part of Purchaser to a post-Closing employment relationship of any fixed term or duration or upon any terms or conditions other than those that Purchaser may establish pursuant to individual offers of employment, and (B) employment offered by Purchaser is "at will" and may be terminated by Purchaser or by an Employee at any time for any reason (subject to any written commitments to the contrary made by Purchaser or an employee and Legal Requirements).   Nothing in this Agreement shall be deemed to prevent or restrict in any way the right of Purchaser to terminate, reassign, promote or demote any of the Re-Hired Employees after the Closing, or to change adversely or favorably the title, powers, duties, responsibilities, functions, locations, salaries, other compensation or terms or conditions of employment of such employees.

(c)   The Seller shall be solely responsible for the payment of all wages and other remuneration due to Employees with respect to their services as employees of Seller through the close of business on the Closing Date.

(d)   Purchaser will set its own initial terms and conditions of employment for the Re-Hired Employees and others it may hire, including work rules, benefits and salary and wage structure, all as permitted by applicable law.   Purchaser shall recognize years of service of Re-Hired Employees with the Seller in determining eligibility of benefits pursuant to Purchaser's policies.

5.8   <u>WARN</u>.   In respect of notices and payment relating to events occurring prior to the Closing or as a result of the transactions contemplated by this Agreement, Purchaser shall be responsible for and assume any liability of Seller for any and all payments, fines and penalties, if any, associated with, the WARN Act and any applicable state or local plant closing, mass layoff, relocation, or severance, or continuation coverage laws which arise out of or are due to actions or events occurring in connection with the transactions contemplated by this Agreement (including, without limitation, for failure to furnish any notices required under the WARN Act).

5.9   <u>COBRA Continuation Coverage</u>.   Purchaser shall offer a group health plan to all employees of Seller and, accordingly, Purchaser shall be responsible for providing continuation coverage under COBRA to those individuals who are M&A qualified beneficiaries (as defined in

Treasury Regulation Section 54.4980B-9, Q&A-4(a)) with respect to the transactions contemplated by this Agreement and the other Transaction Documents.

      5.10   <u>Assumed and Assigned Contracts</u>.

      (a)   <u>Cure Process</u>.  Purchaser shall assume all obligations from and after the Closing Date under Assumed Contracts, and at such time as is required by the Bankruptcy Court in the Sale Order, shall pay cash or other acceptable consideration to the third party (or parties) to the applicable Assumed Contract (each, a "<u>Contract Party</u>") in order to cure the monetary defaults and satisfy any pecuniary obligations of Seller (or obtain waivers with respect thereto) with respect to the Business, and to provide adequate assurance of future performance under the Assumed Contracts.

      (b)   <u>Identification of Assumed Contracts</u>.  Within 5 days after the Execution Date, Purchaser shall provide a <u>Schedule 5.10(b)</u>, which schedule can be modified by the Purchaser by removing from such schedule any Assumed Contract (as defined below) up to ten (10) days before the Closing Date, identifying (i) all Contracts Purchaser wishes to be assumed by Seller and assigned by the Seller to Purchaser at Closing (the "<u>Assumed Contracts</u>"); and (ii) all Contracts that Purchaser will not be seeking to be assigned by the Seller (the "<u>Rejected Contracts</u>").  Seller shall move to assume and assign to Purchaser, effective as of the Closing Date, any Assumed Contract that is designated on or before the 5th day after the Execution Date by Purchaser to Seller. After the Closing Date, the Seller shall be released from any further liability under such Assumed Contracts as provided for under Section 365(k) of the Bankruptcy Code.

      (c)   <u>Non-Assignment of Assets</u>.  Notwithstanding any other provision of this Agreement to the contrary, this Agreement shall not constitute an agreement to assign or transfer and shall not affect the assignment or transfer of any Purchased Asset if (i) an attempted assignment thereof, without the approval, authorization or consent of, or granting or issuance of any license or permit by, any third party thereto would constitute a breach thereof or (ii) the Bankruptcy Court shall not have approved assumption and assignment of any Assumed Contract for any reason (each such action in (i) and (ii), a "<u>Necessary Consent</u>").  In such event, Seller and Purchaser shall use their commercially reasonable efforts, to obtain the Necessary Consents with respect to any such Assumed Contract after the Closing; provided that the failure to obtain any Necessary Consent shall not delay the Closing or give rise to a reduction in the Purchase Price. Nothing in this <u>Section 5.10</u> shall in any way diminish or enlarge (x) Purchaser's obligations hereunder to obtain the Approvals, or (y) the Parties' obligations hereunder to obtain the Necessary Consents.

      5.11   <u>Affirmative Covenants of Seller Regarding Conduct of Business Prior to the Closing</u>.  Seller covenants that, from the date hereof through the Closing Date, except as explicitly permitted otherwise by this Agreement or by prior written consent of Purchaser and subject to any restrictions, rulings and obligations imposed by the Bankruptcy Court, Seller shall:

      (a)   conduct the Business as it exists in accordance with all applicable Legal Requirements;

(b)     notify Purchaser of any unusual problems or developments with respect to the Facility and to the business or operations thereof which (i) would constitute a breach of any representation or warranty hereunder or a violation of any covenant hereunder or (ii) if existing or known on the date of this Agreement, would have been required to be disclosed pursuant to the Agreement;

(c)     maintain Seller's legal existence and qualifications to do business;

(d)     use diligent efforts to assist Purchaser in the transfer to Purchaser or in the obtaining by Purchaser of the Approvals and obtain all authorizations, consents and permits of others required to permit the consummation by Seller of the transactions contemplated by this Agreement;

(e)     keep in full force and effect insurance comparable in amount and scope of coverage to that now maintained by Seller for the benefit of the Acquired Assets;

(f)     permit Purchaser and its authorized representatives to have full access to all of its records, Tax Returns, contracts and documents related to the Property and Business and furnish to Purchaser or its authorized representatives such financial and other information with respect to the Business or the Property as Purchaser may from time to time reasonably request; and

(g)     not take any other action, or fail to take any other reasonable action, which action or failure would have constituted a breach of the representations and warranties of Seller contained herein, or would have rendered untrue, inaccurate or incomplete any of said representations and warranties or any of the Schedules or Exhibits to this Agreement, if such action or failure had occurred prior to the time of execution of this Agreement so as to impede, delay or otherwise interfere with the occurrence of the Closing in accordance with the terms hereof.

5.12    <u>Negative Covenants of Seller Regarding Conduct of Business Prior to the Closing</u>. In addition to the negative covenants, if any, set forth in other Sections of this Agreement, during the period from the date of this Agreement through the Closing Date, Seller covenants that it shall not:

(a)     except in the ordinary course of business, incur, assume, create, guarantee, suffer to exist or become contingently liable for any Indebtedness;

(b)     liquidate, dissolve, consolidate or merge (or be merged or consolidated) with or into any other entity, or sell all or substantially all its properties or assets;

(c)     except in the ordinary course of business, destroy, discard or otherwise dispose of any books or records of the Facility;

(d)     except in the ordinary course of business, make capital expenditures or contracts for the making of capital expenditures by or on behalf of the Property and/or the Facility for the purchase of fixed assets.  For the purposes of this subsection, the term "expenditure" shall mean the purchase price of any fixed asset or the entire rental for the full term in the case of a capital lease;

(e)     make any change in the compensation payable or to become payable to any of its officers, employees, agents or independent contractors or terminate any of them, except in the ordinary course of business; and

(f)     amend or enter into any collective bargaining agreement or memorandum of understanding with any union representing or attempting to represent any of Seller's Employees.

5.13    Consummation of Agreement.

(a)     Seller shall use its commercially reasonable best efforts to perform and fulfill all conditions and obligations on its parts to be performed and fulfilled under this Agreement, to the end that the transactions contemplated by this Agreement shall be fully carried out.  In addition, Seller shall cooperate with all reasonable requests of Purchaser and Purchaser's counsel in connection with the consummation of the transactions contemplated hereby.

(b)     Purchaser shall use its commercially reasonable best efforts to perform and fulfill all conditions and obligations on its parts to be performed and fulfilled under this Agreement, to the end that the transactions contemplated by this Agreement shall be fully carried out.  In addition, Purchaser shall cooperate with all reasonable requests of Seller and Seller's counsel in connection with the consummation of the transactions contemplated hereby.

5.14    <u>Confidentiality</u>.

(a)     Seller agrees that Seller, its officers, directors, agents and representatives, will hold in strict confidence, and will not use, any confidential or proprietary data or information obtained from Purchaser with respect to its business or financial condition except for the purpose of negotiating and completing the transaction contemplated hereby or obtaining the Bankruptcy Court's authorization to consummate the transaction contemplated in this Agreement.  Information generally known in Purchaser's industry or which has been disclosed to Seller by third parties which have a right to do so shall not be deemed confidential or proprietary information for purposes of this Agreement.  If the transaction contemplated by this Agreement is not consummated, Seller will return to Purchaser (or certify that they have destroyed) all copies of such data and information, including but not limited to financial information, customer lists, business and corporate records, worksheets, test reports, tax returns, lists, memoranda, and other documents prepared by or made available to Seller in connection with the transaction.

(b)     From the date hereof until the Closing Date, Purchaser agrees that Purchaser, its officers, directors, agents and representatives, will hold in strict confidence, and will not use, any confidential or proprietary data or information obtained from Seller with respect to its business or financial condition except for the purpose of negotiating and completing the transaction contemplated hereby.  Information generally known in Seller's industry or which has been disclosed to Purchaser by third parties which have a right to do so shall not be deemed confidential or proprietary information for purposes of this Agreement.  If the Closing Date is not consummated, Purchaser will return to Seller (or certify that it has destroyed) all copies of such data and information, including but not limited to financial information, customer lists, business and corporate records, worksheets, test reports, tax returns, lists, memoranda, and other documents prepared by or made available to Purchaser in connection with the transaction.

5.15   <u>Fees and Expenses</u>.

(a)     Except as set forth in Section 10.13 and with respect to the Break-Up Fee, each of the Parties will bear its own expenses in connection with the negotiation and the consummation of the transactions contemplated by this Agreement, and no expenses of Seller relating in any way to the purchase and sale of the Acquired Assets hereunder and the transactions contemplated hereby, including without limitation legal, accounting or other professional expenses of Seller, shall be charged to or paid by Purchaser or included in any of the Assumed Liabilities.

(b)     Purchaser will pay all costs incurred, whether at or subsequent to the Closing, in connection with the transfer of the Acquired Assets to Purchaser as contemplated by this Agreement, including without limitation, all sales, use, excise, real estate conveyance taxes, fees and charges applicable to such transfer including stamp taxes, document taxes and the like and all recording charges and fees applicable to the recordation of releases of any Liens. Purchaser will pay all recording charges and fees applicable to the recordation of deeds and mortgages and other instruments of transfer; and all costs of obtaining or transferring permits, registrations, applications and other tangible and intangible properties; and all premiums, charges and costs of obtaining and providing surveys, appraisals, UCC and title searches and title insurance for the benefit of Purchaser with respect to the Acquired Assets.

5.16   <u>Resident Medical Records</u>.  Purchaser understands that, to the extent allowed by Applicable Law, all of Seller's medical records pertaining to residents of the Facility (including those historic records required to be maintained under Applicable Law) that are in Seller's or Seller's possession are being transferred hereunder to Purchaser or its designee, and, with respect to all medical records, and all other records transferred to Purchaser or its designee hereunder, including financial records, Purchaser agrees that it or its designee, as applicable, will diligently maintain and preserve such records as and to the extent required by law, and allow Seller, or its agents or representatives, to examine from time to time such records relating to the period of Seller's operation of the Facility and to make copies thereof at Purchaser's expense, subject to and only to the extent required by Applicable Laws and solely for Seller's reasonable business purposes.  All patient records shall be maintained in full compliance with all state and federal laws relating to the confidentiality and preservation of medical records.  Purchaser agrees to provide patients and residents with all required notices required to be provided by Purchaser in accordance with Applicable Law.  Seller agrees to provide patients and residents with all required notices required to be provided by Seller in accordance with Applicable Law.

5.17   <u>Access and Inspection</u>.  Upon not less than seventy-two (72) hours prior written notice, Seller shall give, and cause its professional consultants to give, to Purchaser, its representatives, lenders, appraisers, engineers, attorneys, accountants and its other professional consultants reasonable access to the Property and the Facility, Seller and its offices, books and records, and work papers, and accountants' work papers and input during normal business hours on all business days to and with all the directors, officers, and administrators of the Facility, and to furnish such information and documents in its or their possession relating to Seller or the Property and the Facility as Purchaser may reasonably request; provided that Seller's release of such records will not cause Seller to violate any Legal Requirement.  Purchaser shall make and cause its agents to make diligent efforts not to materially interfere with the business of Seller and its use and enjoyment of the Facility and the Property.  Purchaser shall restore any disturbed areas

and shall indemnify, defend and hold Seller harmless from any damage caused to the Facility and/or the Property by, and any claims resulting from Purchaser's inspection of the Facility and/or the Property.  If requested by Seller, any such access on the Facility or the Property shall be accompanied by a representative of Seller.

5.18    Eligible Rollovers from 403(b) Plan.  Seller will use commercially reasonable efforts to enable the rollover of Seller's 403(b) Plan account balances that constitute eligible rollover distributions for eligible Employees to the 401(k) Plan of Purchaser or its Affiliates.  The final determination of eligibility or whether to accept any rollover contributions will be made by Purchaser's 401(k) Plan Administrators in their sole discretion.

5.19    Accounts Receivable.

(a)    Seller shall retain its right, title and interest in and to all unpaid accounts receivable or adjustments thereto with respect to the Facility that relate to the period prior to the Closing Date for the Facility, including, but not limited to, any accounts receivable arising from rate or audit adjustments which relate to the period prior to the Closing Date even if such adjustments occur after the Closing Date.  Without limiting the generality of the foregoing, Seller may collect all such accounts receivable.

(b)    Payments received by Purchaser or Seller after the Closing Date with respect to the Facility from Third Party Payors, or private pay patients, shall be allocated and handled as follows:

i.    if such payments either specifically indicate on the check or accompanying remittance advice, or if the parties agree, that they relate to the period prior to the Closing Date, they shall be forwarded (within five (5) Business Days, and until so forwarded, shall be held in trust for the benefit of Seller) to Seller or retained by Seller, as applicable, along with the applicable remittance advice;

ii.    if such payments indicate on the check or accompanying remittance advice, or if the parties agree, that they relate to the period on or after the Closing Date, they shall be forwarded (within five (5) Business Days, and until so forwarded, shall be held in trust for the benefit of Purchaser) to or retained by Purchaser, as applicable;

iii.    if such payments indicate on the check or accompanying remittance advice, or if the parties agree, that they relate to periods both prior to and after the Closing Date, then the recipient of such payment is authorized to deposit such payments into its own banking depositories and, once such bank has received good funds, (x) if Purchaser is such recipient, to retain the portion thereof which relates to the period on and after the Closing Date and to promptly (and in any event within five (5) Business Days) remit to Seller the portion thereof which relates to the period prior to the Closing Date and, (y) if Seller is such recipient, to retain the portion thereof which relates to the period prior to the Closing Date and to promptly (and in any event within five (5) Business Days) remit to Purchaser the portion thereof which relates to the period on and after the Closing Date; and

iv.    if the check or accompanying remittance advice does not indicate the period to which a payment relates or if there is no accompanying remittance advice and

24

if the parties do not otherwise agree as to how to apply such payment, then any such payment received by Purchaser or Seller within ninety (90) days following the Closing Date will be attributed first to outstanding amounts due from the payor thereof for services rendered or activities occurring prior to the Closing Date, and if received by Purchaser or Seller after such ninety (90) days, will be attributed to any outstanding balance for services rendered or activities occurring after the Closing Date and the party receiving such payment will promptly (and in any event within five (5) Business Days) remit or retain such payment accordingly.

(c)     Nothing herein shall be deemed to limit in any way Seller's rights and remedies to recover accounts receivable due and owing to Seller under the terms of this Agreement, and nothing herein shall be deemed to limit in any way Purchaser's rights and remedies to recover accounts receivable due and owing to Purchaser under the terms of this Agreement.

(d)     If it is determined that any payment hereunder was misapplied by the parties, the party which erroneously received said payment shall remit the same to the other Party within five (5) Business Days after said determination is made.

(e)     Until the first anniversary of the Closing Date, Purchaser and Seller shall, upon reasonable notice and during normal business hours and at reasonable intervals, have the right to inspect all cash receipts of the other respective party in order to confirm the other Party's compliance with the obligations imposed on it under this Section.

(f)     Purchaser shall not initiate any communication to any obligor of any account receivable affirmatively instructing such obligor to pay any amount owed for services provided after the Closing before paying any amount owed for services provided prior to Closing, unless such obligor shall first have notified Purchaser in writing that it disputes any amounts owed for services provided prior to the Closing, and Purchaser shall have furnished to Seller a true copy of such notice.

5.20    <u>Diligent Application for All Approvals</u>.    Upon the entry of the Sale Order, Purchaser shall, with reasonable cooperation of Seller, within ten (10) Business Days after entry of the Sale Order, submit the necessary applications to the Regulatory Authorities to obtain the Approvals (with copies of such applications provided to Seller) and shall diligently and expeditiously follow up on and pursue the Approvals.  Upon the request of either party, the other party shall provide to such requesting party and to the Regulatory Authorities with jurisdiction thereof, such reasonably requested information, reports, documentation, signatures, and testimony before any governmental or administrative tribunal or court which may be required in connection with obtaining any of the Approvals.

5.21    <u>Bankruptcy Court Matters</u>.

(a)     Seller and Purchaser acknowledge that this Agreement and the transaction contemplated hereby are subject to the Bidding Procedures Order and approval by the Bankruptcy Court and, as applicable, entry of the Sale Order.  In the event of any discrepancy between this Agreement and the Sale Order, the Sale Order shall govern.

(b)     This Agreement and the transaction contemplated hereby are subject to Seller's right and ability to consider higher and better competing bids with respect to the Acquired Assets pursuant to the Bidding Procedures Order.  Seller may conduct any auction process in accordance with the Bidding Procedures Order.

(c)     Subject to the Seller's obligations to comply with any order of the Bankruptcy Court, the Seller and Purchaser will promptly make all filings, take all actions and use commercially reasonable efforts to obtain any and all other approvals and orders necessary or appropriate for consummation of the transactions contemplated by this Agreement.

(d)     Purchaser agrees that it will promptly take such actions as are reasonably requested by the Seller to assist in obtaining entry of the Sale Order, including furnishing affidavits or other documents or information for filing with the Bankruptcy Court; provided, however, in no event shall Purchaser or Seller be required to agree to any amendment of this Agreement.

(e)     The Seller further covenants and agrees that, after the entry of the Sale Order, the terms of any order entered by the Bankruptcy Court shall not be intended to (or reasonably likely to) supersede, abrogate, nullify or restrict the terms of this Agreement in any material respect, or prevent the consummation or performance of the transactions contemplated herein.

(f)     If an auction is conducted, and Purchaser is not the winning bidder for the Acquired Assets (such winning bidder, the "Successful Bidder"), Purchaser shall, in accordance with and subject to the Bidding Procedures Order, be required to serve as the back-up bidder if Purchaser is the next highest or otherwise best bidder for the Acquired Assets at the auction (the party that is the next highest or otherwise best bidder at the auction after the Successful Bidder, the "Back-Up Bidder") and, if Purchaser is the Back-Up Bidder, Purchaser shall be required to keep its bid to consummate the transaction contemplated herein on the terms and conditions set forth in this Agreement (as the same may be improved upon by Purchaser in the auction) open and irrevocable until the date this Agreement is otherwise terminated.  Following the auction, if the Successful Bidder fails to consummate the applicable Alternative Transaction as a result of a breach or failure to perform on the part of such Successful Bidder, then Purchaser, if Purchaser is the Back-Up Bidder, will be deemed to have the new prevailing bid, and the Seller may consummate the transactions on the terms and conditions set forth in this Agreement (as the same may be improved upon by Purchaser in the auction) with the Back-Up Bidder.

(g)     In consideration for Purchaser having expended considerable time and expense in connection with this Agreement, the negotiation of this Agreement, and the identification and quantification of the assets and liabilities of Seller, upon the consummation of any Alternative Transaction, Purchaser shall be deemed to have earned the Break-Up Fee, which shall be paid in cash, by wire transfer of immediately available funds from such Alternative Transaction to an account designated by Purchaser to the Seller, without further order of the Bankruptcy Court.  The Parties acknowledge and agree that (1) the Parties have expressly negotiated the provisions of this Section, (2) the payment of the Break-Up Fee is an integral part of this Agreement, and (3) in the absence of the Seller's obligations to make this payment, Purchaser would not have entered into this Agreement.

## ARTICLE VI

## PURCHASER'S CONDITIONS PRECEDENT TO CLOSING

The Closing and Purchaser's obligations hereunder and with respect thereto are expressly contingent and conditional upon the fulfillment, compliance, satisfaction and performance of each of the following conditions prior thereto, any one or more of which may be waived or deferred in whole or in part, but only in writing, by Purchaser at its option and sole discretion.

6.1     <u>Bankruptcy Matters</u>.  The Bankruptcy Court shall have entered the Sale Order on terms reasonably satisfactory to the Parties approving a sale to Purchaser and it shall not be subject to a stay pending appeal.

6.2     <u>Observance and Performance</u>.  Seller shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date, and all representations and warranties of Seller shall remain true and correct as of Closing.

6.3     <u>No Legal Actions</u>.  No Regulatory Authority shall have issued an order, not subsequently vacated, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.

6.4     <u>Permits</u>.  Purchaser shall have obtained the Permits and Approvals, or assurances of issuance thereof, so that Purchaser is authorized to operate the Business.

6.5     <u>Title</u>.  The Title Company is prepared to issue, as of the Closing Date, an Owner's Policy of Title Insurance in substantially the same form and substance as the Pro Forma Title Policy, insuring Purchaser's fee interest in the Facility subject only to the Permitted Encumbrances upon payment by Purchaser of the premium for such policy (it being acknowledged and agreed said premium shall be at Purchaser's sole cost and expense).

## ARTICLE VII

## SELLER'S CONDITIONS PRECEDENT TO CLOSING

The Closing and the Seller's obligations hereunder and with respect thereto are expressly contingent and conditional upon the fulfillment, compliance, satisfaction and performance of each of the following conditions prior thereto; any one or more of which may be waived or deferred in whole or in part, but only in writing, by Seller at its option and sole discretion.

7.1     <u>Bankruptcy Matters</u>.  The Bankruptcy Court shall have entered the Sale Order on terms reasonably satisfactory to the Parties approving a sale to Purchaser and it shall not be subject to a stay pending appeal.

7.2     <u>Observance and Performance</u>.  Purchaser shall have performed and complied with, in all material respects, all covenants and agreements required by this Agreement to be performed and complied with by it prior to or as of the Closing Date, and all representations and warranties of Purchaser shall remain true and correct as of Closing.

7.3     <u>No Legal Actions</u>.   No Regulatory Authority shall have issued an order, not subsequently vacated, restraining, enjoining or otherwise prohibiting the consummation of the transactions contemplated by this Agreement.

7.4     <u>Permits</u>.   Purchaser shall have obtained the Permits and Approvals, or assurances of issuance thereof, so that Purchaser is authorized to operate the Business.

## ARTICLE VIII

## RIGHTS OF TERMINATION AND REMEDIES FOR DEFAULT

8.1     <u>Termination</u>.   This Agreement may be terminated at any time before the Closing:

(a)     by mutual written agreement of Purchaser and Seller;

(b)     by either Purchaser or Seller, upon written notice to the other Party, if the other Party is in material breach or default of any provision of this Agreement, which breach is not cured within ten (10) Business Days after written notice thereof is received; provided, however, that the terminating party is not in material breach or default of this Agreement;

(c)     by either Purchaser or Seller if the sale is disapproved by the Bankruptcy Court, or an Alternative Transaction has been consummated;

(d)     by either Purchaser or Seller if the Closing has not occurred by the Outside Closing Date by no fault of the Party terminating;

(e)     by Seller, if Purchaser is not diligently pursuing the Closing, including all necessary Approvals, or if Purchaser has received notice that it is not reasonably likely to receive all necessary Approvals, such that the Closing can occur on or prior to the Outside Closing Date; or

(f)     by either Purchaser or Seller, if, prior to Closing, the Sale Order, after being entered by the Bankruptcy Court, has subsequently been reversed, revoked, or voided by an order of a court of competent jurisdiction.

8.2     <u>Remedies</u>.

(a)     Termination, plus any rights the Parties may have under this Section regarding the Deposit and the Break-Up Fee, shall be the sole remedy of the Parties for a breach of this Agreement.  If the Closing does not occur in accordance with this Agreement and Purchaser has defaulted under or breached this Agreement, then Purchaser will be deemed to have forfeit its Deposit as liquidated damages.  If the Closing does not occur in accordance with this Agreement and Purchaser has not defaulted or breached this Agreement, the Deposit may be returned to Purchaser, and, in the event of an Alternative Transaction, Purchaser may be paid the Break-Up Fee from the proceeds of the Alternative Transaction.

(b)     The Parties intend that the Deposit constitute compensation, and not a penalty.  The Parties acknowledge and agree that either Party's harm caused by the other Party's

default or breach of this Agreement would be impossible or very difficult to accurately estimate as of the Execution Date, and that the Deposit (or return of the Deposit, as the case may be, and the Break-Up Fee in circumstances where applicable) is a reasonable estimate of the anticipated or actual harm that might arise from such a default or breach.  The transfer and/or return of the Deposit (and payment of the Break-Up Fee in circumstances where applicable) is each Party's sole liability and entire obligation and the exclusive remedy for the other Party's default or breach of this Agreement.  If the Closing does not occur on or before the Outside Closing Date, the Deposit shall be disbursed in accordance with this <u>Section 8.2</u>.

(c)    Immediately upon the occurrence of any termination of this Agreement pursuant to <u>Sections 8.1(a)</u>, <u>8.1(b)</u> (where Purchaser is the terminating Party), <u>8.1(c)</u> , <u>8.1(d)</u> (where Purchaser is not otherwise in default under this Agreement), or <u>8.1(f)</u>, and provided that Purchaser has not otherwise materially breached this Agreement, Seller shall refund the Deposit to Purchaser.  If the termination is pursuant to <u>Section 8.1(c)</u> as the result of an Alternative Transaction, then subject to and in accordance with the terms of the Bidding Procedures Order and provided Purchaser has not breached this Agreement, upon the closing of the Alternative Transaction, Seller shall (i) refund the Deposit to Purchaser and (ii) pay Purchaser the Break-Up Fee from the proceeds of such Alternative Transaction.  In all other circumstances, the Deposit shall be forfeited to the Seller and the Seller shall be released from all obligations to Purchaser hereunder.

ARTICLE IX

CLOSING

9.1    <u>Closing Date</u>.

The closing of the transactions contemplated hereby (the "<u>Closing</u>") shall take place remotely via the exchange of documents and signatures within [__] ([__]) Business Days after receipt of the last Approval necessary for Closing (the "<u>Closing Date</u>"), but in no event later than [_____] (the "<u>Outside Closing Date</u>") (unless otherwise mutually agreed by the Parties).  The transactions contemplated hereby shall take place pursuant to, and in accordance with, the terms and conditions hereof.  The Closing shall be effective as of 11:59 p.m. on the Closing Date or such other date and time as the Parties may agree upon in writing.

9.2    <u>Deliveries of Seller at Closing</u>.  At the Closing, Seller shall deliver to Purchaser the following:

(a)    A copy of the Sale Order.

(b)    The Deeds, together with State and local conveyance tax forms duly executed and payment of said State and local conveyance taxes, a Bill of Sale, and the other Transaction Documents all as they relate to the Acquired Assets.

(c)    Secretary's certificates and such certificates from public officials relating to legal existence and corporate good standing, which Purchaser may reasonably request to verify any representations of Seller herein.

(d)    A copy of the respective duly adopted (i) certificate of incorporation of Seller, certified by the Secretary of State of Florida to be true, complete and accurate as of the Closing Date and (ii) by-laws of Seller, certified by its Secretary to be true, complete and accurate as of the Closing Date.

(e)    A properly executed IRS Form W-9 from Seller.

(f)    Certificates of Seller, executed under the pains and penalties of perjury, stating that Seller is not a "foreign person," as defined in Section 1445(f) of the Code and the regulations issued thereunder, in order to comply with Section 1445(b)(2) and the regulations issued thereunder, in such form as Purchaser or the title insurance company issuing the title policy may require, in their sole discretion.

(g)    A certification of the information necessary to complete and file with the Internal Revenue Service a Form 1099-S in connection with the conveyance of the Acquired Assets.

(h)    Evidence of payment of all property tax bills and tangible property tax bills due and owing related to the Facility and the Property, including all separate tax parcels, if applicable, or an adequate hold-back in Purchaser's reasonable judgment to pay such bills.

(i)    Evidence of payment of water and sewer charges with respect to the Property.

(j)    Any and all Resident Deposits.

(k)    Schedules, updated to the Closing Date.

(l)    Keys.

(m)    Such other commercially reasonable instruments and documents as Purchaser, its lender or its title insurance company reasonably deems necessary to effect the transactions contemplated hereby.

9.3    <u>Deliveries of Purchaser at Closing</u>.  At the Closing, Purchaser shall deliver to Seller the following:

(a)    The Purchase Price in accordance with Section 2.5 hereof.

(b)    Certificate of resolutions of the boards of directors of Purchaser and any Affiliate to which this Agreement has been assigned, authorizing the transactions contemplated hereby, certified by the respective Secretaries of Purchaser and any such Affiliate.

(c)    A copy of the respective duly adopted (i) charter or certificate of formation, as applicable, of Purchaser, certified by the Secretary of State of [Delaware] to be true, complete and accurate as of the Closing Date and (ii) by-laws or operating agreement, as applicable, of Purchaser, certified by its Secretary to be true, complete and accurate as of the Closing Date.

(d)     The agreements listed on Schedule 3, all as they relate to the Acquired Assets and the Property.

(e)     Such other instruments and documents as Seller reasonably deems necessary to effect the transactions contemplated hereby.

ARTICLE X

MISCELLANEOUS

10.1     <u>No Broker</u>.  Except for RBC Capital Markets and Meridan Capital, whose fees will be paid by Seller, Seller represents to Purchaser, and Purchaser represents to Seller, that no agent, finder or broker has acted for it or was the producing and effective cause of this Agreement or the transactions contemplated herein, and that no commissions or finder's fees are due to any third parties.  The Parties agree to indemnify and hold each other harmless with respect to any and all expenses, obligations, and liabilities resulting from the claims or causes of action relating to any claims made by any person retained or used by the indemnifying party for any agent's, broker's or finder's fees or commissions relating to the transactions contemplated herein.

10.2     <u>Entire Agreement</u>.  This Agreement, together with the Schedules and Exhibits attached hereto and all certificates and documents delivered in connection herewith contain the entire understanding of the parties with respect to the subject matters hereof and supersedes all prior and other contemporaneous oral or written understandings and agreements between the Parties hereto.

10.3     <u>Binding Effect; Assignment</u>.  This Agreement, shall be binding upon and inure to the benefit of the Parties hereto and their respective heirs, successors, personal representatives and permitted assigns.

10.4     <u>Notices</u>.  Any notice, demand, offer or other writing required or permitted pursuant to this Agreement shall be in writing, furnished in duplicate and shall be transmitted by hand delivery, certified mail, return receipt requested, or Federal Express or another nationally recognized overnight courier service, postage prepaid, as follows:

(a)     If to Seller:

Senior Care Living VII, LLC
Attn.:  Mark C. Bouldin
3665 East Bay Drive, Suite 204-429
Largo, Florida 33771

With a copy to:

Johnson, Pope, Bokor, Ruppel & Burns, LLP
Attn.:  Michael C. Markham
401 E. Jackson Street, Suite 3100
Tampa, Florida 33602

(b)     If to Purchaser:

[·]

                With a copy to:

[·]

Any party shall have the right to change the place to which such notice shall be given by similar notice sent in like manner to all other parties hereto.  Any such notice, if sent by private express overnight courier service, shall be deemed delivered on the earlier of the date of actual delivery or the next business day following deposit, postage prepaid, with such private express overnight courier service and if delivered by hand delivery shall be deemed delivered on the date of the actual delivery and if sent by mail, shall be deemed delivered on the earlier of the third day following deposit with the U.S.  Postal Service or actual delivery.

10.5    Captions.  The captions of this Agreement are for convenience and reference only, and in no way define, describe, extend or limit the scope or intent of this Agreement or the intent of any provisions hereof.

10.6    Joint Effort.  The preparation of this Agreement has been the joint effort of the Parties, and the resulting document shall not be construed more severely against one of the Parties than the other.

10.7    Counterparts.  This Agreement may be executed in counterparts and each executed copy shall be deemed an original which shall be binding upon all Parties hereto.

10.8    Partial Invalidity.  The invalidity of one or more of the phrases, sentences, clauses, sections or articles contained in this Agreement shall not affect the remaining portions so long as the material purposes of this Agreement can be determined and effectuated.

10.9    No Offer.  Neither the negotiations to date nor the preparation of this Agreement shall be deemed an offer by any party to the other.  No such contract shall be deemed binding on any party until such party has executed and delivered a written agreement.

10.10   Amendments.  This Agreement may not be amended in any respect whatsoever except by a further agreement, in writing, fully executed by each of the parties.

10.11   Schedules and Exhibits.  All Schedules and Exhibits referred to in this Agreement shall be incorporated into this Agreement by such reference and shall be deemed a part of this Agreement as if fully set forth in this Agreement.

10.12   Waivers.  No terms and provisions hereof, including, without limitation, the terms and provisions contained in this sentence, shall be waived, modified or altered so as to impose any additional obligations or liability or grant any additional right or remedy, and no custom, payment, act, knowledge, extension of time, favor or indulgence, gratuitous or otherwise, or words or silence at any time, shall impose any additional obligation or liability or grant any additional right or remedy or be deemed a waiver or release of any obligation, liability, right or remedy except as set forth in a written instrument properly executed and delivered by the party sought to be charged,

32

expressly stating that it is, and the extent to which it is, intended to be so effective. No assent, express or implied, by either party, or waiver by either party, to or of any breach of any term or provision of this Agreement shall be deemed to be an assent or waiver to or of such or any succeeding breach of the same or any other such term or provision.

10.13   Attorneys' Fees.  In any action or proceeding brought to enforce any provision of this Agreement or the other Transaction Documents, or where any provision hereof or thereof is validly asserted as a defense, the successful party shall be entitled to recover reasonable attorneys' fees in addition to any other available remedy.

10.14   Course of Dealing.  No course of dealing and no delay on the part of any party hereto in exercising any right, power, or remedy conferred by this Agreement shall operate as a waiver thereof or otherwise prejudice such party's rights, powers and remedies.  The failure of any of the parties to this Agreement to require the performance of a term or obligation under this Agreement or the waiver by any of the parties to this Agreement of any breach hereunder shall not prevent subsequent enforcement of such term or obligation or be deemed a waiver of any subsequent breach hereunder.  No single or partial exercise of any rights, powers or remedies conferred by this Agreement shall preclude any other or further exercise thereof or the exercise of any other right, power or remedy.

10.15   Jurisdiction.  Each of the Parties agrees that any proceeding brought to enforce the rights or obligations of any Party under this Agreement or any Transaction Document shall be commenced and maintained in the Bankruptcy Court, and the Bankruptcy Court shall have exclusive jurisdiction over any such proceeding.  Each of the Parties consents to the exercise of jurisdiction over it and its properties, in accordance with the terms of this Section, with respect to any proceeding arising out of or in connection with this Agreement, any Transaction Document or the transactions contemplated hereby or thereby, or the enforcement of any rights under this Agreement or any Related Agreement.  EACH PARTY IRREVOCABLY AND UNCONDITIONALLY SUBMITS TO THE EXCLUSIVE JURISDICTION OF THE BANKRUPTCY COURT, AND ANY APPELLATE COURT ARISING THEREFROM, IN ANY ACTION OR PROCEEDING ARISING OUT OF OR RELATED TO THIS AGREEMENT OR ANY OF THE DOCUMENTS ENTERED INTO IN CONNECTION HEREWITH OR FOR THE RECOGNITION OR ENFORCEMENT OF ANY JUDGMENT, AND EACH OF THE PARTIES HERETO IRREVOCABLY AND UNCONDITIONALLY AGREES THAT ALL CLAIMS IN RESPECT OF ANY SUCH ACTION OR PROCEEDING MAY BE HEARD AND DETERMINED IN SUCH COURT.  EACH OF THE PARTIES AGREES THAT A FINAL JUDGMENT IN ANY SUCH ACTION OR PROCEEDING SHALL BE CONCLUSIVE AND BINDING ON SUCH PARTY.

10.16   WAIVER OF JURY TRIAL.  EACH OF PURCHASER AND SELLER HEREBY EXPRESSLY WAIVES ITS, HIS OR HER RESPECTIVE RIGHTS TO A JURY TRIAL OF ANY CLAIM OR CAUSE OF ACTION BASED UPON OR ARISING OUT OF THIS AGREEMENT, ANY OTHER TRANSACTION DOCUMENT OR THE ACQUIRED ASSETS OR ANY DEALINGS BETWEEN THEM RELATING TO THE SUBJECT MATTER OF THIS AGREEMENT.  SELLER AND PURCHASER ALSO WAIVE ANY BOND OR SURETY OR SECURITY UPON SUCH BOND WHICH MIGHT, BUT FOR THIS WAIVER, BE REQUIRED OF ANY PARTY.    THE SCOPE OF THIS WAIVER IS INTENDED TO BE ALL-

ENCOMPASSING OF ANY AND ALL DISPUTES THAT MAY BE FILED IN ANY COURT AND THAT RELATE TO THE SUBJECT MATTER OF THIS TRANSACTION, INCLUDING WITHOUT LIMITATION, CONTRACT CLAIMS, TORT CLAIMS, BREACH OF DUTY CLAIMS, AND ALL OTHER COMMON LAW AND STATUTORY CLAIMS.  SELLER AND PURCHASER FURTHER REPRESENT AND WARRANT THAT EACH HAS REVIEWED THIS WAIVER WITH ITS LEGAL COUNSEL; AND THAT EACH VOLUNTARILY WAIVES ITS JURY TRIAL RIGHTS FOLLOWING CONSULTATION WITH LEGAL COUNSEL. THIS WAIVER IS IRREVOCABLE AND MAY ONLY BE MODIFIED IN AMENDMENTS, RENEWALS, SUPPLEMENTS OR MODIFICATIONS TO THIS AGREEMENT AND ANY OTHER PURCHASE DOCUMENT.  IN THE EVENT OF LITIGATION, SUCH LITIGATION SHALL BE FILED WITH AND HEARD BY THE BANKRUPTCY COURT AND THIS AGREEMENT MAY BE FILED AS A WRITTEN CONSENT TO A TRIAL (WITHOUT A JURY) BY THE BANKRUPTCY COURT.

10.17    Governing Law.  This Agreement including the validity thereof and the rights and obligations of the parties hereunder shall be governed by and construed in accordance with the laws of the State of Texas.

10.18    Third Parties.  Nothing in this Agreement, whether express or implied, is intended to confer any rights or remedies under or by reason of this Agreement on any Persons (including Employees) other than the parties hereto and their respective legal representatives, successors and permitted assigns.  No Person who is not a party to this Agreement (including Employees) may rely hereon or derive any benefit hereby as a third party beneficiary or otherwise.

*[Remainder of Page Intentionally Left Blank]*

IN WITNESS WHEREOF, the parties hereto have hereunto set their hands and seals as of the date first above appearing.

PURCHASER:

[·]

By: _____

Witness: _____          Title: _____

SELLER:

Senior Care Living VII, LLC

[·]

By: _____

Title: _____

[Signature Page for Asset Purchase Agreement]

## LIST OF SCHEDULES AND EXHIBITS

| | |
|---|---|
| Exhibit A | Approvals |
| Exhibit B | Bidding Procedures Order |
| Exhibit C | Excess Land Description |
| Exhibit D | Property Description |
| Exhibit E | Escrow Agreement |
| Exhibit F | Quitclaim Deeds |
| | |
| Schedule X | Assumed Benefit Liabilities |
| Schedule 2 | Permitted Encumbrances |
| Schedule 2.1(d) | Equipment |
| Schedule 2.2 | Excluded Assets |
| Schedule 2.7 | Allocation of Purchase Price |
| Schedule 3 | Transaction Documents |
| Schedule 3.3 | Pending Litigation |
| Schedule 3.4 | Financial Statements |
| Schedule 3.5 | Compliance with Legal Requirements |
| Schedule 3.7 | Environmental Matters |
| Schedule 3.8 | Property Description |
| Schedule 3.9 | Insurance Policies |
| Schedule 5.10(b) | Assumed Contracts |

Label Matrix for local noticing
113A-8
Case 8:22-bk-00103-CED
Middle District of Florida
Tampa
Thu Oct 27 13:39:40 EDT 2022

Baxter Construction, Co.
GrayRobinson, P.A.
Steven J. Solomon, Esq.
333 SE 2nd Avenue, Suite 3200
Miami, FL 33131-2191

County of Denton, Texas
McCreary, Veselka, Bragg & Allen, PC
Julie Anne Parsons
PO Box 1269
Round Rock, TX 78680-1269

Matthew Huckin
Valhalla Real Estate
3605 Caruth Boulevard
Dallas, TX 75225-5102

Lewisville ISD
Linebarger Goggan Blair & Sampson, LLP
c/o Sherrel K Knighton
2777 N Stemmons Frwy Ste 1000
Dallas, TX 75207-2328

Kenneth W Mann
SC&H Group, Inc
6011 University Boulevard
Suite 490
Ellicott City, MD 21043-6107

Mary L. Peebles
232 S. Highland St., Ste. 102
Memphis, TN 38111-4529

Senior Care Living VII, LLC
3665 East Bay Drive, Ste. 204-429
Largo, FL 33771-1990

A Place for Mom, Inc.
PO Box 913241
Denver, CO 80291-3155

ASSA Abloy Global Solutions
PO Box 676947
Dallas, TX 75267-6694

Accushield, LLC
Suite 360
2030 Powers Ferry Rd SE
Atlanta, GA 30339-5016

Airgas USA, LLC
PO Box 734672
Dallas, TX 75373-4672

Allegra
107 N Jefferson St
Tampa, FL 33602-5001

Aquarium Environments, Inc.
d/b/a Fish Gallery
2909 Fountainview Drive
Houston, TX 77057-6105

Aquarius Water Refining
PO Box 337
Wimauma, FL 33598-0337

Arrow Exterminators, Inc.
5750 Rufe Snow Drive
North Richland Hills, TX 76180-6163

Baxter Construction Company
3225 Avenue N
Fort Madison, IA 52627-3553

Baxter Construction, Co
c/o Steven J. Solomon, Esq.
GrayRobinson, P.A.
333 SE 2nd Avenue, Suite 3200
Miami, FL 33131-2191

Best Celebrity Talent
Attn:  Rhonda Medina
700 Meadow Bend Court
Lewisville, TX 75077-8606

Bluestone Pools, LLC
PO Box 92923
Southlake, TX 76092-0923

Cawley Company
PO Box 2110
Manitowoc, WI 54221-2110

Commercial Safety Systems
PO Box 8499
Seminole, FL 33775-8499

Community Payroll
Suite 400
301 Anchor Plaza Parkway
Tampa, FL 33634

D. Park Smith
Law Office of D. Park Smith
250 Cherry Springs Road, Suite 200
HUNT, TX 78024-3010

Denton County Tax Collector
110 W Hickory Street
Denton, TX 76201-4168

Department of Revenue
PO Box 6668
Tallahassee FL 32314-6668

Direct Supply
PO Box 88201
Milwaukee, WI 53288-8201

Echo Lab
PO Box 70343
Chicago, IL 60673-0343

Eldermark Software
PO Box 844707
Boston, MA 02284-4707

FL Dep of Revenue
Collection Agency Section
5050 W Tennessee St.
Tallahassee, FL 32399-6586

G5 Search Marketing, Inc.
Dept LA 23988
Pasadena, CA 91185-0001

HD Supply Facilities Mtnce
PO Box 509058
San Diego, CA 92150-9058

HM LIfe Insurance Company
PO Box 382038
Pittsburgh, PA 15251-8038

Hunter-Kelsey of Texas, LLC
Dennis Leone
SHANKMAN LEONE, P.A.
707 North Franklin Street, 5th Fl
Tampa, FL 33602-4419

Hunter-Kelsey of Texas, LLC
c/o Howard Marc Spector
SPECTOR & COX, PLLC
12770 Coit Road, Suite 850
Dallas, Texas 75251-1364

Hunter-Kelsey of Texas, LLC as Agent and
Attorney-In-Fact for Tarpon Hunters, LLC
c/o Howard Marc Spector
Spector & Cox, PLLC
12770 Coit Road, Suite 850
Dallas, TX 75251-1364

Internal Revenue Service
P.O. Box 7346
Philadelphia, PA 19101-7346

J. Robert Medlin
FTI Consulting
2001 Ross Avenue, Ste. 650
Dallas, TX 75201-2923

Julie Anne Parsons
McCreary, Veselka, Bragg & Allenj, PC
PO Box 1269
Round Rock, TX 78680-1269

Konica Minolta Business Solutions
Dept. 2366
PO Box 122366
Dallas, TX 75312-2366

Lewisville ISD
Linebarger Goggan Blair & Sampson, LLP
c/o Sherrel K Knighton
2777 N Stemmons Frwy Ste 1000
Dallas, Texas 75207-2328

Magnolia Fisheries
PO Box 3087
Coppell, TX 75019-7001

McKesson Medical-Surgical
PO Box 204786
Dallas, TX 75320-4786

Our Place Tuxedos & Uniforms
2044 Smith Street
North Providence, RI 02911-1785

Senior Care Living VI, LLC
6400 Oilfield Rd
Sugar Land, TX 77479-9622

Senior Living Specialists
14580 Berklee Drive
Addison, TX 75001-3532

Shred it
c/o Stericycle, Inc.
28883 Network Place
Chicago, IL 60673-1288

Silversphere, LLC
Suite 200
2570 W Int'l Speedway Blvd
Daytona Beach, FL 32114-8145

Sodexo, Inc & Affiliates
PO Box 360170
Pittsburgh, PA 15251-6170

Songs & Smiles
Suite 260
129 S Main Street
Grapevine, TX 76051-5488

TK Elevator Corp. fka ThyssenKrupp Elevator
c/o Law Office of D. Park Smith
250 Cherry Springs Road, Suite 200
HUNT, TX 78024-3010

TX Comptroller Public Accts
PO Box 13528, Capital Station
Austin, TX 78711-3528

Tarpon Hunters, LLC
7200 N. Mopac Expressway #120
Austin, TX 78731-3058

The County of Denton, Texas
Julie Anne Parsons
McCreary, Veselka, Bragg & Allen, PC
PO Box 1269
Round Rock, TX 78680-1269

The County of Denton, Texas
c/o Julie Anne Parsons, Attorney
McCreary, Veselka, Bragg & Allen, PC
PO Box 1269
Round Rock, TX 78680-1269

Thyssenkrupp Elevator Corp
PO Box 3796
Carol Stream, IL 60132-3796

UMB Bank, NA Master Trustee
120 S. Street #1400
Minneapolis, MN 55402

US Foods, Inc.
PO Box 843202
Dallas, TX 75284-3202

VSL HOldings, LLC
Suite 400
4301 Anchor Plaza Parkway
Tampa, FL 33634-7529

Validus Senior Living REIT
Suite 400
4301 Anchor Plaza Parkwy
Tampa, FL 33634-7529

Welcome Home Software, Inc.
2829 Normandy Drive NW
Atlanta, GA 30305-2824

Michael C Markham +
Johnson Pope Bokor Ruppel & Burns LLP
401 East Jackson Street, Suite 3100
Tampa, FL 33602-5228

Steven J Solomon +
GrayRobinson, PA
333 S.E. 2nd Avenue, Suite 3200
Miami, FL 33131-2191

United States Trustee - TPA +
Timberlake Annex, Suite 1200
501 E Polk Street
Tampa, FL 33602-3949

J Steven Wilkes +
Office of United States Trustee
501 East Polk Street
Tampa, FL 33602-3949

Ryan C Reinert +
Shutts & Bowen LLP
4301 W Boy Scout Blvd, Ste 300
Tampa, FL 33607-5716

Dennis D Leone +
Shankman Leone PA
707 N. Franklin Street, 5th Floor
Tampa, FL 33602-4419

Daniel S Bleck +
Mintz Levin
One Financial Center
Boston, MA 02111-2657

Howard Marc Spector +
Spector & Cox, PLLC
12770 Coit Road, Suite 850
Dallas, TX 75251-1364

Sherrel K Knighton +
Linebarger Goggan Blair & Sampson, LLP
2777 N Stemmons Freeway, Suite 1000
Dallas, TX 75207-2328

Timothy J McKeon +
Mintz Levin
One Financial Center
Boston, MA 02111-2657

Dallas Taylor +
Mintz Levin
666 Third Avenue
New York, NY 10017-4011

Julie Anne Parsons +
McCreary Veselka Bragg & Allen PC
PO Box 1269
Round Rock, TX 78680-1269

Note: Entries with a '+' at the end of the
name have an email address on file in CMECF

The following recipients may be/have been bypassed for notice due to an undeliverable (u) or duplicate (d) address.

(u)Brimmer Burek & Keelan, LLP

(u)Caryl E. Delano
Tampa

(u)Hunter-Kelsey of Texas LLC

(u)RBC Capital Markets, LLC, and Meridian Cap

(u)UMB Bank, N.A.

(d)Baxter Construction Company
3225 Avenue N
Fort Madison, IA 52627-3553

End of Label Matrix
Mailable recipients     73
Bypassed recipients      6
Total                   79