UNITED STATES BANKRUPTCY COURT
MIDDLE DISTRICT OF FLORIDA
TAMPA DIVISION
www.flmb.uscourts.gov

IN RE:

SENIOR CARE LIVING VII, LLC,   CASE NO. 8:22-bk-00103-CED
                               Chapter 11
    Debtor.
_____/

**DISCLOSURE STATEMENT FOR DEBTOR'S AMENDED PLAN
UNDER CHAPTER 11 OF THE UNITED STATES BANKRUPTCY CODE**

    The Debtor, SENIOR CARE LIVING VII, LLC, hereby submits this Disclosure Statement in connection with the Debtor's Amended Plan Under Chapter 11 of the United States Bankruptcy Code (the "Plan") of even date in order to disclose that information deemed by it to be material, important and necessary for creditors and other interested parties to use in order to arrive at a reasonably informed decision in exercising the right to vote on the Plan presently filed with the Bankruptcy Court in this case.  Accompanying this Disclosure Statement after it has been conditionally approved by the Bankruptcy Court will be a notice from the Bankruptcy Court setting the date for the hearing on the acceptance of the Plan and the confirmation of the Plan.  The notice will also provide for the last date by which acceptances or rejections of the Plan may be filed, as well as objections to confirmation.  Creditors and interest holders may vote on the Plan by filling out and mailing the ballot which accompanies the approved Disclosure Statement.  Ballots must be filed and received by counsel for the Debtor in accordance with the order setting the time for the filing of ballots.  As a creditor, your vote is important.  The Plan can be confirmed by the Court if it is accepted by the holders of two-thirds in amount and more than one-half in number of the allowed claims of each class of creditors voting on the Plan.  In the event the requisite acceptances are not obtained, the Court may, nevertheless, confirm the

Plan if the Court finds the Plan accords fair and equitable treatment to any class rejecting it. Only classes of creditors whose rights are impaired by the Plan will be able to vote on the Plan. Any classes of creditors that remain unimpaired by the Plan do not vote on the Plan. Creditors and interest holders should consult this Disclosure Statement and the Plan if they fall within an impaired class, and thus would be entitled to vote on the Plan.

Approval of this Disclosure Statement by the Court does not constitute a recommendation by the Court as to the merits of the Plan. The approval only states that the Court has found that the Disclosure Statement provides the information necessary for creditors to use in order to arrive at a reasonably informed decision with respect to the Plan.

NO REPRESENTATIONS CONCERNING THE DEBTOR, PARTICULARLY AS TO THE LIQUIDATION VALUE OF THE BUSINESS OPERATIONS, VALUE OF PROPERTY OR THE VALUE OF ANY PROMISES TO BE MADE UNDER THE PLAN OTHER THAN THOSE SET FORTH IN THIS DISCLOSURE STATEMENT ARE AUTHORIZED BY THE DEBTOR. THE ATTORNEY FOR THE DEBTOR MAKES NO REPRESENTATIONS OTHER THAN THAT THE INFORMATION CONTAINED IN THIS DISCLOSURE STATEMENT IS BELIEVED TO BE CORRECT AT THE TIME OF THE FILING OF THE DISCLOSURE STATEMENT. ANY REPRESENTATIONS OR INDUCEMENTS MADE TO SECURE THE VOTE FOR ACCEPTANCES OF CREDITORS WHICH ARE OTHER THAN AS CONTAINED IN THIS DISCLOSURE STATEMENT SHOULD NOT BE RELIED UPON BY CREDITORS IN ARRIVING AT A DECISION, AND ANY ADDITIONAL REPRESENTATIONS AND INDUCEMENTS SHOULD BE REPORTED TO THE ATTORNEY FOR THE DEBTOR WHO, IN TURN, SHALL DELIVER SUCH

INFORMATION TO THE BANKRUPTCY COURT OR TO THE OFFICE OF THE U.S. TRUSTEE FOR SUCH ACTION AS MAY BE DEEMED APPROPRIATE.

The financial information contained in this Disclosure Statement or any projections thereafter have not been subject to a certified audit. Every effort has been made to present accurate figures in this Disclosure Statement. Unless stated otherwise, the figures set forth herein are the Debtor's best estimate.

## HISTORICAL INFORMATION

Description of Debtor's Business

The Debtor owned an assisted living facility (ALF) located on 9 acres of Class A property in Lewisville, Texas, known as Inspired Living at Lewisville consisting of approximately 123 assisted living beds, 51 memory support beds, and other common areas. The ALF offers assisted living and memory care. The Debtor also owned approximately 4.04 acres of additional undeveloped real property on the main thoroughfare of Lewisville (the "Excess Real Estate").

Location of Debtor's Operations and Whether Leased or Owned

The Debtor's assisted living facility (owned) was located at 1080 W. Round Grove Rd., Lewisville, TX 75067 (northwest of Dallas, TX).

Reasons for Filing Chapter 11

The Debtor's ALF was constructed on time and opened in 2018 and began leasing slightly slower than budgeted. When the COVID pandemic hit, occupancy at the ALF was approximately 55%. At that occupancy, the ALF could not cover all operating expenses and debt service. The COVID pandemic adversely impacted the growth of occupancy at the ALF.

After the widespread distribution of the Covid Vaccine, the occupancy at the Debtor's ALF trended upward and at some point exceeded 82.5%.

Due to the situation, the UMB Bank, N.A., in its capacity as successor bond trustee and successor master trustee (collectively, the "Bond Trustee") lost patience with the development and filed lawsuits in 2021 against the Debtor for the appointment of a receiver and against Bouldin for the full amount owed under the loan/bond documents (approximately $52 million in principal and accrued interest).  On October 28, 2021, the bond trustee obtained a summary judgment against Bouldin in the amount of $52,869,034.38. In connection with lawsuit against the Debtor, the Bond Trustee obtained an order appointing a receiver over the Debtor's ALF and related property on October 11, 2021.  Such order contemplated a sale process with a bid deadline no more than fourteen (14) weeks after the date the receiver was appointed (on or about January 10, 2022).  The receiver never managed the ALF as management has been done by Validus and who continues so manage.

Given the upward trend in occupancy and the expected continuing trend, the Debtor initially believed that the ALF would be able to generate cash flows sufficient to cover operating expenses and market debt service payments at some point the near future.  Accordingly, the Debtor filed chapter 11 to preserve the value of its assets for all creditors, protect its residents, and with the hope of reorganizing the actual secured debt.

<u>List of Current Officers and Directors, Salaries and Benefits</u>

The sole manager of the Debtor is Senior Care Ownership 4, LLC ("SCO4"), a Florida limited liability company located in Largo, Florida. The manager of SCO4 is Mark C. Bouldin. Mr. Bouldin currently receives no salary or benefits from the Debtor. The Debtor's ALF was managed by Validus Senior Living ("Validus") based in Tampa, Florida.

<u>Debtors' Annual Gross Revenues</u>

Approximately $6.7 million (2021).

<u>General Description and Approximate Value of the Debtor's Current Assets</u>

Cash on hand, assisted living facility and related permits, and Excess Land.

<u>Number of Employees and Management of ALF</u>

The Debtor's ALF had approximately 74 employees through its management company, Validus. Validus managed the ALF and handled bookkeeping and administrative functions for the Debtor's ALF from its offices in Tampa, Florida.

## ARTICLE II
## Bankruptcy Filing

The Debtor filed its Chapter 11 case on January 10, 2022. The Debtor filed bankruptcy with the intention of promptly proposing a plan that would preserve the Debtor's assets, minimize any adverse impact on the ALF residents, and reorganize the Debtor's finances. In that regard, the Debtor did not believe at the filing that a sale of the ALF was in the best interests of the creditors or bondholders.

Shortly after the bankruptcy filing, the Bond Trustee filed a motion with the Bankruptcy Court seeking authorization to keep the state court receiver in place. That motion was denied by the Bankruptcy Court. Instead, the Bankruptcy Court granted the Debtor authority to use cash collateral and authority to continue on as a debtor-in-possession. The Debtor's management

company, Validus, remained in place as it did throughout the since-dissolved state court receivership.

**Steps Taken Since Filing to Facilitate Reorganization**

Shortly after the bankruptcy filing, the Debtor sought and obtained authority to employ a real estate broker (Valhalla Real Estate) to sell its Excess Real Estate. The Debtor ultimately received a bona fide offer to purchase the Excess Real Estate and requested the Bankruptcy Court to approve bid procedures.

With the consent of the Debtor, the Office of the United States Trustee appointed Mary L. Peebles, as patient care ombudsman in this case. On April 14, 2022, Ms. Peebles issued her report on the quality of patient care at the Debtor's ALF opining that management at all levels have been cooperative, honest and forthright, and that patient care is at an acceptable level.

The Debtor filed a motion to direct payment of the 2020 real estate taxes from the debt service reserve held by the Bond Trustee which was granted by the Bankruptcy Court. The Bond Trustee paid the 2020 real estate taxes from the debt service reserve.

The Debtor has timely filed its monthly operating reports and provided requested information to the Bond Trustee. Moreover, the Debtor has engaged in active negotiations with the Bond Trustee concerning the treatment of the bondholder debt, including sale of the Debtor's assets.

The Debtor sought and obtained authority to employ SC&H as financial advisor to assist the Debtor with potential new financing. The Debtor negotiated a term sheet with a lender that was anticipated to immediately provide as much as $35 million to the Bondholders. The Debtor ultimately filed a motion to approve post-petition lending and a motion to approve compromise

with the Bond Trustee. However, the proposed lending fell through and such motions were withdrawn.

In August 2022, the Debtor and Bouldin reached an agreement with the Bond Trustee to cooperate with a sale of the Debtor's assets, both the ALF and the Excess Real Estate. On August 19, 2022, the Debtor filed an Emergency Motion For Order Approving Compromise with UMB Bank, N.A., As Trustee (Doc. 175 – the "Compromise Motion"). A copy of the proposed Settlement Agreement between and among the Debtor, Bouldin and the Bond Trustee was attached to the Compromise Motion. Baxter Construction objected to the Compromise Motion and the Settlement Agreement expressing concerns about the scope of the release in favor of the Bond Trustee. The US Trustee expressed similar concerns. In response, the Debtor, in consultation with the Bond Trustee, proposed a revised Settlement Agreement to Baxter Construction and the US Trustee with a much narrower release in favor of the Bond Trustee. Despite the revised settlement, Baxter Construction continued with its objections and the Compromise Motion remains pending at this time.

Notwithstanding the fact that the Compromise Motion had not yet been approved, the Debtor and Bouldin complied with their obligations under the Settlement Agreement, including revising the Debtor's previously filed motion to approve bid procedures and filing an application to approve the retention of the Bond Trustee's chosen investment banker as the Debtor's investment banker/broker. Moreover, in furtherance of the proposed settlement, the Debtor obtained an order approving bid procedures as supplied by the Bond Trustee and an order approving the retention of RBC Capital Markets, LLC ("RBC"). Over the following months, the Debtor and Bouldin implemented the bid procedures and cooperated with RBC and the Bond Trustee in connection with the marketing and sale of the Debtor's real property. The Debtor also

filed a motion to approve sale of the Debtor's real property in a form acceptable to the Bond Trustee.

The agreed-upon process led to stalking horse contracts on both the ALF and the Excess Real Estate at prices acceptable to the Bond Trustee. There were no overbids on the stalking horse contracts and an auction was not conducted. By Sale Orders dated December 27, 2022, the Bankruptcy Court approved the sale of the ALF and related assets to Phorcys Asset Management, LLC ("Phorcys"), for a price of $28 million, and the sale of the Excess Real Estate to MPH Partners, LLC ("MPH"), for a price of $1,683,445. The Sale Orders contemplate that all proceeds of sale will be held in a separate account pending further order of the Bankruptcy Court.

The closing on the Excess Real Estate occurred in April 2023. In the meantime, Phorcys did not close on the ALF and the Debtor declared Phorcys in default. Subsequently, Phorcys negotiated a reduced price of $26 million on the ALF with the Bond Trustee. The closing on the ALF occurred in July 2023. As a result of the closings, the Debtor received approximately $26,560,232.14 in the special DIP account required under the Sale Orders.

Subsequently, the Debtor and Mr. Bouldin reached a revised settlement with the Bond Trustee concerning the distribution of the sale proceeds and other collateral of the Bond Trustee, including the creation of a fund for distribution to unsecured creditors. In furtherance of the revised settlement, the Bond Trustee filed a Motion for Entry of an Order Authorizing the Distribution of the Proceeds of Sale of the Debtor's Assets (Doc. 372 – the "Distribution Motion"), and the Debtor filed (or will file) an Amended Motion for Order Approving Compromise with UMB Bank, N.A., as Trustee (the "Amended Compromise Motion"). A copy

of the revised Settlement Agreement between and among the Debtor, Bouldin and the Bond Trustee is attached to the Amended Compromise Motion.

## ARTICLE III
## The Plan of Reorganization

Accompanying this Disclosure Statement is a copy of the Plan of Reorganization filed by the Debtor.  ***The Plan should be read carefully as it constitutes the basis for the modification of the Debtor's rights between the Debtor and its creditors***, and if any questions as to interpretation should arise, the terms and conditions of the Plan prevail.

The Plan classifies creditors and equity into classes.  The unclassified claimants and numbered classes are as follows:

ADMINISTRATIVE EXPENSES.  Costs and expenses of administration as defined in the Code as provided in Section 507(a)(1) of the Code, applications for which are filed prior any applicable bar date, as the same are allowed, approved and ordered paid by final, non-appealable order of the Court.  Parties requesting administrative expense priority status must make appropriate application to the Court.  Fees of Debtor's counsel for time through June 30, 2023, have already been paid pursuant to orders of the Bankruptcy Court.  Pursuant to the settlement with the Bond Trustee, Mr. Bouldin is responsible for professional fees after July 1, 2023.

PRIORITY CLAIMS.  Claims entitled to priority pursuant to Section 507(a) of the Code, as the same are allowed, approved or ordered paid by the Court, excluding any claims that are separately classified.  The IRS filed an amended claim (Claim 3-2) for estimated FUTA taxes totaling $2,219, but the claim was subsequently amended to $-0-.

Class 1:  The Allowed Secured Claim relating to the Series A and B Bonds/Notes based on the Series 2016A Bonds and the Series 2016B Bonds and related notes issued pursuant to the bond documents.  The Bond Trustee has filed a single proof of claim in the amount of

$54,060,936.15, which includes the debts evidenced by the Bonds/Notes. The original principal amounts of the Series 2016A Bonds are as follows: Series 2016A-1 - $35,925,000; Series 2016A-2 - $2,550,000; and Series 2016A-3 - $1,915,000. The original principal amount of the Series 2016B Bonds is $4,990,000. The Bond Trustee has a lien on all assets of the Debtor, including the Sale Proceeds and cash on hand.

<u>Class 2</u>: All Allowed Unsecured Claims against the Debtor, including the deficiency claim on the bond debt in the approximate amount of $28 million and the disputed claims filed by Baxter Construction Company ("Baxter") totaling $3,011,041.

<u>Class 3</u>: All Equity Interest Holders of the Debtor. The current equity interest holders of the Debtor are Senior Care Ownership 4, LLC (90%) and Dallas 16, LLC (10%).

**<u>Treatment of the creditors and equity interest holders is set forth in Article 5 of the Plan.</u>**

## ARTICLE IV
### Means for Effecting the Plan – Sales and Settlement and Releases

Payments and distributions under this Plan will be funded from proceeds of the sales of the Debtor's ALF and Excess Real Estate (to the extent not already distributed), any cash on hand, and the Bouldin Payment.

Incorporated into the Plan, to the extent necessary, is the settlement between and among the Debtor, Bouldin and the Bond Trustee **that provides for a comprehensive release of the Bond Trustee** conditioned upon the Bond Trustee's support of the Plan and other consideration. Parties should review the Plan and the Amended Compromise Motion for the terms of the settlement and the releases. The Debtor and Bouldin have complied with all aspects of the

settlement notwithstanding the fact that no settlement has yet to be approved. To the extent necessary, the Sale Orders will also be incorporated into the Plan.

**MOREOVER, THE PLAN CONTAINS SIGNIFICANT RELEASE PROVISIONS. PLEASE REVIEW THE SPECIFIC PROVISIONS OF THE PLAN FOR SPECIFIC INFORMATION ON THE NATURE AND SCOPE OF THE RELEASES.**

## ARTICLE V
## FEDERAL TAX CONSEQUENCES OF PLAN

The Debtor is unable to assess the tax consequences of the Plan with respect to creditors or equity security holders, and each party in interest is referred to their respective tax advisors with respect to their individual tax consequences under the Plan.

## ARTICLE VI
### Financial Performance and Claims

The Debtor's monthly operating reports, showing the performance of the Debtor's ALF during chapter 11, are available in the Bankruptcy Court file (Doc. Nos. 95, 98, 109, 127, 143, 155, 179, 199, 203, 223, 249, 282, 290, 306, 322, 331, 347, and 364). No liquidation analysis is attached as this is effectively a liquidating plan. The Debtor received approximately $26,560,232.14 in sales proceeds into the special DIP account. These funds will be distributed pursuant to an order of the Bankruptcy Court on the Distribution Motion. The Debtor is holding approximately $827,290 in its regular DIP account. Pursuant to the Amended Compromise Motion, Mr. Bouldin will pay $200,000 for a release from the Bond Trustee and such funds will be used for making distribution to unsecured creditors under a confirmed plan. If the Plan is not confirmed, the funds will be paid to the Bond Trustee.

The Debtor has not thoroughly investigated any avoidance claims but is not aware of any such claims. In the months immediately prior to the bankruptcy filing, a receiver was in place over the Debtor's assets. Accordingly, typical avoidance claims would not exist. Baxter has suggested that it or the Debtor may have claims against the Bond Trustee. Baxter has conducted some discovery on claims involving the Bond Trustee. Generally, the Debtor understands that the suggested claims involve disbursement of bond proceeds under the Bond Documents. Disbursement documents and other bond-related documents can be found on the Electronic Municipal Market Access (EMMA) website. The Debtor is uncertain as to the value of any such claims. Baxter describes the potential claims as follows:

### Potential Claims against the Bond Trustee and Construction Monitor

The Debtor may have claims against the Bond Trustee pursuant to the *Trust Indenture and Security Agreement* (the "Bond Indenture") with respect to those certain Senior Housing Revenue Bonds (Inspired Living at Lewisville Project) Series 2016 (the "Bonds"), *Master Trust Indenture, Deed of Trust and Security Agreement* and the *Loan Agreement between Woodloch Health Facilities Development Corporation and Senior Care Living VII, LLC,* and against LM Consultants, Inc. (the "Construction Monitor") and the Bond Trustee arising out of the *Construction Disbursement and Monitoring Agreement by and among Senior Care Living VII, LLC, LM Consultants, Inc.* and Branch Banking and Trust Company (the "Construction Monitoring Agreement"), all dated as of November 1, 2016. The Debtor's claims against the Bond Trustee may be affirmative claims or claims of setoff against the Bond Trustee Claim. The claims against the Construction Monitor would be affirmative claims.

Pursuant to the *Estimated Sources of and Uses of Funds*, $31,385,890.83 of the Bonds (Bond 1, Bond 2 and Bond 3) could only be used for the Project Fund and no other purpose (only Qualified Costs of the Project, and not operating or general administrative expenses of the Debtor). Under the Bond Indenture, a special trust fund for the Project Fund was created and ordered to be established in the custody of the Bond Trustee and held by the Bond Trustee in trust and only applied in accordance with the Bond Indenture, and not comingled. Amounts in the Project Fund could only be used and withdrawn by the Bond Trustee to pay Qualified Costs of the Project.

The Debtor engaged Baxter Construction Company, LLC ("Baxter") as the general contractor for the Project. Based upon information and belief, which

Baxter claims it relied upon, the Project Fund was intended to be adequate to cover the Qualified Costs of the Project, including amounts owed to Baxter. Nevertheless, the Project Fund was ultimately insufficient to cover the Qualified Costs of the Project in an amount which is at least as much as the claims asserted by Baxter against the Debtor (the "Project Fund Shortfall").  *See*, Baxter's Proof of Claim 6 and 7 filed on March 21, 2022.

While the subject of ongoing discovery, the Project Fund Shortfall may be a result of either or both of (i) the Bond Trustee's breach of its duties under the Bond Indenture for failing to, among other things, properly administer the Project Fund by disbursing funds for purposes which were not Qualified Costs of the Project or otherwise permitted; and (ii) the Construction Monitor's breach of its duties under the Construction Monitoring Agreement for failing to, among other things, properly administer the Debtor's Disbursement Requests for permitted purposes in accordance with the Monitoring Agreement.

The above information is not the Debtor's statement of position and is provided for informational purposes. The Bond Trustee denies any liability for the claims. Importantly, the Debtor entered into a Forbearance Agreement with the Bond Trustee in February 2020 through which the Debtor released the Bond Trustee of any and all claims.

## Alternatives to the Plan

The alternatives to the Plan are dismissal of the bankruptcy case or conversion of the case to a chapter 7 liquidation. Given the status of the sales process and other matters as approved by the Bankruptcy Court, neither appears to be a necessary nor preferred option in this case. Dismissal is of no benefit to the parties. Conversion to chapter 7 would require a chapter 7 trustee to distribute funds with payment of a statutory commission pursuant to the Bankruptcy Code.

## CONCLUSION

The Debtor believes that it is in the best interests of all Creditors to confirm the Plan.

**THE DEBTOR RECOMMENDS ACCEPTANCE OF THE PLAN**.

Dated: September 15, 2023

/s/ Michael C. Markham
Michael C. Markham
JOHNSON, POPE, BOKOR, RUPPEL & BURNS, LLP
401 E. Jackson St., Suite 3100
Tampa, FL 33602
(727) 480-5118
mikem@jpfirm.com
Attorney for Debtor

9045618_1